JENNER & BLOCK LLP
JULIE A. SHEPARD (SBN 175538)
JShepard@jenner.com
ANDREW G. SULLIVAN (SBN 301122)
AGSullivan@jenner.com
SATI HARUTYUNYAN (SBN 313138)
SHarutyunyan@jenner.com
EFFIONG K. DAMPHA (SBN 323554)
EDampha@jenner.com
633 West 5th Street Suite 3600
Los Angeles, CA 90071-2054
Telephone:    (213) 239-5100
Facsimile:    (213) 239-5199

GIANNI P. SERVODIDIO (*pro hac vice to be submitted*)
gps@jenner.com
919 Third Avenue
New York, NY 10022-3908
Telephone: (212) 891-1600
Facsimile: (212) 891-1699

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| COLUMBIA PICTURES INDUSTRIES, INC.; AMAZON CONTENT SERVICES, LLC; DISNEY ENTERPRISES, INC.; PARAMOUNT PICTURES CORPORATION; WARNER BROS. ENTERTAINMENT INC.; UNIVERSAL CITY STUDIOS PRODUCTIONS LLLP; UNIVERSAL TELEVISION LLC; and UNIVERSAL CONTENT PRODUCTIONS LLC, | Case No. 2:20-cv-03129-JAK-GJS **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** Judge: Hon. John A. Kronstadt |
| Plaintiffs, | Date: May 11, 2020 Time: 8:30 a.m. Courtroom: 10B |
| v. | |
| ALEJANDRO GALINDO and DOES 1-20, | Filed concurrently herewith: (1) Declaration of Kevin Plumb (2) Declaration of Jan Van Voorn (3) Declaration of Sean Jaquez |
| Defendants. | (4) Declaration of Julie Shepard (5) [Proposed] Preliminary Injunction |
| | Trial Date: None Set |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on May 11, 2020, at 8:30 a.m., or as soon thereafter as counsel may be heard,[1] before the Honorable John A. Kronstadt, in Courtroom 10B of the United States District Court for the Central District of California, located at First Street Courthouse, 350 W. First Street, Los Angeles, California 90012, Plaintiffs Columbia Pictures Industries, Inc., Amazon Content Services, LLC, Disney Enterprises, Inc., Paramount Pictures Corporation, Warner Bros. Entertainment, Inc., Universal Studios Productions LLLP, Universal Television LLC, and Universal Content Productions LLC (collectively, "Plaintiffs") will and hereby do move for a Preliminary Injunction:

(i) enjoining Defendant Alejandro Galindo ("Galindo" or "Defendant"), and all individuals acting in concert or participation or privity with him, from publicly performing, reproducing, distributing, or otherwise infringing in any manner (including without limitation by materially contributing to or intentionally inducing the infringement of) any right under the Copyright Act in any of their copyrighted works, including without limitation by publicly performing or reproducing those Works, or by distributing any software or providing any service or device that does or facilitates any of the foregoing acts; and

(ii) enjoining the respective domain name registrars for the TekkHosting.com and NitroIPTV.com domain names from allowing these domains to be modified, sold, transferred to another owner, or

---

[1] Plaintiffs have commenced this action and served this Motion to put Defendants on notice of their claims and to seek preliminary injunctive relief from the Court pending adjudication of those claims. However, without waiver or prejudice as to their assertion that the requested preliminary relief is necessary to prevent irreparable harm to their intellectual property rights, Plaintiffs defer to the Court as to the proper time at which this Motion may be heard in light of the exigent circumstances and limitations on judicial resources created by the current COVID-19 public health emergency.

deleted, and also requiring them to disable access to TekkHosting.com and NitroIPTV.com.

This Motion is based upon this Notice of Motion and Motion; the attached Memorandum of Points and Authorities; the Declarations of Kevin Plumb ("Plumb Decl."), Jan van Voorn ("Van Voorn Decl."), Sean Jaquez ("Jaquez Decl."), and Julie Shepard ("Shepard Decl.") and Exhibits thereto; all documents on file in this action; and such further or additional evidence or argument as may be presented before or at the time of the hearing on this Motion.

Dated:  April 3, 2020                    JENNER & BLOCK LLP


                                        By:  */s/ Julie Shepard*
                                             Julie Shepard
                                             *Attorneys for Plaintiffs*

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................. 1

II.   FACTUAL BACKGROUND ............................................................... 2

   A.  Plaintiffs And Their Copyrighted Works.................................... 2

   B.  Defendant's Infringing IPTV Service ......................................... 3

   C.  How Nitro TV Works................................................................. 4

   D.  Defendant's Growing Reseller Network...................................... 6

III.  ARGUMENT ...................................................................................... 7

   A.  Plaintiffs Are Likely To Succeed On The Merits. ...................... 7

      1.  Defendant Directly Infringes Plaintiffs' Copyrighted Works. ............. 7

         (a)   Defendant Publicly Performs Plaintiffs' Copyrighted Works................................................................................. 8

         (b)   Defendant Reproduces Plaintiffs' Copyrighted Works................ 9

      2.  Defendant Is Liable For Secondary Infringement. ............................. 11

         (a)   Defendant Is Liable For Knowingly And Materially Contributing To Infringement. ................................................... 11

            (i)    Defendant Has Knowledge Of Infringement. .................... 11

            (ii)   Defendant Materially Contributes To Infringement. ......... 15

         (b)   Defendant Is Liable For Inducing Infringement........................ 16

            (i)    Defendant Distributes An Infringing Service. ................... 16

            (ii)   Defendant Acts with the Object To Promote Infringement. ....................................................................... 16

            (iii)  Defendant Causes Infringement. ....................................... 19

   B.  Plaintiffs Will Suffer Irreparable Harm Absent An Injunction. ............... 19

C.   The Balance Of Hardships Tips Sharply In Plaintiffs' Favor And
        An Injunction Would Servce The Public Interest. ................................... 22

D.   Temporarily Disabling Defendant's Websites Is Warranted. ................... 23

IV.   CONCLUSION ................................................................................................. 25

MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*A&M Records, Inc. v. Napster, Inc.*,
239 F.3d 1004 (9th Cir. 2001)..................................................................7, 8, 15

*Am. Broad. Companies, Inc. v. Aereo, Inc.*,
573 U.S. 431 (2014) ..................................................................................8, 9

*Amazon Content Servs., LLC v. Set Broad., LLC*,
No. 2:18-cv-03325-MWF-AS, Dkt. 59 (C.D. Cal. July 31, 2019) .....................6

*Apple Inc. v. Psystar Corp.*,
673 F. Supp. 2d 943 (N.D. Cal. 2009) ..............................................................22

*Arista Records LLC v. Lime Group LLC*,
No. 06 CV 5936 (KMW), 2011 WL 1641978 (S.D.N.Y. Apr. 29,
2011)..................................................................................................................9

*Arista Records, LLC v. Tkach*,
122 F. Supp. 3d 32, 33, 36 (S.D.N.Y. 2015)......................................................24

*Arista Records LLC v. Usenet.com, Inc.*,
633 F. Supp. 2d 124 (S.D.N.Y. 2009)................................................................9

*Cadence Design Sys., Inc. v. Avant! Corp.*,
125 F.3d 824 (9th Cir. 1997)..............................................................................22

*China Cent. Television v. Create New Tech. (HK) Ltd.*,
No. CV 15-01869-MMM-MRWX, 2015 WL 3649187 (C.D. Cal.
June 11, 2015)....................................................................................................19

*Columbia Pictures Indus., Inc. v. Fung*,
710 F.3d 1020 (9th Cir. 2013)........................................................16, 17, 18, 19

*Dish Network LLC v. Dillion*,
No. 12CV157 BTM NLS, 2012 WL 368214 (S.D. Cal. Feb. 3,
2012)..................................................................................................................24

*Disney Enterprises, Inc. v. VidAngel, Inc.*,
224 F. Supp. 3d 957, 970-71 (C.D. Cal. 2016), *aff'd*, 869 F.3d 848
(9th Cir. 2017) ..................................................................................9, 11, 13, 23

*Disney Enterprises, Inc. v. VidAngel Inc.*,
    No. 2:16-cv-04109-AB-PLA, Dkt. 520 (C.D. Cal. Sept. 5, 2019)....................13

*Eldred v. Ashcroft*,
    537 U.S. 186 (2002) ............................................................................23

*Elsevier Inc. v. Stew Yee Chew*,
    2019 U.S. Dist. LEXIS 196 (S.D.N.Y. Jan. 2, 2019)..........................13

*Erickson Prods., Inc. v. Kast*,
    921 F.3d 822 (9th Cir. 2019)....................................................... 11, 12

*Fonovisa, Inc. v. Cherry Auction, Inc.*,
    76 F.3d 259 (9th Cir. 1996) ...............................................................15

*Fox Television Stations, Inc. v. BarryDriller Content Sys., PLC*,
    915 F. Supp. 2d 1138 (C.D. Cal. 2012)....................................9, 19, 21

*Kelly v. Primco Mgmt., Inc.*,
    No. CV-14- 07263 BRO, 2015 WL 10990368 (C.D. Cal. Jan. 12,
    2015) ...............................................................................................23

*Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*,
    658 F.3d 936 (9th Cir. 2011) .............................................................12

*Luvdarts, LLC v. AT & T Mobility, LLC*,
    710 F.3d 1068 (9th Cir. 2013) ...........................................................14

*MAI Sys. Corp. v. Peak Computer, Inc.*,
    991 F.2d 511 (9th Cir. 1993) ...............................................................9

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
    545 U.S. 913 (2005) .....................................................................16, 17

*Nat'l Football League v. PrimeTime 24 Joint Venture*,
    211 F.3d 10 (2d Cir. 2000). ..................................................................8

*Netflix et al. v. Dragon Media Inc. et al.*,
    No. 2:18-cv-00230-MWF-AS, Dkt. 72 (C.D. Cal. January 29,
    2020)...............................................................................................12

*Paramount Pictures Corp., et al. v. Omniverse World Television, Inc.*,
    No. 2:19-cv-01156-DMG-PJWx, Dkt. 60 (C.D. Cal. November 14,
    2019) ............................................................................................. 1, 6

*Perfect 10, Inc. v. Amazon.com, Inc.*,
  508 F.3d 1146 (9th Cir. 2007) ........................................................................ 15

*Perfect 10, Inc. v. Visa Int'l Serv., Ass'n*,
  494 F.3d 788 (9th Cir. 2007) .......................................................................... 11

*Salinger v. Colting*,
  607 F.3d 68 (2d Cir. 2010) .............................................................................. 19

*Screen Gems–Columbia Music, Inc. v. Mark–Fi Records, Inc.*,
  256 F. Supp. 399 (S.D.N.Y. 1966) .................................................................. 14

*Sega Enters. v. Accolade, Inc.*,
  977 F.2d 1510 (9th Cir. 1992) ......................................................................... 11

*Showtime Networks Inc. v. Doe*,
  No. 2:15-CV-03147-GW-MRW, 2015 WL 12646501 (C.D. Cal.
  Apr. 30, 2015) ................................................................................................. 24

*Solid Host, NL v. Namecheap, Inc.*,
  652 F. Supp. 2d 1092 (C.D. Cal. 2009) *abrogated on other
  grounds by Petroliam Nasional Berhad v. GoDaddy.com, Inc.*, 737
  F.3d 546 (9th Cir. 2013) .................................................................................. 13

*Ticketmaster L.L.C. v. RMG Techs., Inc.*,
  507 F. Supp. 2d 1096 (C.D. Cal. 2007) ........................................................... 21

*Tiffany Design, Inc. v. Reno–Tahoe Specialty, Inc.*,
  55 F. Supp. 2d 1113 (D. Nev. 1999) ................................................................ 11

*Triad Sys. Corp. v. Se. Exp. Co.*,
  64 F.3d 1330 (9th Cir. 1995), *superseded by statute on other
  grounds* ........................................................................................................... 22

*TVB Holdings USA Inc. v. Enom Inc.*,
  No. SACV13624JLSDFMX, 2014 WL 12569432 (C.D. Cal. Apr.
  22, 2014) ......................................................................................................... 24

*Unicolors, Inc. v. Urban Outfitters, Inc.*,
  853 F.3d 980 (9th Cir. 2017) ........................................................................... 14

*Universal City Studios Prods. LLLP v. TickBox TV LLC*,
  No. CV 17-7496-MWF (ASX), 2018 WL 1568698 (C.D. Cal. Jan.
  30, 2018) ....................................................................................................... 9, 13

*VHT, Inc. v. Zillow Grp., Inc.,*
    918 F.3d 723 (9th Cir. 2019) ............................................................................ 11

*Warner Bros. Entm't Inc. v. WTV Sys., Inc.,*
    824 F. Supp. 2d 1003 (C.D. Cal. 2011) ................................................... passim

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ............................................................................................. 22

*WPIX, Inc. v. ivi, Inc.*, 691 F. 3d 275 (2d Cir. 2012) ....................................... 19, 20

**STATUTES**

17 U.S.C. § 106 ................................................................................................ passim

17 U.S.C. § 117 ....................................................................................................... 22

17 U.S.C. § 410 ......................................................................................................... 7

17 U.S.C. § 502 ......................................................................................................... 7

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Defendant Alejandro Galindo ("Defendant" or "Galindo") owns and operates Nitro TV, an unauthorized online streaming service engaged in mass-scale copyright infringement on an ongoing basis. Defendant's service offers a collection of thousands of live and title-curated television channels illegally streamed on Nitro TV twenty-four hours a day, seven days a week, throughout the United States and abroad, to anyone willing to pay a $20 per-month subscription fee. The channels made available without authorization on Nitro TV feature many of the world's most popular television programs and motion pictures such as *The Office*, *Spider-Man: Homecoming*, *Frozen 2*, *Star Trek Beyond*, *Homecoming*, and *Joker*, including works whose copyrights Plaintiffs own or exclusively control ("Copyrighted Works") and which are being streamed without their authority.

In short, Nitro TV is an illegal commercial enterprise designed, architected, and operated by Defendant to profit from the infringement of Plaintiffs' Copyrighted Works. Moreover, to broaden the reach of Nitro TV and increase the ill-gotten profits derived from this infringing service, Defendant has developed a rapidly growing network of resellers who sell and aggressively market subscriptions to Nitro TV.[2]

Nitro TV inflicts irreparable harm on Plaintiffs' businesses by eroding the legitimate marketplace for access to Plaintiffs' Copyrighted Works. That harm has intensified with the recent expansion of Defendant's illicit operations. Plaintiffs request a preliminary injunction be entered enjoining further infringement of their Copyrighted Works by Defendant and those acting in concert with him.

The elements necessary for entry of a preliminary injunction are easily met

---

[2] This increase in Nitro TV resellers appears to coincide with Plaintiffs' successful action in this Court to stop another infringing streaming service, resulting in that service being permanently enjoined in the fall of 2019. *See Paramount Pictures Corp., et al. v. Omniverse World Television, Inc.*, No. 2:19-cv-01156-DMG-PJWx, Dkt. 60 (C.D. Cal. November 14, 2019); *see also* Van Voorn Decl., ¶¶ 5, 34, 47.

here. *First*, Plaintiffs are likely to succeed on the merits because Defendant operates Nitro TV in blatant violation of Plaintiffs' exclusive public performance and reproduction rights in the Copyrighted Works. *See* Section III.A.1, *infra*. And, to the extent Defendant may claim he is only facilitating access to infringing streams originating from third parties, he remains secondarily liable for infringement. *See* Section III.A.2, *infra*. In both cases, Defendant's actions constitute infringement.

*Second*, the balance of hardships sharply tips in Plaintiffs' favor and issuing an injunction would be in the public interest. The ongoing and threatened harms suffered by Plaintiffs are irreparable, and outweigh the harm, if any, that may result from enjoining Defendant's transparently illegal business operation. *See* Section III.B, *infra*. An injunction is also in the public interest, which favors the protection of copyright interests against illicit commercial exploitation. *See* Section III.C, *infra*.

Plaintiffs respectfully request the Court issue the proposed preliminary injunction enjoining Defendant, and those acting in concert with him, from further infringing Plaintiffs' Copyrighted Works, and freezing the transfer of the identified domain names instrumental in propagating Defendant's infringing service.

## II.    FACTUAL BACKGROUND

### A.    Plaintiffs And Their Copyrighted Works

Plaintiffs, either directly or indirectly through their affiliates, produce and distribute a significant portion of the world's most popular television programs and motion pictures. Jaquez Decl., ¶ 14. They also own or hold the exclusive U.S. rights (among others) to reproduce, distribute, and publicly perform the Copyrighted Works, including by means of streaming those works over the Internet to the public. Declaration Sean Jaquez ("Jaquez Decl."), ¶¶ 4-10, 17, 21, 37-38; Declaration of Jan van Voorn ("Van Voorn Decl."), Ex. 16.

Plaintiffs, either directly or indirectly through their affiliates, authorize the legitimate distribution and public performance of the Copyrighted Works in various formats and through multiple distribution channels, including through cable and

2

direct-to-home satellite services, through authorized Internet video-on-demand ("VOD") services, and through authorized Internet or over-the-top ("OTT") streaming services, among other distribution channels. Jaquez Decl., ¶¶ 4, 6.

Plaintiffs have invested and continue to invest substantial resources and effort each year to develop, produce, distribute, and publicly perform Plaintiffs' Copyrighted Works. Jaquez Decl., ¶ 5. Plaintiffs also expend considerable effort and resources to address the unlawful infringement of their Copyrighted Works, including by bringing lawsuits against infringing parties. *See* Jaquez Decl., ¶ 12.

**B.    Defendant's Infringing IPTV Service**

Defendant Galindo—in concert with other individuals—owns and operates the Internet Protocol television ("IPTV") service commonly referred to as Nitro TV. Declaration of Kevin Plumb ("Plumb Decl."), Exs. 1-9; Van Voorn Decl., ¶¶ 9-11, Ex. 10. In exchange for subscription fees, Nitro TV subscribers are provided unauthorized access to an array of thousands of live and title-curated television channels that are streamed twenty-four hours a day, seven days a week on the web-based Nitro TV platform as well as the Nitro TV application for use on mobile phones and smart TVs (collectively the "Nitro TV Platforms"). Van Voorn Decl., ¶¶ 20-23. Thousands of hours of copyrighted content, including Plaintiffs' Copyrighted Works, are made available to Nitro TV subscribers daily via Nitro TV, without authorization from the relevant copyright holders. Jaquez Decl., ¶¶ 13-14; Van Voorn Decl., ¶¶ 7, 19, 29, Ex. 16.

To market and promote the Nitro TV Platforms and the availability of subscriptions, Galindo created and acted as an administrator of the Nitro TV Official Facebook group, www.facebook.com/groups/Nitroiptv/ ("Nitro TV Facebook Group"). Plumb Decl., ¶¶ 6-7, Ex. 1. Among other things, as reflected in the following post, Galindo used the Nitro TV Facebook Group to: inform subscribers of Nitro TV's new channels and program offerings; provide subscribers updates about the Nitro TV Platforms; and invite subscribers to request TV shows they

3

wanted added to Nitro TV. Plumb Decl., ¶¶ 8-9, Ex. 3.[3]



Galindo has also used the Nitro TV Facebook Group as a vehicle to advise subscribers how to hide their infringing activity. Plumb Decl., ¶ 10, Ex. 6.

**C.    How Nitro TV Works**

The website TekkHosting.com is part of Nitro TV's "back-end" support; it is the primary interface through which users receive access credentials to the Nitro TV Platforms and receive answers to technical questions about the infringing service. Van Voorn Decl., ¶¶ 17-18, 20-21, Exs. 12, 13, 14; Plumb Decl., Exs. 3, 9. To obtain credentials allowing access to the Nitro TV Platforms, a subscriber must either purchase a subscription directly through TekkHosting.com,[4] or from a Nitro TV reseller who has purchased so-called Nitro TekkHosting Reseller Credits through

---

[3] Plaintiffs only became aware of the infringing Nitro TV service, which Galindo apparently started in 2017, long after this post by Galindo, which was located during the course of investigating the Nitro TV service. Van Voorn Decl., ¶ 8, n.1.

[4] At times, the Nitro TV service on-boarded new subscribers through the use of other domain names, such as NitroIPTV.com. Plumb Decl., ¶ 12, Exs. 1, 6 and 9.

TekkHosting.com, as explained further below. Van Voorn Decl., ¶¶ 17-18, 20-21, 30, Exs. 12, 17; Plumb Decl., Exs. 3, 9; *see* Section II.D, *infra*.[5]

Nitro TV subscriptions typically sell for $20 per month for two devices. Van Voorn Decl., ¶ 18. Upon paying the monthly subscription fee, a new subscriber receives an email within approximately 24 hours providing Nitro TV credentials and a link to the Nitro TV application (the "App") for them to download onto one or more devices (e.g., laptop or Android phone). Van Voorn Decl., ¶¶ 20-21. Upon downloading the App and launching one of the Nitro TV Platforms, Nitro TV subscribers have been greeted by the message: "Enjoy the best television channels with the best IPTV App!" Van Voorn Decl., ¶ 22, Ex. 15. And, as reflected by the screenshot below, they are provided with an organized and user-friendly interface through which they are able to stream thousands of live and title-curated television channels. Van Voorn Decl., ¶¶ 22-28.



---

[5] These sales include transactions with Nitro TV resellers and subscribers located in California, who are able to watch Nitro TV in California. Van Voorn Decl., ¶¶ 19, 32. Galindo has also transacted business with California companies, such as Facebook, in the promotion and marketing of Nitro TV. Plumb Decl., Exs. 1-8.

The copyrighted content streamed and reproduced without authorization on the Nitro TV Platforms includes numerous Copyrighted Works of Plaintiffs, such as *The Office*, *Spider-Man: Homecoming*, *Toy Story 3*, *Star Trek Beyond*, *Homecoming*, and *Joker*. Van Voorn Decl., ¶ 29, Ex. 16.

**D.    Defendant's Growing Reseller Network**

Defendant has expanded the scope of the Nitro TV unlawful commercial enterprise by creating and growing a network of resellers who market and promote Nitro TV to attract new subscribers to the illegal service. Van Voorn Decl., ¶ 30, Ex. 17. These resellers buy "TekkHosting Nitro Reseller Credits" that may be exchanged for Nitro TV subscriber credentials and, in turn, they market and sell Nitro TV subscriptions. *Id*. Volume discounts incentivize resellers to buy large quantities of credits and boost their subscription sales. *Id.*, ¶ 31, Ex. 17.

Nitro TV resellers have promoted Nitro TV as a substitute for authorized and licensed distributors (e.g., cable television providers, OTT streaming services). Van Voorn Decl., ¶ 33, Ex. 19. For example, Nitro TV is marketed as "simply the best and most reliable streaming service on the market, featuring over 2,500 HD streams." Shepard Decl., ¶ 4, Ex. 29. Users can access "NFL, NHL, MLB, NBA, Soccer, UFC & PPV," "24/7 Channels and Premium Movies," "US Regionals," "Fitness, Music, Latino, Spanish, and more!" *Id*, Ex. 30.

Defendant's network of resellers appears to be rapidly growing in part due to Plaintiffs' enforcement actions against other similar illegal services. For example, in the last few months, Plaintiffs obtained a permanent injunction against Omniverse, another infringing IPTV service. *See Omniverse*, No. 2:19-cv-01156-DMG-PJWx, Dkt. 60.[6] More than 25 new Nitro TV reseller websites have appeared since around

---

[6] Before Omniverse, Plaintiffs obtained permanent injunction against Setvnow (hereinafted, "Set TV Now"), yet another illicit service similar to Nitro TV. *See Amazon Content Servs., LLC v. Set Broad., LLC*, No. 2:18-cv-03325-MWF-AS, Dkt. 59 (C.D. Cal. July 31, 2019).

the time this injunction issued, apparently to address the vacuum for services in this illicit market created by the Omniverse shutdown. Van Voorn Decl., ¶ 34.

Nitro TV is well-positioned to continue to receive an influx of new subscribers now that Omniverse and Set TV Now have been shuttered. Indeed, the recent increase in Nitro TV resellers appears to be linked to these changed market conditions and provides further support for the need for immediate relief. Each Nitro TV reseller substantially increases the size of Defendant's infringing enterprise. Indeed, one reseller recently boasted about the success of his reselling efforts: "Over 45,000 customers activated in the last 12 months." Shepard Decl., ¶ 4, Ex. 28.

## III.   ARGUMENT

The Copyright Act authorizes courts to grant injunctive relief "to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a). A preliminary injunction is called for here as Plaintiffs have established: (1) they are likely to succeed on the merits of their claims for copyright infringement; (2) they will suffer irreparable harm absent injunctive relief; (3) the balance of hardships tips in their favor; and (4) injunctive relief is in the public interest. *See A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001).

**A.    Plaintiffs Are Likely To Succeed On The Merits.**

**1.    Defendant Directly Infringes Plaintiffs' Copyrighted Works.**

Plaintiffs will succeed on the merits of their direct infringement claim because they easily establish the elements of direct infringement. Plaintiffs (1) "show ownership" of the Copyrighted Works;[7] and (2) demonstrate Defendant's violation of "at least one exclusive right granted to copyright holders," *Napster*, 239 F.3d at 1013. Specifically, Defendant is violating two of Plaintiffs' exclusive rights: the

---

[7] With respect to their copyright ownership, Plaintiffs have filed herewith certificates of registration issued by the Copyright Office for the Copyrighted Works identified in the Complaint. Van Voorn Decl., ¶ 16. The certificates create a presumption of copyright validity and ownership. 17 U.S.C. § 410(c).

7

right to publicly perform and the right to reproduce Plaintiff's Copyrighted Works. Each violation alone is sufficient to support the requested injunctive relief. *Id.*

(a)     **Defendant Publicly Performs Plaintiffs' Copyrighted Works.**

Plaintiffs have the exclusive right, among others, "to perform" the Copyrighted Works "publicly." 17 U.S.C. § 106(4). A party performs a work publicly when it "transmit[s] or otherwise communicate[s] a performance . . . of the work . . . to the public, by means of any device or process, whether the members of the public capable of receiving the performance . . . receive it in the same place or in separate places and at the same time or at different times." *Id.* § 101(2) (definition of "[t]o perform . . . a work 'publicly'").

The streaming of copyrighted works over the Internet without the copyright holder's authorization violates the copyright holder's public performance right. *See*, *e.g.*, *Am. Broad. Companies, Inc. v. Aereo, Inc.*, 573 U.S. 431, 431 (2014) (finding Internet streaming constitutes public performance) ("*Aereo*"); *Warner Bros. Entm't Inc. v. WTV Sys., Inc.*, 824 F. Supp. 2d 1003, 1006-07, 1010-11 (C.D. Cal. 2011) (holding service violated public performance right by streaming contents of DVDs from DVD players purportedly assigned to individual users).

Where—as here—the electronic transmission of a work involves a technical process, the public performance of that work includes each step in that process. For example, in *National Football League v. PrimeTime 24 Joint Venture*, the defendant captured protected content in the United States, and transmitted it from the United States to a satellite and from the satellite to the public in Canada. 211 F.3d 10, 11 (2d Cir. 2000). The defendant argued that the uplink transmission to the satellite was not a public performance, notwithstanding that the signal it captured was eventually transmitted to the public. *See id*. The court rejected that argument, holding "a public performance . . . includes 'each step in the process by which a protected work wends its way to its audience,'" which included the defendants' satellite uplink of the copyrighted content that was ultimately broadcast to the public. *Id*. at 12 (citation

omitted); *see also Aereo*, 573 U.S. 431, 446-48 (rejecting defendant's claim that its technical design, which used an individual antenna to make a separate transmission path to each user, made the performances private rather than public; noting subscribers would not "care much" about the service's technical design).

The transmission of Plaintiffs' Copyrighted Works via the Internet on the Nitro TV Platforms without Plaintiffs' authorization clearly violates Plaintiffs' exclusive public performance right. *See, e.g.*, *Aereo*, 573 U.S. 431, 449-51; *Disney Enterprises, Inc. v. VidAngel, Inc.*, 224 F. Supp. 3d 957, 970-71 (C.D. Cal. 2016), *aff'd*, 869 F.3d 848 (9th Cir. 2017) (affirming that streaming edited versions of motion pictures constituted "publicly performing" the movies); *Universal City Studios Prods. LLLP v. TickBox TV LLC*, No. CV 17-7496-MWF (ASX), 2018 WL 1568698, at *9 (C.D. Cal. Jan. 30, 2018) ("Broadcasting copyrighted video content to the public over the internet without authorization infringes upon the copyright owner's public performance right."); *Fox Television Stations, Inc. v. BarryDriller Content Sys., PLC*, 915 F. Supp. 2d 1138, 1151 (C.D. Cal. 2012) (granting preliminary injunction to enjoin defendant streaming service from "retransmitting, streaming, or otherwise publicly performing" plaintiffs' copyrighted works).[8]

### (b)   Defendant Reproduces Plaintiffs' Copyrighted Works.

Plaintiffs have the exclusive right "to reproduce" their works, 17 U.S.C. § 106(1), which includes the right to create digital copies. *See, e.g.*, *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 518 (9th Cir. 1993) (transferring digital work

---

[8] The Van Voorn and Shepard Declarations, and attached Exhibits, establish that Plaintiffs' Copyrighted Works are being streamed on Nitro TV. *See Arista Records LLC v. Lime Group LLC*, No. 06 CV 5936 (KMW), 2011 WL 1641978, at *8 (S.D.N.Y. Apr. 29, 2011) ("Courts have consistently relied upon evidence of downloads by a plaintiff's investigator to establish both unauthorized copying and distribution of a plaintiff's work.") (collecting cases); *Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 150 n.16 (S.D.N.Y. 2009) ("Courts routinely base findings of infringement on the actions of plaintiffs' investigators.").

"from a permanent storage device to a computer's RAM [or storage]" infringes the reproduction right).

Defendant Galindo and the other operators of Nitro TV necessarily infringe Plaintiffs' reproduction right as unauthorized copies of Plaintiffs' Copyrighted Works must be made in the process of creating Nitro TV's so-called "24/7" channels. These 24/7 channels are devoted exclusively to a single show or movie and continuously stream episodes of a single television series (e.g.*, Friends*, *The Office*) or a single movie (e.g., *Captain America: The Winter Soldier*), or collection of movies (e.g, 24/7 *Spider-Man* movie channel), at all times of the day and night, seven days a week. Van Voorn Decl., ¶ 25. Unlike Nitro TV's channel offerings (e.g., Disney Channel, Paramount Network, and FX) appropriated from other distributors and streamed live on Nitro TV,[9] these 24/7—or title-curated—channels are not restreamed broadcast channels and must be individually constructed before they can be offered on Nitro TV. Van Voorn Decl., ¶ 26. Such construction would necessarily entail reproducing copies of the relevant television program(s) or motion picture(s) to assemble them in the order to be streamed in a continuous loop for the purpose of transmitting them nonstop to Nitro TV subscribers via the Nitro TV Platforms. *Id.*

Similarly, digital copies of the Copyrighted Works are being made in connection with the "Catch Up" feature offered on Nitro TV. *See* Van Voorn Decl., ¶ 27. Nitro TV's "Catch Up" feature allows subscribers to watch television programs from the prior two days. *Id.* For example, a Nitro TV subscriber using this feature on a Monday would be shown a guide of what aired on Sunday and Saturday, and can select and watch a program that aired at 8 p.m. on either day on a specific channel

---

[9] Streaming live means that the programming is streamed on Nitro TV Platforms contemporaneously with the original source of the telecast. In other words, the program airing on a television channel like the Disney Channel through an authorized source (e.g., a cable or satellite TV provider) is available on Nitro TV at the same time as it is telecast on the authorized source. Van Voorn Decl., ¶ 24.

(e.g., Disney Channel, Paramount Network). *Id.* It is only possible to offer this feature by making days' worth of copies of all programs on all channels with the Catch Up feature. *Id.*

Such copying of Plaintiffs' Copyrighted Works violates Plaintiffs' reproduction rights. *See, e.g.*, *Sega Enters. v. Accolade, Inc*., 977 F.2d 1510, 1518 (9th Cir. 1992) ("[O]n its face, [17 U.S.C. § 106(1)-(2)'s] language unambiguously encompasses and proscribes 'intermediate copying'"); *VidAngel*, 224 F. Supp. 3d at 969-70 (enjoining infringing service based on reproduction right violation); *Tiffany Design, Inc. v. Reno–Tahoe Specialty, Inc*., 55 F. Supp. 2d 1113, 1121 (D. Nev. 1999) ("[T]he digitization or input of any copyrighted material, whether it be computer code or visual imagery, may support a finding of infringement notwithstanding only the briefest of existence in a computer's RAM.").

### 2. Defendant Is Liable For Secondary Infringement.

Defendant Galindo is also liable under the two theories of secondary liability—contributory infringement and inducement—each of which provides an independent basis to support an injunction. *Perfect 10, Inc. v. Visa Int'l Serv., Ass'n*, 494 F.3d 788, 795 (9th Cir. 2007).

#### (a) Defendant Is Liable For Knowingly And Materially Contributing To Infringement.

Secondary liability is established under a theory of contributory infringement where the defendant "has knowledge of another's infringement" and "materially contributes" to the infringement. *VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 745 (9th Cir. 2019) (citing *Perfect 10*, 494 F.3d at 795). Both elements are plainly satisfied here.

##### (i) Defendant Has Knowledge Of Infringement.

The Ninth Circuit has held defendants are liable for contributory infringement where they either have "actual knowledge of specific acts of infringement" or "[w]illful blindness of specific facts" from which infringement can be inferred. *See*

11

*Erickson Prods., Inc. v. Kast*, 921 F.3d 822, 832 (9th Cir. 2019) (citing *Luvdarts, LLC v. AT & T Mobility, LLC*, 710 F.3d 1068, 1072-73 (9th Cir. 2013)).[10] The evidence demonstrates Galindo's clear knowledge of, and no less than willful blindness toward, the infringement of Plaintiffs' Copyrighted Works.

Galindo clearly knows that Nitro TV is being used to infringe Plaintiffs' Copyrighted Works. Unlike the situation where content is uploaded by a service's users, here Galindo himself has curated the television programming and channels available on Nitro TV. *See* Plumb Decl., Exs. 2-5 (Galindo updating Group members that *Game of Thrones* can be viewed on Nitro TV and that CBS channels had been added). Galindo even asked viewers what television shows they wanted him to add to Nitro TV and, significantly, the Nitro TV's channel guide reflects that there are now 24/7 channels dedicated to each show that the viewers identified in response. Plumb Decl., Ex. 3 (Galindo asking members of the Nitro TV Facebook Group page to "[p]lease post here TV shows you want next so that we can get an idea which ones to add next" and members identifying shows); Van Voorn Decl., ¶ 13, Ex. 11.[11]

Perhaps even more telling were Galindo's actions after learning of a lawsuit against the similarly-infringing Set TV Now service, discussed above. Plumb Decl., Ex. 7; Van Voorn Decl., ¶ 39.[12] In the ensuing weeks after his April 2018 post

---

[10] The Ninth Circuit has also stated the standard differently in holding that defendants with "constructive knowledge" of infringement (i.e., those who "know or have reason to know" infringement is taking place) are likewise liable for contributory infringement. *Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc.*, 658 F.3d 936, 943 (9th Cir. 2011); *see Kast*, 921 F.3d at 832 (noting but explicitly declining to address the different standards of knowledge articulated by the Ninth Circuit).

[11] One of these channels streamed the television series while the others gave error messages. Van Voorn Decl., ¶ 13. The inability to play these other 24/7 channels could just have been a temporary technical issue. *Id.*

[12] The lawsuit against the Set TV Now service is just one instance of Plaintiffs' efforts to stop the infringement of their content by bringing lawsuits against the distributors of products and services that—like Nitro TV—directly and/or secondarily infringe their copyrights. *See, e.g., Netflix et al. v. Dragon Media Inc. et*

reflecting his awareness of the lawsuit, Galindo took a number of steps to hide his tracks. Plumb Decl., Ex. 7; Van Voorn Decl., ¶¶ 35-45. For example, Galindo changed the status of the Nitro Facebook TV Group used to promote and market Nitro TV, and to communicate with Nitro TV resellers, from "Closed" (which means the group and its members are publicly visible in searches) to "Secret" (which means the group remains "invisible" in searches and can be joined by invite-only) in order to further conceal the content of his posts. Plumb Decl., Ex. 7.[13]

Defendant Galindo and those acting in concert with him also attempted to anonymize the operation of Nitro TV and their connection to this illegal enterprise. This included by (i) removing Nitro TV branding from the Nitro TV Platforms; (ii) removing public-facing statements from the TekkHosting.com website that indicate the website's infringing use; (iii) concealing the identity of the registrant of the TekkHosting.com website from public access; and (iv) failing to register a Digital Millennium Copyright Act ("DMCA") agent for the domains operated in connection with the TekkHosting.com and NitroIPTV.com websites. Van Voorn Decl., ¶¶ 36-45. These steps to operate anonymously in the wake of the Set TV Now case filing further reflects Galindo's awareness of the illegality of his conduct. *See Elsevier Inc. v. Stew Yee Chew*, 2019 U.S. Dist. LEXIS 196, at *1 (S.D.N.Y. Jan. 2, 2019) (finding infringement was willful where the defendant "attempted to change or conceal their identities to avoid detection"); *Solid Host, NL v. Namecheap, Inc.*, 652 F. Supp. 2d 1092, 1096 (C.D. Cal. 2009), *abrogated on other grounds by Petroliam Nasional Berhad v. GoDaddy.com, Inc.*, 737 F.3d 546 (9th Cir. 2013) (noting that services that register domain names through a proxy to allow registrants to remain

---

*al.*, No. 2:18-cv-00230-MWF-AS, Dkt. 72 (C.D. Cal. January 29, 2020) (permanently enjoining infringing service); *Disney Enterprises, Inc. v. VidAngel Inc.*, No. 2:16-cv-04109-AB-PLA, Dkt. 520 (C.D. Cal. Sept. 5, 2019) (permanently enjoining infringing service); *TickBox*, 2018 WL 1568698, at *15 (preliminarily enjoining infringing service).

[13] *See* "Using Facebook Groups," lifewire.com/facebook-groups-4103720.

13

anonymous "[n]aturally . . . appeal to registrants who wish to conceal their identities for illegitimate purposes").

At minimum, Defendant has evinced "willful blindness" to the direct infringement facilitated by his Nitro TV service. *Luvdarts*, 710 F.3d at 1073 ("Willful blindness of specific facts would establish knowledge for contributory liability."). Indeed, as noted above, Defendant systematically amassed thousands of live and title-curated television channels, including the Disney Channel, Paramount Network, and multiple ABC, NBC, CBS, and FOX channels from around the United States, many of which feature Plaintiffs' Copyrighted Works. Plumb Decl., Exs. 1-7; Van Voorn Decl., ¶¶ 6, 23-29, Exs. 11, 16. Defendant sells access to this vast array of channels on Nitro TV without authorization for $20 month – a figure so incongruous with market rates (Van Voorn Decl. ¶¶ 18, 31; Shepard Decl.¶3, Ex. 27) that it shows that Galindo necessarily knows, or is deliberately and willfully blind to the fact, that third parties are infringing Plaintiffs' copyrights by transmitting them without authorization. *See, e.g., Unicolors, Inc. v. Urban Outfitters, Inc.*, 853 F.3d 980, 991 (9th Cir. 2017) (holding defendants' apparent failure to make any meaningful "attempt to check or inquire into" whether plaintiffs had authorized third party's use of plaintiff's copyrighted works was more than "sufficient evidence of willful infringement"); *see also Screen Gems–Columbia Music, Inc. v. Mark–Fi Records, Inc.*, 256 F. Supp. 399, 404 (S.D.N.Y. 1966) (denying summary judgment where the defendants were dealing with counterfeit musical records priced "so suspiciously below the usual market price" that it "served as notice of the illicit operation" as defendants must have known or "deliberately closed [their] eyes" to the fact that the records were infringing). This fact shows at the very least Galindo's willful blindness towards the infringement of Plaintiffs' Copyrighted Works.

In short, Plaintiffs have shown Galindo has the requisite knowledge of the infringement of Plaintiffs' Copyrighted Works.

(ii)    Defendant Materially Contributes To Infringement.

A "material contribution" is found where a defendant "substantially assists . . . a worldwide audience of users to access infringing materials." *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1172 (9th Cir. 2007). Defendant has done precisely this by architecting and operating the Nitro TV Platforms, as well as by designing and managing the distribution channels that provide access to the Nitro TV Platforms, all with the goal of growing the subscriber base accessing infringing content to be as large as possible. *See, e.g., Napster*, 239 F.3d at 1022-23; *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 264 (9th Cir. 1996) ("[P]roviding the site and facilities for known infringing activity is sufficient to establish contributory liability."). This conduct more than meets the threshold of a "material contribution" necessary for a claim of contributory infringement. *Perfect 10*, 508 F.3d at 1172.

Indeed, the Ninth Circuit has held that a "material contribution" occurs where a defendant with knowledge of infringement "can take simple measures to prevent further damage to copyrighted works," but instead "continues to provide access to infringing works." *Id.* Here, Defendant is not merely failing to take steps to minimize the infringement taking place on Nitro TV. Rather, he and his fellow Nitro TV operators have actively architected Nitro TV to serve as a hub of mass infringement, including by actively curating the thousands of hours of unauthorized copyrighted content streamed daily, and putting in place a network of resellers to further disseminate that content. Van Voorn Decl., ¶¶ 6, 17-28, 30-34, 47; *see also* Section II.B-D, *supra*. Defendant could, at any time, remove subscribers' access to the infringing channels; his decision instead to add and promote the availability of this infringing content on Nitro TV plainly constitutes a material contribution to the mass-scale infringement at issue. Plumb Decl., Exs. 1-7; Van Voorn Decl., ¶¶ 12-15.

**(b)     Defendant Is Liable For Inducing Infringement.**

Defendant's conduct likewise gives rise to secondary liability under a theory of inducement. The Ninth Circuit has articulated the inducement theory as requiring the following elements: (i) "distribution of a device or product," which is satisfied where a defendant "provid[es] some service used in accomplishing the infringement"; (ii) "acts of infringement" of a third party; (iii) "an object [of the defendant] of promoting [the device's or product's] use to infringe copyright"; and (iv) "causation." *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1032 (9th Cir. 2013) (citing *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005)).

(i)     Defendant Distributes An Infringing Service.

Here, the first two inducement prongs require little discussion. Nitro TV is a "service used in accomplishing the infringement," and "acts of infringement" are clearly taking place. *Fung*, 710 F.3d at 1032, 1033; *see* Section III.A.1, *supra*. The unauthorized streaming of copyrighted content on the Nitro TV Platforms constitutes ongoing infringement on a massive scale, and Defendant provides access to this infringing service by distributing Nitro TV credentials to subscribers directly and through his reseller network. *See* Section II.B-D, *supra*.

(ii)     Defendant Acts with the Object To Promote Infringement.

Next, Defendant is clearly acting "with the object of promoting [Nitro TV's] use to infringe copyright," as shown both "by [his] clear expression" and his "other affirmative steps taken to foster infringement." *Grokster*, 545 U.S. at 936-37; *see also Fung*, 710 F.3d at 1034.

Of particular importance are promotional statements reflecting that the Defendant's purpose is to promote infringement. *Grokster*, 545 U.S. at 937 ("The classic instance of inducement is by advertisement or solicitation that broadcasts a message designed to stimulate others to commit violations."); *see also Fung*, 710

16

F.3d at 1034-35. Here, Defendant incentivized his reseller network to sell more subscriptions to his illegal service by promoting volume discounts. Van Voorn Decl., ¶¶ 30-31, Ex. 17. And, in addition to the marketing efforts performed by these resellers, Defendant promoted the availability of copyrighted content on Nitro TV via the Nitro TV Facebook Group that he created and administered. For example, as evidenced by Galindo's posts before making the Group "secret," he announced:

- The addition of popular channels with copyrighted television programming, Plumb Decl., Ex. 4 (announcing the addition of three CBS channels to the local channels already available on Nitro TV);
- The availability of *Game of Thrones* on a VOD basis, *id.*, Ex. 3; and
- The addition of 24/7 channels, *id.*, Ex. 2.

Further, as previously noted, Galindo also asked subscribers to identify the television programs they wanted him to add to Nitro TV's channel lineup, and it appears that he added these programs as there are now 24/7 channels dedicated to each show that the viewers identified in response. Plumb Decl., Ex. 3; Van Voorn Decl., ¶ 13, Ex. 11. Defendant's actions are akin to the *Grokster* defendants who "respond[ed] affirmatively to requests for help in locating and playing copyrighted materials." *Grokster,* 545 U.S. at 938; *see also Fung*, 710 F.3d at 1036 (noting in connection with a finding of defendant's intent to promote infringement that the "record is replete with instances of Fung responding personally to queries for assistance in: uploading torrent files corresponding to obviously copyrighted material, *finding particular copyrighted movies and television shows*, getting pirated material to play properly, and burning the infringing content onto DVDs for playback on televisions.") (emphasis added).

Galindo also used the Nitro TV Facebook Group page to post advice to Nitro TV subscribers on how to access restricted content by hiding their true locations from detection when using Nitro TV, allowing such subscribers to thereby circumvent anti-piracy protections and evade a court order implemented by Internet

service providers in the United Kingdom. Plumb Decl., ¶ 10, Ex. 6. Galindo's assistance in this regard further reflects his intent to promote infringement. *See Fung*, 710 F.3d at 1036 (noting the defendant helped getting "pirated material to play properly").

Defendant's actions further confirm his intent to promote infringement. Indeed, courts have held that even a failure to take "steps to develop filtering tools or other mechanisms to diminish the infringing activity" corroborates an intent to promote infringement. *Id*. Here, as shown above, Defendant has done much more by affirmatively selecting the copyrighted content illegally streamed and copied in connection with offering the Nitro TV service. *See also* Section II.B, *supra*.

Another corroborating factor evidencing a defendant's infringing intent is a tie between the defendant's profits and infringement. *Fung*, 710 F.3d at 1036-37. As articulated by the Ninth Circuit:

> The more users who visit [Defendant] Fung's websites and view the advertisements supplied by Fung's business partners, the greater the revenues to Fung. Because "the extent of the [services'] use determines the gain to [Fung], the commercial sense of [his] enterprise turns on high-volume use, which the record shows is infringing." Given both the clear expression and other affirmative steps and the supporting evidence, Fung's "unlawful objective is unmistakable."

*Id.* at 1037 (quoting *Grokster*, 545 U.S. at 940, 125).

Similar to *Fung*, Defendant's profits are driven by the volume of use of his service, specifically, the number of Nitro TV paid subscribers. As with the service in *Fung*, Defendant operates the infringing Nitro TV enterprise to reap as much profit as possible for Defendant and those acting in concert with him. Indeed, he has an extensive—and expanding—network of Nitro TV resellers that is used to grow the Nitro TV subscriber base and subscription revenues. Van Voorn Decl., ¶ 30-34. To attract and maintain paid subscribers, the resellers—like Defendant—promote the copyrighted television programming available on Nitro TV. *Id*., ¶ 33, Ex. 19;

18

Shepard Decl., ¶ 4, Exs. 28-30. Defendant also provides his resellers with volume discounts to incentivize them to grow the Nitro TV business. Van Voorn Decl., ¶ 31.

Finally, Defendant's intent to promote infringement is evidenced by the actions he undertook to conceal his connection with Nitro TV, as detailed above.

(iii)   <u>Defendant Causes Infringement.</u>

The causation element is plainly satisfied based on the evidence already discussed above. Namely, Defendant and those acting in concert with him make their infringing service with thousands of hours of copyrighted content available to Nitro TV subscribers in a user-friendly manner. *See* Section II.C, *supra*. They have also actively promoted the availability of this infringing content on the Nitro TV Platforms, and developed an extensive web of resellers to market Nitro TV and expand its subscriber base. *See* Section II.B-D, *supra*. As such, Defendant has made clear his unlawful intent that the Nitro TV Platforms be used to facilitate infringement, which is all that is required to show causation. *See Fung*, 710 F.3d at 1038 (the "causation" factor is satisfied where defendant acts with "the manifested intent that [their] service actually be used in [an infringing] manner")*; see also China Cent. Television v. Create New Tech. (HK) Ltd.*, No. CV 15-01869-MMM-MRWX, 2015 WL 3649187, at *10 (C.D. Cal. June 11, 2015) (finding the causation factor satisfied where "defendants are the but-for cause of [the] infringement, i.e., their distribution and promotion of the Infringing TV pad Apps is the mechanism that makes that infringement by a large number of users possible.").

**B.**   **Plaintiffs Will Suffer Irreparable Harm Absent An Injunction.**

Courts find that a copyright holder's harm is likely "irreparable" for many reasons, including that a particular loss is "difficult to replace," "difficult to measure," or of a kind "that one should not be expected to suffer." *Salinger v. Colting*, 607 F.3d 68, 81 (2d Cir. 2010); *see also WTV Systems*, 824 F. Supp. 2d at 1013 (irreparable harms are those that are "neither easily calculable, nor easily compensable"). Here, Nitro TV has already inflicted irreparable harms on Plaintiffs

19

and will continue to do so until it is enjoined. *See, e.g., WPIX, Inc. v. ivi, Inc.*, 691 F. 3d 275, 85-87 (2d Cir. 2012) (finding extensive irreparable harms caused by unlicensed Internet retransmissions of live television channels); *BarryDriller*, 915 F. Supp. 2d at 1147 (same).

*First*, Nitro TV interferes with Plaintiffs' basic right as the copyright holders to control "when, where, to whom, and for how much they will authorize transmission of their Copyrighted Works to the public." *WTV Systems*, 824 F. Supp. 2d at 1012. Plaintiffs exercise their exclusive rights to license distributors and downstream services to develop and grow markets for their content, particularly in the emerging digital markets. Jaquez Decl., ¶¶ 6-10. Plaintiffs' ability to control and carefully choreograph the exploitation of their Copyrighted Works through licensing them in different distribution channels and at different times, which is referred to as "windowing," is the linchpin of their business. *See* Jaquez Decl., ¶¶ 8-9.

Defendant's business operation usurps Plaintiffs' control over the exercise of their exclusive rights by interfering with Plaintiffs' distribution strategies. With its user-friendly interface and expansive lineup of live and title-curated channels, Nitro TV provides many of the same OTT streaming services offered by cable and satellite providers to Nitro TV's paid subscribers, except that it does so without copyright holder authorization.[14] Defendant's operation of the Nitro TV "infringing service without the normal licensing restrictions imposed by Plaintiffs . . . interfere[s] with Plaintiffs' ability to control the use and transmission of their Copyrighted works, thereby, causing irreparable injury." *WTV Systems*, 824 F. Supp. 2d at 1012-13 (citation omitted); *see also WPIX*, 691 F. 3d at 85-87 (describing the litany of

---

[14] Galindo actually offers more channels than an authorized distributor because authorized distributors only offer their local broadcast channels (e.g., ABC, CBS, and NBC). Defendant streams numerous versions of the ABC, CBS, CW, NBC, and FOX channels from multiple cities across the U.S. to all Nitro TV subscribers wherever they are located. Van Voorn Decl., ¶ 23.

irreparable harms caused by unlicensed Internet retransmissions of broadcast television).

**Second**, unless enjoined, Nitro TV will interfere with Plaintiffs' existing relationships with legitimate online services. These legitimate services negotiate their licenses and abide by contractual restrictions. Jaquez Decl., ¶ 25. Defendant need not honor such contractual restrictions because he circumvents the licensing process altogether. This unfair competition undermines the legitimate market for content streamed over the Internet, which is a robust and growing part of the Plaintiffs' businesses and an important option to many consumers. *Id*. This threatens harm to Plaintiffs' relationships and their goodwill with authorized distributors by undermining their ability to provide licensed offerings. *See, e.g., Ticketmaster L.L.C. v. RMG Techs., Inc.*, 507 F. Supp. 2d 1096, 1115 (C.D. Cal. 2007) (irreparable harm includes "damage to goodwill"); *WTV Systems*, 824 F. Supp. 2d at 1012-13 (finding unlicensed streaming "jeopardize[d] the continued existence of Plaintiffs' licensees' businesses" and harmed plaintiffs' goodwill with its licensees). This unfair competition also disadvantages Plaintiffs in negotiations with prospective or existing authorized distributors. *See BarryDriller*, 915 F. Supp. 2d at 1147 ("If Defendants can transmit Plaintiffs' content without paying a fee, Plaintiffs' existing and prospective licensees will demand concessions to make up the loss of viewership to non-paying alternatives . . . .").

**Third**, the operation of Nitro TV is contributing to consumer confusion regarding what is lawful and what is not by misleading customers into believing that the Nitro TV service is also legitimate. Jaquez Decl., ¶ 31. In this way, Nitro TV subscribers and potential subscribers may mistakenly view Nitro TV as a legal and sanctioned alternative, when it is not. This harms the market for legitimate services by drawing users away from Plaintiffs' licensees. *See WTV Systems*, 824 F. Supp. 2d at 1013 (finding that defendants' service threatened "to create incorrect but

lasting impressions with consumers about what constitute[d] lawful video on demand exploitation" of copyrighted works).

*Fourth*, the existence of the Nitro TV service harms the overall development of the on-demand streaming market "by offering a sub-optimal customer experience and, thus, tarnishing customers' perception of video on demand as an attractive option for viewing Plaintiffs' Copyrighted Works." *WTV Systems*, 824 F. Supp. 2d at 1014. Indeed, Nitro TV has garnered user complaints regarding the functioning of the Nitro TV Platforms. Van Voorn Decl., ¶ 46, Ex. 25.

The scope of foregoing harms caused by Defendant and those acting in concert with him continues to grow, as over 25 new Nitro TV resellers have been added to the Nitro TV reseller network in just the past few months. Unless the requested preliminary injunction is issued, Nitro TV—and the irreparable harm Defendant's infringement inflicts—will likely continue to grow given that two high-profile infringing services (Omniverse and Set TV Now) were enjoined in July and November of 2019, and Nitro TV appears poised to continue to receive an influx of new subscribers seeking another infringing service in light of these shutdowns.

## C.   The Balance Of Hardships Tips Sharply In Plaintiffs' Favor And An Injunction Would Servce The Public Interest.

Before issuing a preliminary injunction, a court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (internal quotation marks and citation omitted). The court must also consider whether the issuance of an injunction would be in the public interest. *Id.*

As previously discussed, the threat of harm to Plaintiffs is substantial. *See* Section III.D, *supra*. In contrast, Defendant "cannot complain of the harm that will befall it when properly forced to desist from its infringing activities." *Triad Sys. Corp. v. Se. Exp. Co.*, 64 F.3d 1330, 1338 (9th Cir. 1995), *superseded by statute on other grounds*, 17 U.S.C. § 117(c); *see Cadence Design Sys., Inc. v. Avant! Corp.*,

22

125 F.3d 824, 830 (9th Cir. 1997) ("Where the only hardship that the defendant will suffer is lost profits from an activity which has been shown likely to be infringing, such an argument in defense merits little equitable consideration . . . .") (quotations and citations omitted); *Apple Inc. v. Psystar Corp.*, 673 F. Supp. 2d 943, 950 (N.D. Cal. 2009) ("Since [small start-up defendant] does not (and cannot) claim any legitimate hardships as a result of being enjoined from committing unlawful activities, and Apple would suffer irreparable and immeasurable harms if an injunction were not issued, this factor weighs strongly in favor of Apple's motion.").

Finally, upholding copyright protection is in the public interest. *See Eldred v. Ashcroft*, 537 U.S. 186, 212 n.18 (2002) ("[t]he economic philosophy behind the [Copyright] [C]lause . . . is the conviction that encouragement of individual effort by personal gain is the best way to advance public welfare through the talents of authors and inventors") (citation omitted); *Kelly v. Primco Mgmt., Inc.*, No. CV-14-07263 BRO, 2015 WL 10990368 at *16 (C.D. Cal. Jan. 12, 2015) ("[I]t is virtually axiomatic that the public interest can only be served by upholding copyright protections . . . ."); *see also VidAngel*, 869 F.3d at 867 ("[T]he public has a compelling interest in protecting copyright owners' marketable rights to their work and the economic incentive to continue creating television programming and motion pictures.") (quotations omitted).

In sum, a preliminary injunction is in the public interest, and the balance of hardships between the parties supports the issuance of a preliminary injunction.

**D.      Temporarily Disabling Defendant's Websites Is Warranted.**

Plaintiffs' request for an injunction requires temporarily freezing the TekkHosting.com and NitroIPTV.com domain names used to operate Nitro TV, so the websites cannot be accessed or transferred during the pendency of this action. Although Defendant has used an anonymizing service to hide the name of the registered owner of these domains, the relevant registration records indicate these domain name registrations have been obtained through the services of Namecheap,

Inc. and Domain.com LLC. Van Voorn Decl. ¶¶ 36-38, Ex. 20. Where—as here—infringing websites are operated by defendants who have attempted to elude identification, the risk is high that when confronted with a lawsuit seeking to stop their ongoing infringement, the defendants will simply instruct their domain registrar to transfer their domain name to another registrar not subject to the jurisdiction of this Court and revive their infringing activities using new servers and infrastructure. *See Arista Records, LLC v. Tkach*, 122 F. Supp. 3d 32, 33, 36 (S.D.N.Y. 2015) (citing *N. Face Apparel Corp. v. Fujian Sharing Imp. & Exp. Ltd.*, No. 10-civ-1630, slip op. at 1-4, Dkt. 15 (S.D.N.Y. Mar. 2, 2010)) (enforcing injunction involving domain name registrar to stop defendant's evasion efforts to continue infringing).

In such situations, courts commonly issue injunctive relief in the form of an order to the domain name registrar to preclude the transfer of the domain name, and to render the infringing websites disabled during the pendency of the action, thus preventing any further illegal use or migration of the infringing domain names and thereby maintaining the status quo. *See, e.g., id.*; *Dish Network LLC v. Dillion*, No. 12CV157 BTM NLS, 2012 WL 368214, at *5 (S.D. Cal. Feb. 3, 2012) (ordering registrar to transfer the domains of sites illegally streaming copyrighted content to the plaintiff's chosen registrar and for the infringing service to cease all operations); *Showtime Networks Inc. v. Doe*, No. 2:15-CV-03147-GW-MRW, 2015 WL 12646501, at *2 (C.D. Cal. Apr. 30, 2015) (ordering all "hosts, registrars and name servers" to "suspend all services with respect to Defendants' Infringing Websites" to prevent the illegal streaming at issue). Even where the owner of the domain name at issue has not yet been specifically identified, this Court has still issued injunctive relief to ensure that unidentified party(ies) in control of web domains used to infringe are divested of control over those domains. *See TVB Holdings USA Inc. v. Enom Inc.*, No. SACV13624JLSDFMX, 2014 WL 12569432, at *1-2 (C.D. Cal. Apr. 22, 2014) (where infringing site's operator registered web domain under an alias, ordering registrar to freeze this unknown party's ability to transfer the domain).

## IV.   CONCLUSION

Defendant is engaged in blatant infringement of Plaintiffs' Copyrighted Works. His actions in response to legal action against the similarly-infringing Set TV Now service (which has since been adjudicated to be infringing) were not to cease his own infringement, but rather, to attempt to go underground to continue his infringing operation. Defendant and his reseller network threaten irreparable harm to Plaintiffs.

Plaintiffs respectfully request the Court issue the proposed preliminary injunctive relief enjoining Defendant, and those acting in concert with him, from further infringing Plaintiffs' Copyrighted Works. To effectuate this relief, Plaintiffs further request that the Court issue an order enjoining the respective domain name registrars for the TekkHosting.com and NitroIPTV.com domain names (Namecheap, Inc. and Domain.com LLC) from allowing these domains to be modified, sold, transferred to another owner, or deleted, and also requiring them to disable access to TekkHosting.com and NitroIPTV.com.


Dated:  April 3, 2020                    JENNER & BLOCK LLP


                                         By:  */s/ Julie A. Shepard*
                                              Julie Shepard

                                              *Attorneys for Plaintiffs*