JENNER & BLOCK LLP
JULIE A. SHEPARD (SBN 175538)
JShepard@jenner.com
ANDREW G. SULLIVAN (SBN 301122)
AGSullivan@jenner.com
SATI HARUTYUNYAN (SBN 313138)
SHarutyunyan@jenner.com
EFFIONG K. DAMPHA (SBN 323554)
EDampha@jenner.com
633 West 5th Street Suite 3600
Los Angeles, CA 90071-2054
Telephone:   (213) 239-5100
Facsimile:    (213) 239-5199

GIANNI P. SERVODIDIO (admitted *pro hac vice*)
gps@jenner.com
919 Third Avenue
New York, NY 10022-3908
Telephone:   (212) 891-1600
Facsimile:    (212) 891-1699

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| COLUMBIA PICTURES INDUSTRIES, INC.; AMAZON CONTENT SERVICES, LLC; DISNEY ENTERPRISES, INC.; PARAMOUNT PICTURES CORPORATION; WARNER BROS. ENTERTAINMENT INC.; UNIVERSAL CITY STUDIOS PRODUCTIONS LLLP; UNIVERSAL TELEVISION LLC; and UNIVERSAL CONTENT PRODUCTIONS LLC, <br><br> Plaintiffs, <br><br> v. <br><br> ALEJANDRO GALINDO and DOES 1-20, <br><br> Defendants. | Case No. 2:20-cv-03129-SVW-GJSx <br><br> **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR AN ORDER:** <br> **1) REQUIRING EVIDENCE PRESERVATION, IMAGING OF DEVICES, AND DEFENDANT'S DEPOSITION;** <br> **2) COMPELLING SUPPLEMENTAL RESPONSES AND PRODUCTION;** <br> **3) COMPELLING CONSENT TO PRODUCTION OF EMAILS BY GOOGLE; AND** <br> **4) FOR ATTORNEYS' FEES** <br><br> Filed concurrently herewith: Declaration of Julie Shepard, Declaration of Jan van Voorn, and [Proposed] Orders <br><br> Trial Date:  October 13, 2020 |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that Plaintiffs Columbia Pictures Industries, Inc., Amazon Content Services, LLC, Disney Enterprises, Inc., Paramount Pictures Corporation, Warner Bros. Entertainment Inc., Universal Studios Productions LLLP, Universal Television LLC, and Universal Content Productions LLC (collectively, "Plaintiffs") hereby submit this Notice of Motion and Motion for an Order: 1) requiring evidence preservation, imaging of devices, and a deposition of Defendant Alejando Galindro ("Defendant") regarding document preservation and search issues; 2) compelling supplemental responses and production to Plaintiffs' first set of interrogatories and first and second set of requests for production; 3) compelling consent to production of emails by Google; and 4) finding Plaintiffs should be awarded their reasonable attorneys' fees incurred in connection with this Motion pursuant to Federal Rule of Civil Procedure Rule 37 and setting a briefing schedule.

*First*, an order instructing Defendant as to his to duty to preserve is warranted because there is a significant concern that relevant evidence is being, or will be, destroyed, and failure to preserve this evidence will irreparably harm Plaintiffs by depriving them of key proof that is uniquely in Defendant's possession.  And to ensure Defendant is preserving all relevant evidence, Plaintiffs need to immediately depose Defendant to identify the repositories of relevant documents and the electronic storage devices he used; his preservation (or lack thereof) of documents; and any deletion of emails or other records.  Additionally, an order requiring forensic imaging of Defendant's relevant electronic storage devices, email and social media accounts, and messengering applications is warranted because (1) there are serious questions as to the reliability and completeness of Defendant's discovery responses, and (2) the devices and accounts at issue have a sufficient nexus to this case.

*Second*, because the evidence Plaintiffs have uncovered through other means demonstrates that (i) Defendant's claim to have no responsive documents, and (ii)

Defendant's responses to Interrogatories Nos. 1-2 and Requests for Production ("RFP") Nos. 2-5 and 7-80, are not be credible, Defendant should be compelled to provide further responses to these discovery requests and to produce all responsive documents in his possession, custody, or control.   Defendant has waived all objections to this discovery, which seeks indisputably relevant information.[1]

*Third*, given the substantial evidence strongly suggesting that Defendant violated his duty to preserve relevant emails, and the fact that now only Google has the ability to produce some of them, Defendant should be compelled to consent to Google's production of these responsive emails.

*Finally*, attorneys' fees are warranted given Defendant's misconduct in the discovery process, which required Plaintiffs to bring this Motion.

Counsel for the parties have met and conferred pursuant to L.R. 37-1 regarding the disputes as detailed in the Declaration of Julie Shepard.  On July 7, 2020, the undersigned sent counsel for Defendant a meet and confer letter setting forth the deficiencies in Defendant's discovery responses.  Counsel then met and conferred by telephone on July 13, 2020, had follow-up discussions regarding Defendant's supplemental interrogatory responses, and ultimately were unable to resolve any of the disputes presented in this Motion.  On August 5, 2020, the parties emailed the Court requesting a pre-discovery motion telephonic conference.  The Court determined that it would not resolve the issues without full briefing, and

---

[1] This discovery is directed to the core issues in the case: Defendant's direct sales of subscriptions to his infringing Internet Protocol television service called Nitro TV, his reseller network, the revenues he has earned from Nitro TV, his creation of channels and other content sources for Nitro TV, identification of individuals with whom he is working and their roles, his payment processors, his channels of communication regarding Nitro TV (*e.g.*, email, instant messaging applications, social media), the willfulness of his copyright infringement and any violations of the preliminary injunction order (*e.g.*, his repeat involvement with infringing services, his knowledge of prior litigation involving a now permanently enjoined IPTV service called SET TV, any continued involvement in IPTV services), and his affirmative defenses and disclaimers of responsibility and control.

ordered Plaintiffs to file a motion.  Dkt. No. 53.  Plaintiffs submit this Motion in compliance with that order, as modified.  *See* Dkt. No. 56.

Plaintiffs' Motion is based on the Notice of Motion and Motion; the attached Memorandum of Points and Authorities; the Declaration of Julie Shepard ("Shepard Decl."); the Declaration of Jan van Voorn previously filed with the Court on April 3, 2020 and submitted herewith as Exhibit T to the Shepard Declaration ("Van Voorn Decl."); the Declaration of Jan van Voorn filed concurrently ("Second Van Voorn Decl."); the [Proposed] Orders; all documents on file in this action; and such further or additional evidence or argument as may be presented before or at the hearing on this matter.

Dated:  August 19, 2020                        JENNER & BLOCK LLP


By: _____
Julie Shepard
*Attorneys for Plaintiffs*

# **TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................. 1

II.   STATEMENT OF FACTS .................................................................... 3

    A.   Defendant Operated Nitro TV.................................................... 3

    B.   Plaintiffs Secured a Preliminary Injunction Based on Evidence
        Reflecting Defendant's Ownership and Operation of Nitro TV............... 4

    C.   Plaintiffs Served Their First Set of Targeted Discovery to Test
        Defendant's Excuse for Violating the PI Order in Anticipation of
        Moving for a Finding of Contempt and Then Served a Second
        Comprehensive Set of Requests for Production. ....................................... 5

    D.   Defendant Provided Deficient Discovery Responses That Reveal
        He Spoliated Evidence. ........................................................................... 6

    E.   Third Party Productions Belie Defendant's Claim That No
        Responsive Documents Ever Existed and That He Cannot Identify
        Individuals Involved in Nitro TV........................................................... 8

        1.   Google's Production................................................................ 8

        2.   FDCServers' Production ...................................................... 10

        3.   Subpoenas for Payment Records .......................................... 11

III.  AN ORDER INSTRUCTING DEFENDANT TO PRESERVE EVIDENCE
    AND REQUIRING IMAGING OF HIS DEVICES IS WARRANTED. ....... 11

    A.   Defendant's Discovery Misconduct Necessitates an Order to
        Preserve Evidence. ............................................................................... 11

    B.   Forensic Imaging of Defendant's Pertinent Electronic Storage
        Devices, Email and Social Media Accounts, and Messengering
        Applications Is Warranted........................................................................ 15

IV.   AN ORDER COMPELLING FURTHER INTERROGATORY RESPONSES
    IS WARRANTED. ................................................................................... 19

V.    AN ORDER COMPELLING PRODUCTION OF ALL RESPONSIVE
      DOCUMENTS TO PLAINTIFFS' FIRST AND SECOND SET OF
      REQUESTS FOR PRODUCTION IS WARRANTED. ................................ 21

      A.    Documents Identifying Others Involved in Nitro TV, Their Roles,
            and the Companies Providing Content and Infrastucture for Nitro
            TV ....................................................................................................... 21

      B.    Documents Reflecting the Revenues Defendant Derived From Nitro
            TV and Concerning His Purchase of Reseller Credits and Sales of
            Subscriptions ..................................................................................... 22

      C.    Documents Reflecting the Payments He Has Made Indirectly and
            Directly to Others for Their Work on Nitro TV ........................................ 23

      D.    Documents Reflecting Non-Privileged Post-Filing Communications
            and Communications with Domain Name Registrars ............................... 23

      E.    Documents Reflecting Defendant's Email and Telegram Accounts
            Used for Nitro TV ............................................................................... 24

VI.   AN ORDER COMPELLING CONSENT TO PRODUCTION OF EMAILS
      BY GOOGLE IS WARRANTED. .................................................................. 25

VII.  PLAINTIFFS REQUEST THAT THE COURT FIND DEFENDANTS'
      MISCONDUCT WARRANTS AWARDING PLAINTIFFS THEIR
      ATTORNEYS' FEES. ................................................................................. 27

VIII. CONCLUSION ............................................................................................ 28

PLAINTIFFS' NOTICE OF MOTION AND MOTION

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Advante Int'l Corp. v. Mintel Learning Tech.*,
  2006 WL 3371576 (N.D. Cal. Nov. 21, 2006)...........................................15, 18

*Al Noaimi v. Zaid*,
  2012 WL 4758048 (D. Kan. Oct. 5, 2012)........................................................26

*Alexis v. Rogers*,
  2017 WL 1073404 (S.D. Cal. Mar. 21, 2017)...................................................17

*Am. LegalNet, Inc. v. Davis*,
  673 F. Supp. 2d 1063 (C.D. Cal. 2009).......................................................11, 12

*Bower v. Bower*,
  2011 WL 1326643 (D. Mass. Apr. 5, 2011) ....................................................27

*Bright Sols. for Dyslexia, Inc. v. Doe 1*,
  2015 WL 5159125 (N.D. Cal. Sept. 2, 2015)........................................11, 12, 13

*Cahn v. Oversee.net*,
  2011 WL 13220391 (C.D. Cal. Nov. 29, 2011)................................................18

*Columbia Pictures Indus., Inc. v. Fung*,
  2007 WL 9627610 (C.D. Cal. July 25, 2007) .....................................13, 14, 18

*Columbia Pictures Indus. v. Bunnell*,
  2007 WL 2080419 (C.D. Cal. May 29, 2007)..................................................14

*Equal Rights Ctr. v. Post Props., Inc.*,
  246 F.R.D. 29 (D.D.C. 2007) ..........................................................................19

*Glazer v. Fireman's Fund Ins. Co.*,
  2012 WL 1197167 (S.D.N.Y. Apr. 5, 2012)....................................................27

*In re Subpoena Duces Tecum to AOL, LLC*,
  550 F. Supp. 2d 606 (E.D. Va. 2008)...............................................................27

i

*Mafille v. Kaiser-Francis Oil Co.*,
   2019 WL 1933747 (N.D. Okla. May 1, 2019) ................................... 26

*Negro v. Super. Ct.*,
   230 Cal. App. 4th 879 (2014), *as modified* (Nov. 18, 2014) ........................... 26

*O'Grady v. Super. Ct.*,
   139 Cal. App. 4th 1423 (2006), *as modified* (June 23, 2006) ........................... 27

*OOO Brunswick Rail Mgmt. v. Sultanov*,
   2017 WL 67119 (N.D. Cal. Jan. 6, 2017) ............................................... 12, 13, 14

*Playboy Enters., Inc. v. Welles*,
   60 F. Supp. 2d 1050 (S.D. Cal. 1999) ........................................... 17, 18

*Richmark Corp. v. Timber Falling Consultants*,
   959 F.2d 1468 (9th Cir. 1992) ................................................. 21

*Rogers v. Giurbino*,
   288 F.R.D. 469 (S.D. Cal. 2012) .............................................. 21

*Romano v. Steelcase Inc.*,
   907 N.Y.S.2d 650 (N.Y. Sup. Ct. 2010) ........................................ 26

*Satmodo, LLC v. Whenever Commc'ns, LLC*,
   2018 WL 3495832 (S.D. Cal. July 20, 2018) ............................... 16, 18

*Skinner v. Ryan*,
   2014 WL 3064897 (D. Ariz. July 7, 2014) ..................................... 19

*United Artists Corp. v. United Artist Studios LLC*,
   2019 WL 9049050 (C.D. Cal. Oct. 7, 2019) ............................... passim

*Zubulake v. UBS Warburg LLC*,
   229 F.R.D. 422 (S.D.N.Y. 2004) ............................................ 13

**STATUTES**

18 U.S.C. § 2702(b)(3) .............................................................. 26

**OTHER AUTHORITIES**

Fed. R. Civ. P. 26 ................................................................... 15

Fed. R. Civ. P. 30..................................................................................................15

Fed. R. Civ. P. 37(a), (c) ....................................................................................27

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   INTRODUCTION

Plaintiffs bring this Motion to address Defendant Alejandro Galindo's ("Defendant") intentional spoliation of evidence, false discovery responses, and failure to produce relevant documents and information.

Defendant is the owner of an infringing, subscription-based Internet Protocol television ("IPTV") service, referred to as Nitro TV, which he operated from the shadows of the Internet.  Since his scheme was uncovered and Plaintiffs filed this lawsuit, Defendant has admitted that he sold Nitro TV subscriptions to consumers (*i.e.*, he is a frontline Nitro TV reseller), but he has attempted to cover up his role as the operator of the service in a transparent effort to limit his damages exposure. Defendant's tactical denials of involvement, however, are refuted by the clear evidence that formed the basis for the preliminary injunction granted in May 2020 and only underscore his willful violation of the discovery rules.  Indeed, Defendant has not produced a single document or identified any of his partners or affiliates in his initial disclosures or verified interrogatory responses.  Even worse, Defendant has deleted relevant emails and instant messages demonstrating his operational role in Nitro TV and transferred control over one of the critical domain names used to operate the business shortly after being served with the complaint in this action.

Defendant's remarkable excuse for flouting his discovery obligations is that he ran his Nitro TV business through a web of aliases and with a messaging service called Telegram configured for messages to self-destruct after they are read.  But as incriminating as such admissions may be standing alone, Defendant's cover story for the supposed lack of any records is patently false for several reasons.

*First*, by necessity, the purchase and sale of Nitro TV subscriptions and reseller credits means that responsive bank, financial, subscriber, and revenue records were created and exist.  This is true whether one credits Defendant's story of his lesser role as a frontline reseller or instead believes (as Plaintiffs do) that he

sits at the top of the pyramid of Nitro TV resellers and directs Nitro TV's operations. As a result, an order requiring the production of these documents (and the other documents that Defendant is withholding) is warranted.

*Second*, Defendant has left an electronic trail, and documents produced by third parties contradict Defendant's disclaimers and verified discovery responses. By way of example only, Plaintiffs have discovered the identity of a person acting in concert with Defendant—Richard Horsten. Plaintiffs have also learned that Defendant communicated with Mr. Horsten via email (not just Telegram, as Defendant contends). Defendant failed in two sets of verified interrogatory responses to identify Mr. Horsten, provide his contact information, or describe his role in Nitro TV. Defendant cannot credibly explain away this omission by claiming he does not know Mr. Horsten or somehow forgot about the services he provided to Defendant in connection with Nitro TV. Indeed, Defendant paid Mr. Horsten tens of thousands of dollars—including more than $14,000 in 2020 alone—through an account associated with Defendant's wife. And Defendant's omission of Mr. Horsten from his discovery responses appears deliberate: records produced by Google strongly suggest that Defendant deleted emails exchanged with Mr. Horsten along with other relevant, responsive communications in a massive email purge *after* Defendant was served with the complaint in this action.

*Third*, Defendant appears to have continued to use Telegram to communicate about Nitro TV after being on notice of this action, and yet he has failed to take basic steps to reconfigure the "app" so that his messages no longer self-destruct. This runs afoul of Defendant's obligation to preserve evidence and prevent any automated deletion of messages.

Notably, when Plaintiffs raised the evidence of Defendant's document destruction with Defendant's counsel, he merely said that he has instructed his client to preserve evidence. Defendant's apparent continued use of Telegram set to auto-delete and his selective deletion of almost 1,500 emails from his Gmail account

reflect that Defendant has not followed those instructions.[2]

Defendant's conduct flies in the face of a party's obligations in discovery. Plaintiffs respectfully request, as described more fully below, that the Court enter an order 1) requiring Defendant to preserve evidence, mandating that Defendant be deposed limited to record issues, and allowing the imaging of electronic devices; 2) compelling further interrogatory responses and Defendant's production of responsive documents; 3) compelling Defendant's consent to Google's production of Defendant's responsive emails that he deleted, to the extent recoverable; and 4) awarding Plaintiffs their reasonable attorneys' fees.

## II.   STATEMENT OF FACTS

### A. Defendant Operated Nitro TV.

Nitro TV is an IPTV service.  Van Voorn Decl., ¶¶ 6–11, Ex. 10.  Defendant registered the domain name NitroIPTV.com in December 2016,[3] several months before the subscription-based Nitro TV service launched.  Shepard Decl., ¶ 5, Exs. A, B (Response to Interrogatory No. 9).[4]

Defendant promoted, marketed and sold Nitro TV subscriptions via NitroIPTV.com.  Shepard Decl., ¶ 6, Ex. G.  In exchange for monthly subscription fees of $20 per month, Nitro TV subscribers were provided unauthorized access to an array of thousands of live and title-curated television channels streamed 24 hours a day, seven days a week.  Van Voorn Decl., ¶¶ 18, 22–25.  Within approximately

---

[2] Plaintiffs are awaiting productions pertaining to other email addresses used by Defendant.

[3] Records show the NitroIPTV.com domain name remained in Defendant's control until after he was served in this action in April 2020, and the domain was transferred in an apparent effort to evade the requested injunctive relief.  Shepard Decl., ¶¶ 8–10, Ex. H.  It may still reside in Defendant's control, but steps were taken to conceal the current ownership and control of this domain and others after this action was filed.  *Id.*, ¶ 14.

[4] Plaintiffs did not learn of the Nitro TV service until long after it launched.  *See* Van Voorn Decl., ¶ 8 n.1.

3

24 hours of subscribing to Nitro TV and providing their payment information subscribers were sent an email with their subscriber credentials. *See* Van Voorn Decl., ¶¶ 19-21.

The channels made available without authorization on Nitro TV feature many popular television programs and motion pictures, such as *The Office*, *Spider Man: Homecoming*, *Toy Story 3*, *Star Trek Beyond*, *Homecoming*, and *Joker*, including works whose copyrights Plaintiffs own or exclusively control ("Plaintiffs' Copyrighted Works"). Van Voorn Decl., ¶ 6.

In addition to directly marketing to subscribers, Defendant also used NitroIPTV.com to promote and expand the scope of Nitro TV by creating and growing a network of resellers—creating an enterprise akin to a pyramid scheme. Shepard Decl., Ex. G; *see also* Van Voorn Decl., ¶¶ 30-31, Ex. 17. Resellers would purchase "TekkHosting Nitro Reseller Credits" which they would exchange for Nitro TV subscriber credentials upon selling a Nitro TV subscription. Volume discounts incentivized resellers to buy large quantities of credits and to market and promote Nitro TV to attract new subscribers to the illegal service. *Id.*

Prior to the commencement of the action, the NitroIPTV.com domain redirected to another domain, "TekkHosting.com," from which Nitro TV subscriptions and Nitro TV TekkHosting reseller credits could be purchased. Van Voorn Decl., ¶ 17. The TekkHosting domain name was held under an alias of Richard Horsten—who, as noted above, Defendant has paid tens of thousands of dollars, including what appears to be a Christmas bonus. Shepard Decl., ¶¶ 15-16, Ex. L.

**B. Plaintiffs Secured a Preliminary Injunction Based on Evidence Reflecting Defendant's Ownership and Operation of Nitro TV.**

Defendant's control and ownership of the Nitro TV enterprise was hidden. *See* Van Voorn Decl., ¶¶ 35–45. Plaintiffs, however, eventually learned of the illegal service and subsequently discovered that Defendant—acting in concert with

others—owns and operated Nitro TV.  Van Voorn Decl., ¶¶ 9-16, 47, Ex. 10; Dkt. Nos. 13-1–13-9 (Plumb Decl., Exs. 1-9).

On April 3, 2020, Plaintiffs filed and personally served Defendant with their complaint and motion for a preliminary injunction ("PI Motion"), setting forth evidence reflecting Defendant's operation, control, and ownership of the infringing Nitro TV service and seeking to enjoin his mass-scale, ongoing infringement of Plaintiffs' Copyrighted Works.  Dkt. Nos. 1 and 12.

On May 11, 2020, the Court entered an order preliminarily enjoining Defendant, and those acting in concert with him, from their ongoing infringement of Plaintiffs' Copyrighted Works.  Dkt. No. 34 ("PI Order") at 4-5.  The PI Order also enjoined the domain registrars for NitroIPTV.com and TekkHosting.com (the "Infringing Domain Names") at the time the action was filed—*i.e.*, Namecheap, Inc. and Domain.com, LLC—"from allowing the Infringing Domain Names to be modified, sold, transferred to another owner, or deleted," and ordered these registrars to take certain steps to "disable access to the Infringing Domain Names."  *Id.*

**C. Plaintiffs Served Their First Set of Targeted Discovery to Test Defendant's Excuse for Violating the PI Order in Anticipation of Moving for a Finding of Contempt and Then Served a Second Comprehensive Set of Requests for Production.**

Defendant failed to immediately shut down the Nitro TV service on his own in violation of the PI Order.  Shepard Decl., ¶ 7.  As a result, Plaintiffs served the PI Order on Namecheap and Domain.com so that access to the Infringing Domain Names would be disabled.  *Id.*, ¶ 8. These domain name registrars responded that Defendant's NitroIPTV.com domain, along with TekkHosting.com, had transferred away within days of Defendant being served with the PI Motion, which (as Defendant intended) prevented these registrars from disabling access to the Infringing Domains.  *Id.*, ¶¶ 8–11, Exs. H, I.  This allowed Defendant's Nitro TV service to remain in operation, streaming Plaintiffs' Copyrighted Works 24 hours a day, seven days a week, in violation of the PI Order.  *Id.*, ¶ 12, Ex. J.

Plaintiffs made repeated demands for Defendant to disable access to Nitro TV. *Id.*, ¶ 17, Ex. M.  In response, through his counsel, Defendant claimed that he was just a reseller with no control over Nitro TV.  *Id.*,  ¶ 17.  He also tried to explain away the evidence submitted in connection with the PI Motion reflecting Defendant's curating of the content for Nitro TV with a claim that Defendant was just acting at the direction of others.  *Id.*  Tellingly, however, Defendant never offered a shred of evidence (*e.g.*, records of him purchasing reseller credits, documents reflecting the instructions that he allegedly received)—then or now—to support these claims.  *Id.*

To aid in their enforcement of the PI Order, Plaintiffs propounded targeted interrogatories and requests for documents to identify others supposedly responsible for Nitro TV, if not Defendant, as well as documents supporting Defendant's claim that he was just a reseller and did not control Nitro TV.  *Id.*, ¶ 18, Exs. A, C.[5] Plaintiffs subsequently served a second, more comprehensive set of document requests.  *Id.*, ¶ 24, Ex. D.  This Motion concerns Defendant's responses to the interrogatories and the two sets of requests for production (sometimes "RFP").

### D. Defendant Provided Deficient Discovery Responses That Reveal He Spoliated Evidence.

In responding to Plaintiffs' discovery requests, Defendant failed to produce a single document, including any that support his claim that he is just a reseller with no control over Nitro TV.  *Id.*, ¶ 23, Exs. A, C.  He also refused to provide the real names or roles of anyone else involved in Nitro TV.  *Id.*, ¶ 22, Exs. A, B.  Instead, he merely provided the names of two aliases used on Telegram (++240 and AD2020) and claimed that "there are no responsive documents as anything involved with

---

[5] Plaintiffs were poised to file an *ex parte* application seeking to shorten the time in which Defendant had to respond to this discovery given Defendant's refusal to shut down Nitro TV when it finally ceased operating at the end of May, approximately two and a half weeks after the PI Order was entered.  Shepard Decl., ¶ 19.

nitrolPTV.com (sic) was done through 'telegram' (sic) and that application has deleted per settings." *Id.*, ¶ 20, Ex. C.  From his responses, it also appears that Defendant continued to use Telegram, which was set to auto-delete messages, to communicate regarding Nitro TV even after he was on notice of this action on April 3.  *Id.*, Ex. C (Response to RFP No. 2).[6]

Plaintiffs immediately raised concerns about Defendant's destruction of evidence when they received Defendant's responses to their first set of discovery and engaged in meet and confer efforts to resolve this dispute.  *Id.*, ¶ 17, Ex. N. Defendant's supplemental interrogatory responses remain deficient, and he continues to claim that he has no responsive documents to Plaintiffs' first set of RFPs due to his use of Telegram to conduct Nitro TV business.  *Id.*, ¶ 22.  Defendant, who has waived all objections to the Plaintiffs' second set of RFPs, has also asserted that he does not have a single responsive document.  *Id.*, ¶ 25, Ex. E.

As detailed immediately below, productions from third parties in response to subpoenas reflect the creation and existence of relevant, responsive documents, which Defendant has not produced.  In a number of instances, the evidence shows or, at a minimum, strongly suggests, that responsive, relevant documents were deleted during the pendency of this action.

---

[6] Plaintiffs' request and Defendant's response are as follows:
    <u>Request for Production No. 2:</u>
    All of your communications with anyone other than your lawyer regarding Nitro TV, TekkHosting.com, and NitroIPTV.com from April 3, 2020 to present, inclusive.
    <u>Defendant's Response:</u>
    Without waiving any objections, there are no responsive documents as anything involved with ntrolPTV.com (sic) was done through "telegram" (sic) and that application has deleted per settings.

### E. Third Party Productions Belie Defendant's Claim That No Responsive Documents Ever Existed and That He Cannot Identify Individuals Involved in Nitro TV.

In light of Defendant's refusal to immediately shut down Nitro TV, the absence of support for Defendant's disclaimer of control over Nitro TV, and his transfer of NitroIPTV.com during the pendency of this lawsuit, Plaintiffs served their first set of subpoenas and have continued to follow Defendant's electronic trail with additional subpoenas. *Id.*, ¶ 26.  Below is a brief overview of the some of the productions received.   They show that Defendant has not been accurate or forthcoming in his discovery responses and has likely spoliated evidence.

#### 1.   Google's Production

Plaintiffs served Google with a subpoena for information and communications related to fo*****@gmail.com, an email address they learned had been used by Defendant in connection with Nitro TV. *Id.*, ¶ 27, Ex. O.  Google produced, among other things, what it refers to as email header information associated with Defendant's email address in mid-July.  *Id*.  The non-content email header information reflects, among other things, the "to", "from", and date sent or received and if the email has been put in "trash" (which means the email has been removed from the account holder's inbox or sent box by selecting to "trash" it) or "deleted" (which means it has been permanently deleted). *Id.*, ¶¶ 27, 29–30, Ex. P.

Defendant's email header information contains close to 1,500 email header entries with "deleted, trash" notations or a variant on that phrase. *Id.*, ¶ 28.   Based on the information received from Google, it appears that Defendant engaged in a surgical and massive email purge after being served on April 3.  *Id*., ¶¶ 29–30 Ex. P.[7]  The email header production reflects that from over 6,800 emails, Defendant selected about 1,500 to delete. *Id.*, ¶ 30.

---

[7] Email header information exists only for emails that are in Google's possession. Google retains emails that are permanently deleted from the user's point of view, which are denoted "deleted" in the headers, for 30 to 60 days following their

Defendant's permanently deleted emails include emails that Defendant sent to Mr. Horsten as reflected in the example below:

```
X-Gmail-Labels: Deleted,Sent,Trash
…
Thu, 31 May 2018 15:19:15 -0700 (PDT)
From: fo*****@gmail.com
Date: Thu, 31 May 2018 17:19:15 -0500
…
To: horsten@*****.***.**
```

Shepard Decl., ¶ 31, Ex. O (highlighting added).  As explained above, Defendant's May 2018 email to Mr. Horsten appears to have been permanently deleted from Defendant's Gmail account *after the case was filed on April 3, 2020.*

Defendant did not limit his deletion of relevant emails to his communications with Mr. Horsten.  To the contrary, Defendant deleted hundreds of emails sent and received from a number of different providers of services that facilitate the operation and sale of IPTV service.  *See* Shepard Decl., ¶ 31; Second Van Voorn Decl., ¶¶ 10–21.  Many of these deleted emails likely contain relevant information.  For example, hundreds of deleted emails involve communication with MoonClerk, a company that facilitates recurring and one-time payments.  Shepard Decl., ¶¶ 30-32, 34, Ex. O; Second Van Voorn Decl., ¶ 20; https://www.moonclerk.com/.  Such services appear to have been used to support Defendant's Nitro TV operation in terms of his network

---

permanent deletion.  There are two ways for an email to become permanently deleted from the user's point of view: (1) The user moves an email to the trash folder, and then the user empties the trash folder; or (2) The user moves an email to the trash folder, and Google automatically removes it after it has been in the trash for 30 days.  Shepard Decl., ¶ 29, Ex. P.  This means that the "deleted" fo*****@gmail.com emails listed in Google's header production were deleted by the fo*****@gmail.com account holder in the 60 to 90 days prior to Google pulling its email header information for production on or around June 15, 2020.  *Id.*, ¶ 30, Ex. P.  This strongly suggests that Defendant's email purge commenced after Defendant was served on April 3.  Assuming a 90-day window applied, it is theoretically possible that Defendant randomly decided in late March 2020 to delete close to 1,500 emails from 2016 to 2020 while leaving thousands of other emails untouched.  But this seems highly improbable.  The more likely scenario is that Defendant selectively deleted these emails after being served to try to cover his tracks.

9

of resellers (with the sale of Nitro TV Reseller Credits on a one-time or recurring basis) and/or his direct sales to subscribers (with the collection of recurring payments for their monthly Nitro TV subscriptions).  *See* Second Van Voorn Decl., ¶ 20, Ex. B.  Defendant also deleted over 20 emails reflecting communications with Coinbase, a cryptocurrency company that can be used to accept payments in the form of cryptocurrency as well as to convert revenues to store them as cryptocurrency.  *See id.*, ¶ 21; Shepard Decl., ¶ 32, Ex. O; https://www.coinbase.com/.

Moreover, the very existence of many of these emails undermines Defendant's claim that he is "just a reseller," as only *operators*, and not those who were merely selling subscriptions to end user subscribers, would need to communicate with many of these service providers (*e.g.*, Xtream Codes, WHMCS). Second Van Voorn Decl., ¶¶ 12, 14–15.

Besides the deletion of relevant documents, Google's production also reflects that Defendant continues to possess relevant, responsive documents.  For example, Defendant received emails on April 11, 2020 from iPage, Inc., which provided services to Defendant pertaining to the NitroIPTV.com website.  Shepard Decl., ¶¶ 10, 33, Ex. O.  He has not produced those emails.  *Id.*

### 2.   FDCServers' Production

Plaintiffs subpoenaed FDCServers ("FDC"), a company that offers high volume, large scale web hosting services.  Shepard Decl., ¶ 34; Second Van Voorn Decl. ¶ 17; https://www.fdcservers.net/.  FDC's production reflects that it had a customer using the email address fo*****@gmail.com associated with Defendant. Shepard Decl., ¶ 34, Ex. O.  The company name on this account is "tekkhosting," and the customer is "Martha Galindo," who is believed to be Defendant's mother. *Id.*  FDC's production reflects that it communicated with the account holder regarding this account, and Google's production reflects that FDC sent emails to and/or received emails to fo*****@gmail.com pertaining to this account.  *Id.* None

of these communications have been produced, and a number of the emails were permanently deleted.  *Id.*

### 3. Subpoenas for Payment Records

The documents Plaintiffs received in response to a subpoena to PayPal for records pertaining to Richard Horsten reflect that Mr. Horsten was paid over $30,000 by Anna Galindo, who is believed to be Defendant's wife.  Shepard Decl., ¶ 16, Ex. L.  The response Plaintiffs received to their subpoena to another third party involved in Nitro TV reflects that that party was paid over $40,000 through Anna Galindo, Martha Galindo, and tekkhosting@gmail.com.  Shepard Decl., ¶ 35, Ex. R.

## III. AN ORDER INSTRUCTING DEFENDANT TO PRESERVE EVIDENCE AND REQUIRING IMAGING OF HIS DEVICES IS WARRANTED.

Defendant's blatant disregard for his discovery obligations and his apparent wholesale destruction of evidence warrants the issuance of an order instructing him on his duty to preserve all remaining evidence (if any) and allowing Plaintiffs to immediately depose Defendant on the issues of document searches and preservation, without it impacting Plaintiffs' right to later depose Defendant on substantive claims and defenses.  The record also supports requiring forensic imaging of Defendant's electronic storage devices, email and social media accounts, and messengering applications containing evidence relating to this case.

### A. Defendant's Discovery Misconduct Necessitates an Order to Preserve Evidence.

An order instructing Defendant as to his to duty to preserve is necessary, as there is a significant concern that relevant evidence is being, or will be, destroyed.

"[C]ourts have the implied or inherent power to issue preservation orders . . . ."  *Am. LegalNet, Inc. v. Davis*, 673 F. Supp. 2d 1063, 1071 (C.D. Cal. 2009).  In most cases, a preservation order is unnecessary because parties "are under [an ongoing] duty to preserve [relevant] evidence." *Bright Sols. for Dyslexia, Inc. v. Doe*

*1*, 2015 WL 5159125, at *2 (N.D. Cal. Sept. 2, 2015).  When, however, there is "a significant concern that potentially relevant evidence will be destroyed causing harm to the opposing party," courts deem it appropriate to issue a preservation order.  *Id.*

To assess whether a preservation order is warranted, courts apply two related tests.  The first test asks whether a preservation order "is necessary and not unduly burdensome."  *Am. LegalNet*, 673 F. Supp. 2d at 1072.  Under this test, "the proponent ordinarily must show that absent a court order, there is significant risk that relevant evidence will be lost or destroyed—a burden often met by demonstrating that the opposing party has lost or destroyed evidence in the past or has inadequate retention procedures in place."  *Id.* (citation omitted).  The second test balances three considerations: "(1) threats to preservation of the evidence, (2) irreparable harm likely to result to the party seeking preservation, and (3) the capability of the custodian to maintain the evidence sought to be preserved."  *OOO Brunswick Rail Mgmt. v. Sultanov*, 2017 WL 67119, at *1 (N.D. Cal. Jan. 6, 2017).

Plaintiffs readily satisfy both tests.  As an initial matter, Defendant admits that he is a reseller of Nitro TV, owned the NitroIPTV.com domain name to resell Nitro TV, and that he created and administered the Nitro TV Official Facebook group page.  Shepard Decl., ¶ 20, Exs. A, B.  Thus, even accepting Defendant's description of his role in Nitro TV, it is implausible that Defendant would have no responsive documents unless he had engaged in widespread deletion.

Indeed, there is substantial evidence that Defendant has destroyed and concealed relevant evidence.  As previously noted, a Google production shows that close to 1,500 emails were permanently deleted, which, based on information from Google, indicates such emails were likely deleted after the lawsuit was filed.  *See* Section II.E, *supra*.  What is more, there is reason to believe that a number of the deleted emails are relevant to this action.  By way of example, Defendant deleted emails he sent to "horsten@*****.***.**"—*i.e.*, Richard Horsten, along with emails from FDC related to the business of "tekkhosting" and communication with

the recurring payment processor MoonClerk.  *Id.*  Accordingly, it is highly likely that these and other deleted emails relate to the operation of Nitro TV.  *See OOO Brunswick*, 2017 WL 67119, at *1 (issuing a preservation order because the defendant's misconduct—sending confidential documents from a work email account to a personal email account, deleting the sent messages, and emptying the trash folder—suggested that defendants would "delete relevant material from their [personal] email accounts").

Significantly, any pertinent deleted emails—and other "deleted" data on Defendant's electronic storage devices more generally (*e.g.*, software applications and text/SMS messages)—are at risk of permanent destruction absent intervention.  Shepard Decl., ¶ 29, Ex. P; *Bright Sols.*, 2015 WL 5159125, at *3 (noting that under Google's "regular business practices, user data is routinely destroyed within months after a user deletes that information"); *OOO Brunswick*, 2017 WL 67119, at *1 (noting the risk "that Google and Rackspace might delete material themselves . . . by automatically erasing emails that [the defendants] moved to their trash folders"); *see also Columbia Pictures Indus., Inc. v. Fung*, 2007 WL 9627610, at *5 (C.D. Cal. July 25, 2007) (noting that "'[d]eleting' a file does not actually erase that data from the computer's storage devices" but rather "changes [the data] to a 'not used' status," which "permit[s] the computer to write over the 'deleted' data").

In addition to email destruction, as described above, it appears that Defendant has continued his practice of communicating about Nitro TV via Telegram, which he admits is set to auto-destruct messages.  Shepard Decl., ¶ 20, Ex. C.  Defendant's admission shows a knowing, ongoing, and willful destruction of evidence in violation of his duty to preserve evidence that is plainly relevant to this action.  *See Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 431 (S.D.N.Y. 2004) ("Once a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and . . . ensure the preservation of relevant documents.") (quoting *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 218 (S.D.N.Y. 2003)).

A preservation order is necessary here because the failure to preserve this evidence will irreparably harm Plaintiffs by depriving them of key proof that is uniquely in Defendant's possession.   As noted, deleted ESI—whether communications or other data—exists, if at all and only temporarily, in Defendant's electronic storage devices. *See Columbia Pictures*, 2007 WL 9627610, at *5 (noting that "data which is deleted from a computer is retained on the hard drive, but is constantly being overwritten by new data, through the normal use of the computer equipment").  Yet such evidence is key to refuting Defendant's claim that he is just a Nitro TV reseller (by, for example, revealing use of software or services for IPTV operators); showing the extent of the infringement of Plaintiffs' Copyrighted Works (by, for example, reflecting the works streamed); and identifying his Nitro TV network (by, for example, identifying his resellers).  *See OOO Brunswick*, 2017 WL 67119, at *1 (concluding that the deletion of pertinent emails would cause irreparable harm); *Columbia Pictures Indus. v. Bunnell*, 2007 WL 2080419, at *4 (C.D. Cal. May 29, 2007) (noting that certain ESI was relevant to Plaintiffs' copyright infringement action because it evinced "whether defendants' users have directly infringed plaintiffs' copyrighted works, and to what extent defendants' website is used for purposes of copyright infringement").

Finally, the burden, if any, on Defendant to preserve this evidence is trivial—especially as compared to the ill-gotten gains he reaped by way of his mass-scale copyright infringement of Plaintiffs' works.  At most, Defendant will simply have to cease affirmatively deleting relevant evidence, switch off any auto-delete settings, and forensically image pertinent electronic storage devices so as to prevent further overwriting of deleted data.  The first two pose no burden at all.  *See id.* at *7 (concluding that retaining the data "would be a trivial matter involving little more than a setting change on the web server program").  And it would not be unfair to require Defendant to cover the costs of imaging, as it is his brazen conduct that requires the issuance of a preservation order in the first place.  *Cf. United Artists*

14

*Corp. v. United Artist Studios LLC*, 2019 WL 9049050, at \*10–11 (C.D. Cal. Oct. 7, 2019) (noting "the evidence is clear that, but for [defendant's misdeeds], the forensic investigation would not be necessary" and ordering the parties to share equally in the cost of forensic investigation subject to cost shifting if further evidence of "discovery misconduct . . . should surface").

Accordingly, the Court should issue an order instructing Defendant as to his duty to preserve relevant evidence.  To ensure Defendant is preserving all relevant evidence, Plaintiffs further request that the Court order an immediate deposition of Defendant to identify the repositories of relevant documents and the electronic storage devices he used; his preservation (or lack thereof) of documents; and any deletion of emails or other records.  Fed. R. Civ. P. 26, Cmt. (noting that "[w]hen a case involves discovery of electronically stored information," "identification of, and early discovery from, individuals with special knowledge of a party's computer systems may be helpful").  Plaintiffs also ask that the Court order that such a deposition will not count against Plaintiffs' deposition of Defendant regarding the claims and defenses in this matter.[8]

### B. Forensic Imaging of Defendant's Pertinent Electronic Storage Devices, Email and Social Media Accounts, and Messengering Applications Is Warranted.

Courts typically order forensic imaging under two distinct circumstances.[9]  The first is where "serious questions exist both as to the reliability and the completeness of materials produced in discovery."  *Advante Int'l Corp. v. Mintel*

---

[8] *See* Wright & Miller, Federal Practice & Procedure, § 2104 (3d ed.) (noting that "that there is a strong reason to take [ESI discovery] depositions early in the case, and in such circumstances it could readily be counterproductive for that early and narrow deposition to foreclose a later deposition addressed to the merits of the case"); *see also* Fed. R. Civ. P. 30 (permitting leave of court to take multiple depositions "to the extent consistent with Rule 26(b)(1) and (2)").

[9] Assuming a preservation order is in place, the imaging could occur after Plaintiffs depose Defendant regarding the devices and repositories he used as described above.

15

*Learning Tech.*, 2006 WL 3371576, at *1 (N.D. Cal. Nov. 21, 2006); *see also United Artists Corp.*, 2019 WL 9049050, at *9 ("The scales tip in favor of compelling forensic imaging where there exists evidence of either discrepancies in discovery response or a failure by the responding party to produce requested information"). The second is where there is a special connection between the electronic storage devices and the claims in the case. *See, e.g., Satmodo, LLC v. Whenever Commc'ns, LLC*, 2018 WL 3495832, at *4 (S.D. Cal. July 20, 2018) (ordering hard drive imaged as "[the] defendant allegedly used the computer itself to commit the wrong that is the subject of the lawsuit"). Both circumstances are present here.

*First*, there is specific, concrete evidence raising serious doubts about the reliability and completeness of Defendant's discovery responses. To begin, Defendant has produced ***zero*** documents in response to Plaintiffs' document requests, stating that "there are no responsive documents." Shepard Decl., ¶¶ 20, 23, Ex. B. This strains credulity for many reasons. It is impossible to believe that Defendant, who has admittedly been involved with Nitro TV for over three years, does not have a single document pertaining to Nitro TV. Defendant's efforts to explain this away with claims such as "[m]any companies are paperless" is nonsensical. Shepard Decl., Ex. S. It ignores the common meaning of the word "paperless" and erroneously equates it with "record-less." Moreover, Defendant's representation that there are no responsive documents is even inconsistent with his purported counter-narrative—that he is simply a Nitro TV reseller. Even if that were true, there would, at a minimum, be communications and financial documents evincing his Nitro TV transactions as well as records reflecting the revenues that Defendant earned from selling Nitro TV subscriptions. Finally, non-party discovery has yielded scores of documents regarding Defendant's ownership and subsequent transfer of NitroIPTV.com; Defendant's financial dealings with individuals and entities involved in operating Nitro TV; and Defendant's communications with such individuals and entities (most likely regarding Nitro TV). *See* Section II.E. The

16

circumstances here go far beyond raising serious doubts about the reliability and completeness of Defendant's discovery responses and, thus, warrant imaging. Courts have ordered forensic imaging under similar circumstances. *See, e.g., United Artists Corp*., 2019 WL 9049050, at *10 (ordering forensic imaging upon a showing of serious doubts about the reasonableness and adequacy of the defendant's search efforts where the defendant, an online film festival operator accused of trademark infringement, produced only 56 pages of publicly-available internet printouts and screenshots of two emails in response to 57 document requests).

Next, to the extent Defendant is not presently willfully withholding documents and in fact, has "no responsive documents," the evidence indicates this is because Defendant has engaged in across-the-board destruction and spoliation of relevant evidence. *See* Section II.E. This provides further grounds for ordering forensic imaging. *See Playboy Enters., Inc. v. Welles*, 60 F. Supp. 2d 1050, 1052 (S.D. Cal. 1999) (ordering forensic imaging of the defendant's hard drive where there was evidence that defendant's "custom and practice [was] to delete incoming e-mail after [she] read it and to delete outgoing e-mail after [she] sent it," as well as to "delete from the 'trash' section of the computer the e-mail which [she] deleted from the e-mail mailbox"); *Alexis v. Rogers*, 2017 WL 1073404, at *5 (S.D. Cal. Mar. 21, 2017) (concluding the defendants "established a legal basis justifying their request for a forensic examination of Plaintiff's computer and/or hard drive(s)" based on evidence that the plaintiff's "computer or hard drive crashed and that she lost, or subsequently was unable to locate, relevant documents").

*Second*, there is a special connection between Defendant's electronic storage devices, as well as his email and social media accounts and messengering applications (collectively, "Accounts"), and this action. Given that Nitro TV was an online/digital business, Defendant's electronic storage devices and Accounts used in connection with operating Nitro TV likely contain unique evidence that is material to this case. This includes, among other things, the software (or the remaining traces

of such software) that Defendant used to support the illegal IPTV service and other incriminating data that Defendant has likely deleted from all other servers or electronic storage devices but that persists in the devices' hard drives. *See United Artists Corp.*, 2019 WL 9049050, at *10 (noting that "[b]ecause UAS is an online business, there is no [] means [other than forensic imaging] by which UAC may obtain these documents, to the extent they exist"); *Columbia Pictures*, 2007 WL 9627610, at *4–5 (observing that "it is well-established that deleted files are discoverable" and noting that "data which is deleted from a computer is retained on the hard drive, but is constantly being overwritten by new data, through the normal use of the computer equipment").  Along the same lines, Defendant's infringing conduct was necessarily perpetrated by way of his computers, mobile phones, and other electronic devices. *See, e.g., Satmodo,* 2018 WL 3495832, at *4 (ordering forensic imaging because the defendant "allegedly used the computer itself to commit the wrong," and "inspection of the devices could reveal evidence of the click-fraud that Plaintiff alleges . . . or, possibly, that the devices have been modified/wiped").

Accordingly, the Court should order forensic imaging of any computers, mobile phones, hard drives, or other electronic storage devices in Defendant's possession, custody, or control used in connection with Nitro TV, as well as any Accounts Defendant used in connection with Nitro TV.  To that end, Plaintiffs submit a [Proposed] Order setting forth an imaging protocol, which is narrowly tailored to the needs of this case and tracks imaging protocols other federal courts have found sufficient to safeguard against any privilege and privacy concerns. *See, e.g., Playboy*, 60 F. Supp. 2d at 1054; *Advante*, 2006 WL 3371576, at *1; *Cahn v. Oversee.net*, 2011 WL 13220391, at *2 (C.D. Cal. Nov. 29, 2011).

\\

\\

## IV.    AN    ORDER    COMPELLING    FURTHER    INTERROGATORY RESPONSES IS WARRANTED.

Defendant has "a duty to provide true, explicit, responsive, complete and candid answers to [Plaintiffs'] discovery." *Skinner v. Ryan*, 2014 WL 3064897, at *4 (D. Ariz. July 7, 2014) (citation omitted); *see also Equal Rights Ctr. v. Post Props., Inc.*, 246 F.R.D. 29, 32 (D.D.C. 2007) ("One of the primary purposes of discovery is to make a trial less a game of blind man's bluff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent.") (alterations omitted) (citation omitted).  As set forth below, Defendant utterly failed to fulfill this duty in his responses to Plaintiffs' Interrogatories Nos. 1 and 2.

These interrogatories simply ask Defendant to identify (1) other individuals—"including full name, all known aliases, and full contact information"—involved in Nitro TV and their roles and (2) the individuals responsible for running or operating Nitro TV, to the extent Defendant claims he is not in control. Ex. A.  Defendant was not candid or complete in his verified responses.

As explained above, Defendant claimed that he could only recall two aliases for individuals he communicated with via Telegram.  Then, after a meet-and-confer call pointing out that this response could not be squared with records Plaintiffs submitted in connection with their PI Motion, Defendant merely supplemented his response to add individuals Plaintiffs were already aware worked with Defendant on his Official Nitro TV Facebook group, and then he continued his stonewalling by claiming that he did not "know anything" about these admins "or the details that you seek."  *See* Shepard Decl., ¶ 22, Ex. B.  Defendant justified his supposed inability to identify anyone by asserting that "anything involved with nitroIPTV (sic) was done through 'telegram' (sic) and that application has deleted per settings."  *See* Shepard Decl., ¶ 20; Ex. C.  Plaintiffs do not doubt that Defendant communicated about Nitro TV using Telegram to hide his illegal conduct.  But that does not mean Defendant is

19

unable to provide the real names and contact information for these individuals or other key participants in Nitro TV operations.

The deficiencies in Defendants' responses are apparent for two main reasons. *First*, Defendant's long involvement as—at a minimum—a reseller in the illegal Nitro TV enterprise and the creator and administrator of the Nitro TV Official Facebook group belies his assertion that he knows **nothing** about **anyone** else involved.  Indeed, Defendant was involved with Nitro TV before the service itself was launched through 2020.  *See* Section II.A.  Further, because Defendant was, even by his own admission, at the very least a reseller of Nitro TV subscriptions, financial and subscriber records reflecting these sales and purchases—and the names of the other parties to these financial transactions—must have been created.  *See* Second Van Voorn Decl., ¶¶ 3, 5.  Simply put, Defendant's story that he can identify just two aliases of individuals involved in the Nitro TV enterprise has been implausible from the outset.

*Second*, the productions from third parties demonstrate that Defendant communicated with other individuals involved in Nitro TV through email and paid some of them, like Richard Horsten and others involved in the Nitro TV enterprise, large sums of money through payments made by Defendant's family members, Martha Galindo and Anna Galindo.  *See* Section II.E, *supra*.  This evidence reflects that Defendant has not been forthcoming in his verified responses and has much more responsive information that he has not yet provided, including information explaining the roles of Martha and Anna Galindo in his Nitro TV enterprise.[10]

Plaintiffs respectfully request that the Court order Defendant to provide fulsome, verified, supplemental responses to Interrogatories Nos. 1 and 2.

---

[10] Defendant's failure to identify Martha Galindo, Anna Galindo, and Mr. Horsten are just a few examples of his refusal to identify those with whom he has worked and regularly communicated regarding Nitro TV.  Other examples exist but are not provided here, as Defendant's tactic is to "supplement" his deficient discovery responses with information Plaintiffs already know.

## V.    AN ORDER COMPELLING PRODUCTION OF ALL RESPONSIVE DOCUMENTS TO PLAINTIFFS' FIRST AND SECOND SET OF REQUESTS FOR PRODUCTION IS WARRANTED.

Defendant has stonewalled Plaintiffs by claiming that he does not have a single document referring Nitro TV and otherwise responsive to Plaintiffs' requests. *See* Shepard Decl., ¶¶ 20–21, 23, 25, Exs. C, E.  As stated before and confirmed by the examples below, Defendant's position is demonstrably untrue in many cases and not credible in others.  Accordingly, Plaintiffs respectfully request that Defendant be ordered to produce all documents responsive to RFP Nos. 2 through 5 and 7 through 80 in his possession, custody, or control.  *See Rogers v. Giurbino*, 288 F.R.D. 469, 485 (S.D. Cal. 2012) (granting motion to compel further responses to discovery requests where "responsive documents [were] likely to exist"); *see United Artists Corp.*, 2019 WL 9049050, at *6, *11 (compelling further searches for responsive documents because "there [was] reason to believe that the production [was] incomplete").[11]

### A. Documents Identifying Others Involved in Nitro TV, Their Roles, and the Companies Providing Content and Infrastucture for Nitro TV

Plaintiffs served document requests seeking types of information similar to that sought by Plaintiffs' Interrogatories Nos. 1 and 2, including RFP Nos. 37 (seeking documents identifying people involved in Nitro TV), 34 (seeking documents identifying any person from whom Defendant has acquired content for Nitro TV and the he amount paid them), 39-43 (seeking documents pertaining to Mr. Horsten and the administrators of Defendant's Official Nitro TV Facebook group), 47 (seeking documents identifying all payment processors), 50–52 (seeking

---

[11] Defendant has waived all objections to RFP Nos. 2 through 5 and 7 through 80 by not asserting any objections and failing to timely respond.  Shepard Decl., ¶ 25, Ex. E.  *See Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1473 (9th Cir. 1992) ("It is well established that a failure to object to discovery requests within the time required constitutes a waiver of any objection.").

documents identifying Nitro TV resellers and the number of subscribers they have), and 64 (seeking documents identifying people involved in the marketing and promotion of Nitro TV).   Shepard Decl., ¶ 24, Ex. D.   Defendant has failed to produce any responsive documents.  *Id.*, ¶ 25, Ex. E.  Yet for the reasons set forth above in Sections II.E and IV, responsive documents were created and must exist unless Defendant destroyed them.

### B. Documents Reflecting the Revenues Defendant Derived From Nitro TV and Concerning His Purchase of Reseller Credits and Sales of Subscriptions

Plaintiffs asked Defendant to produce documents and all communications related to his purchases of Nitro TV reseller credits as well as documents sufficient to identify the total number of Nitro TV subscribers on a monthly basis.  *See* RFP Nos. 3, 4, and 55. In response, Defendant repeated the refrain that he has no responsive documents, as "anything involved with nitroIPTV (sic) was done through 'telegram' (sic) and that application has deleted per settings."  *See* Ex. C (Def's Responses to Pl.'s First Set of RFPs).  Plaintiffs also asked for documents reflecting any revenues Defendant earned and other consideration he received in connection with Nitro TV as well as documents reflecting revenue sharing arrangements.  *See* RFP Nos. 9-12, 38, 56-59.   Again, Defendant responded he has no responsive documents.

Defendant's responses cannot be squared with the facts even if Defendant is only a Nitro TV reseller.  As a Nitro TV reseller for a ***paid*** subscription service (which Defendant says he is), Defendant would necessarily have—at the very least—financial records, such as credit card statements, and other bank and subscriber records, reflecting his purchases of Nitro TV reseller credits as well as the revenues from his subscription sales.  Defendant's use of Telegram does not explain his failure to produce such documents, as Telegram can only be used to communicate with other users who have downloaded and installed the Telegram app.

22

Second Van Voorn Decl., ¶ 5.  Thus, as a practical matter, Telegram cannot be used for transactions and communications regarding most of the underlying functions of a subscription-based IPTV service such as billing and payment.  *Id.*  Indeed, the Google email headers reflect Defendant used a recurring payment processor called MoonClerk.  They also include communications with Coinbase, a company whose services would permit Defendant both to accept payments in cryptocurrency as well as to convert revenues earned from Nitro TV into cryptocurrency.  Second Van Voorn Decl., ¶ 21; https://www.coinbase.com/.  In short, Defendant's use of Telegram cannot explain his complete failure to produce his financial, subscriber, and reseller records, as well as related emails.[12]

### C. Documents Reflecting the Payments He Has Made Indirectly and Directly to Others for Their Work on Nitro TV

RFP No. 46 seeks documents evidencing who Defendant has paid, directly or indirectly, for assistance with Nitro TV and how much they were paid.  Defendant claims that he has no responsive documents, but records produced by third parties show otherwise, as they reflect that Defendant's wife and mother paid Mr. Horsten and another individual who also assisted Defendant with Nitro TV tens of thousands of dollars, which suggests that Defendant used them as conduits.  *See* Section II.E.

### D. Documents Reflecting Non-Privileged Post-Filing Communications and Communications with Domain Name Registrars

As noted above, RFP No. 2 asked Defendant to provide all of his communications regarding Nitro TV, NitroIPTV.com, and TekkHosting.com, from April 3, 2020, when the complaint in this action was served, to the present.  RFP No.

---

[12] As noted above, Defendant's assertion that he possesses no communications with persons from whom he has purchased Nitro TV reseller credits cannot be squared with the all of the evidence submitted with the Plaintiffs' PI Motion, including exhibits thereto, reflecting the purchase, sale, and transmittal of login credentials, along with customer service communications in connection with NitroIPTV.com that were conducted through websites (*e.g.*, inquiry pages and chats) and follow-up emails.  *See* Dkt. 12.

5 seeks communications with "Namecheap, Inc., Domain.com, LLC, Tucows, Inc., TucowsDomain.com and any other domain registrars regarding Nitro TV." In response to both RFPs, Defendant stated that he had no responsive documents due to his use of Telegram set to delete. *See* Shepard Decl. ¶ 23; Ex. C.

Even putting aside evidence that Defendant spoliated evidence by destroying a portion of his communications regarding Nitro TV, third-party productions alone reflect that Defendant's response is suspect. *See* Section II above. As previously explained, records produced by Google, FDC, and other third parties indicate that Defendant communicated via email with companies providing infrastructure to IPTV services (*see id.*; Second Van Voorn Decl., ¶¶ 10–21), and that these emails likely were related to Nitro TV, NitroIPTV.com, and/or TekkHosting.com. By way of example only, Defendant's email header information reflects that Defendant exchanged emails with iPage, Inc., the website host for NitroIPTV.com, in April 2020, within days of the commencement of transfer away request. *See* Shepard Decl., ¶ 33; Exs. H, O. For these reasons, Defendant's claim that he has no documents responsive to these requests is unconvincing.

**E. Documents Reflecting Defendant's Email and Telegram Accounts Used for Nitro TV**

Plaintiffs requested documents reflecting Defendant's email addresses, the messengering applications he used, and his Telegram account information and credentials. *See* RFP Nos. 21, 22, 26, 27, 69. After Defendant repeatedly represented that he used Telegram, he now implausibly claims that he has no ability to produce documents reflecting his Telegram credentials or the accounts used. Equally unbelievable is Defendant's claim that he has no documents reflecting the email accounts he used in connection with Nitro TV, as it is clear he used fo*****@gmail.com, and Plaintiffs' have located several others through third-party subpoenas. Shepard Decl., ¶ 36.

***

As reflected in the examples above, Defendant's claim to have no responsive documents appears to be false.[13] Plaintiffs respectfully request that Defendant be ordered to produce all documents responsive to RFP Nos. 2–5 and 7–80 in his possession, custody, or control that have not been permanently deleted.  To the extent that Defendant permanently deleted documents from his email inbox, but those documents remain in Google's possession, Plaintiffs request that Defendant be ordered to consent to Google's production of these emails, as detailed in Section VI below.  Further, given the significant issues that exist with respect to the adequacy of Defendant's search for responsive documents, Plaintiffs also request a deposition of Defendant pertaining to document repositories, retention, and searches, as further described in Section III above.

## VI.   AN ORDER COMPELLING CONSENT TO PRODUCTION OF EMAILS BY GOOGLE IS WARRANTED.

Citing the Stored Communications Act ("SCA"), Google has refused to produce emails from the address fo*****@gmail.com without Defendant's consent (which he has not provided).  But as previously explained, Google has been able to provide Plaintiffs with the non-content headers for these emails, and Plaintiffs were able to determine that:

- Defendant had deleted close to 1,500 emails in the 60 to 90 days preceding Google's pull of the email header information on or about June 15, 2020,

---

[13]  Plaintiffs' examples address many but not all of the document requests at issue in this Motion, given that Defendant has waived all objections to every document requests, and, in an effort to avoid redundancy, as Defendant has proffered the same unbelieveable response to each document request.  In addition to what has been described before, Plaintiffs' RFPs seek highly relevant information, including information regarding Defendant's creation of Nitro TV channels and his other content sources, identification of all payment processors, the willfulness of his copyright infringement and any violations of the preliminary injunction order (*e.g.*, his repeat involvement with infringing services, his knowledge of prior litigation involving a now permanently enjoined IPTV service called SET TV, any continued involvement in IPTV services), and his affirmative defenses.

PLAINTIFFS' NOTICE OF MOTION AND MOTION

strongly suggesting that Defendant deleted those emails after being served with the complaint in this case.

- Many of these emails are likely relevant to this case and responsive to the requests for production Plaintiffs served on Defendant and not likely to have been deleted in the regular course of Defendant's business.  Indeed, many of these emails are several years old, so it is highly unlikely Defendant would have decided to delete them in April or May of 2020 had he not been served with the complaint.

*See* Section II.E, *supra*.  Given the substantial evidence strongly suggesting that Defendant violated his duty to preserve these emails, and the fact that now only Google has the ability to produce them, Defendant should be compelled to consent to Google's production of these emails.

The SCA permits providers to disclose electronic communications "with the lawful consent of the originator or an addressee or intended recipient of such communication, or the subscriber in the case of remote computing service."  18 U.S.C. § 2702(b)(3).  Such "lawful consent" may be compelled by court order.  Indeed, several courts have compelled such consent.[14]  *See, e.g.*, *Mafille v. Kaiser-Francis Oil Co.*, 2019 WL 1933747, at *4 (N.D. Okla. May 1, 2019) ("The court views requiring Christopher to execute a consent to the release of the information sought by the subpoena in Request No. 1 to be no more invasive than requiring him to open a physical filing cabinet to supply documents responsive to a discovery request."); *Al Noaimi v. Zaid*, 2012 WL 4758048, at *3 (D. Kan. Oct. 5, 2012); *Romano v. Steelcase Inc.*, 907 N.Y.S.2d 650, 657 (N.Y. Sup. Ct. 2010); *cf. Negro v. Super. Ct.*, 230 Cal. App. 4th 879, 899 (2014), *as modified* (Nov. 18, 2014) (holding

---

[14] Google indicated that it would produce the requested emails pursuant to a court order specifying Defendant's consent along with Defendant's provision of consent. Plaintiffs modeled the [Proposed] Order submitted herewith on a form supplied by Google.

PLAINTIFFS' NOTICE OF MOTION AND MOTION

that Florida court's order compelling consent "constituted 'lawful consent' under the SCA").[15]

Plaintiffs, thus, respectfully request that the Court compel Defendant to consent to Google's production of the deleted emails.  To the extent Defendant may claim privilege over some of these emails, Plaintiffs would not object to Google producing the deleted emails to Defendant's counsel for counsel to review and produce all responsive, non-privileged emails and log all emails Defendant withholds as privileged.  Further, as Plaintiffs have outstanding subpoenas for other relevant email header information, Plaintiffs respectfully request that the Court compel Defendant to consent to all other providers' production of deleted emails.

## VII.   PLAINTIFFS REQUEST THAT THE COURT FIND DEFENDANTS' MISCONDUCT WARRANTS AWARDING PLAINTIFFS THEIR ATTORNEYS' FEES.

Defendant's false discovery responses, refusal to produce documents, and spoliation of evidence warrant an order reimbursing Plaintiffs for the reasonable expenses incurred in bringing this Motion.  *See* Fed. R. Civ. P., 37(a), (c).[16]  Plaintiffs

---

[15] Several other courts have endorsed this approach.  *See, e.g.*, *Glazer v. Fireman's Fund Ins. Co.*, 2012 WL 1197167, at *3 (S.D.N.Y. Apr. 5, 2012) ("The Court . . . may simply *direct* that [a party] consent to disclosure if the chats are likely to contain information relevant to this case."); *Bower v. Bower*, 2011 WL 1326643, at *2 (D. Mass. Apr. 5, 2011) ("The parties do not seem to dispute that this court could order El–Nady to consent to the production of the emails since they are under her control although maintained by the service provider."); *In re Subpoena Duces Tecum to AOL, LLC*, 550 F. Supp. 2d 606, 613 n.5 (E.D. Va. 2008) (indicating that court "could order the Rigsbys to consent to AOL's disclosing the contents of their e-mails under the pain of sanctions"); *O'Grady v. Super. Ct.*, 139 Cal. App. 4th 1423, 1446 (2006), *as modified* (June 23, 2006) (noting "[w]here a party to the communication is also a party to the litigation, it would seem within the power of a court to require his consent to disclosure on pain of discovery sanctions").

[16] Plaintiffs reserve the right to seek additional sanctions for Defendant's spoliation of evidence once its scope and impact is more fully ascertained.

respectfully request that the Court set a briefing schedule for Plaintiffs' attorneys' fees motion.

## VIII.  CONCLUSION

Defendant's intentional spoliation of evidence, false discovery responses, and failure to produce relevant documents and information warrant the issuance of each of the three [Proposed] Orders submitted herewith.  These orders:

- Require Defendant to preserve evidence and immediately provide a deposition regarding document preservation and search issues that will not impact Plaintiffs' right to subsequently fully depose Defendant on substantive issues; compel Defendant to provide supplemental interrogatory responses and responses to document requests and to produce all documents responsive to RFP Nos. 2-5 and 7-80 in his possession, custody, or control; and find that Plaintiffs should be awarded their reasonable attorneys' fees incurred in connection with this Motion;

- Require Defendant to allow the imaging of all devices in his possession, custody, or control, as well as all Accounts, used in connection wth Nitro TV or any IPTV service; and

- Compel Defendant's consent to production of responsive emails by Google in the form submitted concurrently with this Motion.

Dated:  August 19, 2020                              JENNER & BLOCK LLP

                                                                By:  _____
                                                                        Julie Shepard
                                                                        *Attorneys for Plaintiffs*