1

2

3

4

5

6

7

8            UNITED STATES DISTRICT COURT

9            CENTRAL DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| COLUMBIA PICTURES INDUSTRIES, INC., et al., | Case No. 2:20-cv-03129-MEMF (GJSx) |
| Plaintiffs | |
| v. | **REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE** |
| ALEJANDRO GALINDO, et al., | |
| Defendants. | |

This Report and Recommendation is submitted to United States District Judge Maame Ewusi-Mensah Frimpong, pursuant to 28 U.S.C. § 636 and General Order No. 05-07 of the United States District Court for the Central District of California. This R&R addresses Plaintiff's Motion for Sanctions Against Defendant Alejandro Galindo ("Sanctions Motion") [Dkt. 164] and, additionally, contains the Court's recommendation of an award of attorneys' fees for motion practice associated with both the Sanctions Motion ($93,000 [Dkts. 177, 177-1]) and a previous Discovery Motion [Dkt. 57] ($88,080 [Dkts. 82, 82-2.]).[1]  For the reasons that follow, the

---

[1] The Magistrate Judge previously ruled that attorneys' fees and costs would be awarded on Plaintiff's Motion to Compel [Dkt. 57] but failed to enter a final order regarding the amount of fees after Plaintiffs filed their request and supporting

Court recommends that the District Judge (1) find that defendant Alejandro Galindo[2] willfully violated Court orders, and refused and failed to cooperate in discovery, and (2) issue terminating sanctions against Defendant.  Further, (3) the Court recommends that defendant Alejandro Galindo be ordered to pay a total of $181,080 in attorneys' fees and costs to Plaintiffs.

## INTRODUCTION

In this action, Plaintiffs are suing seven named Defendants for copyright infringement based on their ownership, operation, and marketing of an infringing Internet Protocol television ("IPTV") service called Nitro TV.  Second Amended Complaint ("SAC") [Dkt. 113] ¶ 1.  According to the SAC, until enjoined by the Court (United States District Judge Stephen V. Wilson), Defendants offered Nitro TV subscription packages consisting of thousands of live and title-curated television channels available twenty-four hours a day, seven days a week, throughout the United States and abroad.  *Id.*  Plaintiffs allege that the channels available on Nitro TV include many popular television programs and motion pictures such as *The Office*, *Spider-Man: Homecoming*, *Toy Story 3*, *Star Trek Beyond*, *Homecoming*, and *Joker*, including works whose copyrights Plaintiffs own or exclusively control. *Id.*  Plaintiffs further allege that, during the several years Defendants operated Nitro TV, they infringed, at a minimum, the 1897 copyrighted works identified by title and copyright registration number in Exhibit A of their SAC.

---

declaration.  Rather than entering attorneys' fees and sanctions orders piecemeal, the Magistrate Judge includes herein the fees award from the earlier motion practice along with her recommendation for terminating sanctions and the additional fees award.

[2] As detailed below, only Alejandro Galindo was named as a defendant in the original complaint.  Relatives of Alejandro Galindo with the same last name are named in the Second Amended Complaint.  The Court will use full names or otherwise distinguish the family members from Galindo as necessary in this R&R.

Plaintiffs allege that Defendants' infringement was willful, as Defendants actively selected the programming that they sold and streamed illegally to subscribers on Nitro TV Platforms, notified Nitro TV subscribers when channels containing Plaintiffs' Copyrighted Works had been added, asked subscribers for feedback regarding what television programs they would like Defendants to add to Nitro TV's channel lineup, and apparently added television shows in response to subscribers' feedback. *Id.* ¶ 3. Further, Defendants continued to operate and promote Nitro TV after receiving notices that they were infringing Plaintiffs' copyrights. *Id.* And, according to the SAC, Defendants attempted to hide their tracks and operate anonymously. *Id.* ¶ 4.

Plaintiffs filed their original complaint in April 2020. At that time, Defendant Alejandro Galindo ("Defendant") was the only named defendant. Plaintiffs immediately sought and were granted a preliminary injunction to stop Defendant's infringement, including his ongoing operation of Nitro TV. [Dkts. 12, 34.]

As detailed further below, Defendant refused to cooperate in discovery and did not produce any documents. Nevertheless, after obtaining records through third-party subpoenas and securing leave to amend based on those records, Plaintiffs filed the operative SAC on March 23, 2021, which added additional defendants and copyrighted works they allege were infringed. [Dkt. 113.] Among the newly added defendants are Anna Galindo, Martha Galindo, and Osvaldo Galindo. *Id.* Defendant filed his answer to the SAC on April 13, 2021, in which he asserted several affirmative defenses, including that his infringement was innocent. [Dkt. 126.]

On August 19, 2020, Plaintiffs filed their first motion for discovery ("Discovery Motion"). [Dkt. 57.] After full briefing, the Court granted that motion at a hearing in October 2020 [Dkts. 88 (transcript ("Tr.")) and 139]. The details of the Court's ruling are included where necessary in the factual findings below.

On June 4, 2021, Plaintiffs filed the Sanctions Motion that is the primary subject of the instant R&R.  Plaintiffs requested terminating sanctions, or, in the alternative, a host of preclusionary sanctions that would essentially amount to terminating sanctions in the case of Defendant.  [Dkt. 164.]  The Sanctions Motion was heard by the Court on July 7, 2021, and Plaintiffs filed subsequent documents as ordered by the Court.

### FINDINGS OF FACT

**I.    Defendant's Destruction of Evidence and False Discovery Responses Under Oath.**

1.    Defendant registered the domain name NitroIPTV.com in December 2016.  [Dkt. 58-6 at 2; *see also* Dkt. 58-1 at 6.]  Defendant used several domain names and email addresses.  For example, when registering the domain name NitroIPTV.com, Defendant used the email address forenzi@gmail.com.  [Dkt. 58-6 at 2.]  Defendant also created the Google email address NitroIPTV@gmail.com on December 1, 2016.  [Dkt. 164-8 at 2.]  And Defendant created the Official Nitro TV Facebook Group in 2017, which promoted NitroIPTV.com.  [Dkts. 58-2 at 5] (admitting creation of Facebook group); 13 ¶¶ 6–10; 13-1 at 2 (Facebook group page).]

2.    On April 3, 2020, Defendant was personally served with Plaintiffs' initial complaint and motion for a preliminary injunction seeking to stop Defendant's ongoing operation of Nitro TV.  [Dkt. 23.]  On April 7, 2020, Defendant's counsel filed a notice of appearance in this case.  [Dkt. 20.]

3.    On April 12, 2020, after being put on notice of the claims asserted against him arising from his operation of Nitro TV, Defendant deleted his primary NitroIPTV@gmail.com email account.  [Dkt. 164-8 at 2.]

4.    While as a legal matter, Defendant was on notice through personal service and because he was represented by counsel that he was required to retain

relevant evidence, he was specifically advised by his counsel, Mr. Vondran, that he had to preserve evidence.  Mr. Vondran declared on both September 21, 2020 and June 10, 2021 that Galindo had previously been advised of his duty to preserve and not to spoil evidence in this case.  Defendant's counsel was, in the Court's view, intentionally vague in both declaration about when he advised Defendant of his duty to preserve evidence.

5.      Defendant also purged a large quantity of e-mails from his email account forenzi@gmail.com, which was also used in connection with Nitro TV's operations.  Over 1,500 of 6,800 emails were deleted.  [Dkts. 58 ¶¶ 27–33; 58-2 at 7; 58-6; 58-8; 58-15; 58-16; 59 ¶¶ 7–9.]  Defendant used this email account to communicate with co-Defendant Richard Horsten and in setting up accounts with providers of services used by IPTV services like Nitro TV.  *Id.*

6.      Deletion of some forenzi@gmail.com emails occurred after Defendant was on notice of the claims asserted against him in this action.  This fact is established by the dates of the emails Defendant deleted.  Specifically, Defendant received emails after April 3, 2020 that he later deleted.  Such e-mails could only have been deleted after Defendant was served with the complaint.  [*See, e.g.*, Dkts. 164-1 ¶ 11; Dkt. 164-15 at 2–7.]

7.      Although it has not been possible for Plaintiffs to definitely determine when the deletion of forenzi@gmail.com emails dated prior to April 3, 2020 occurred, the information produced pursuant to subpoena by third-party Google strongly suggests they were deleted *after* Defendant was on notice of this litigation.  [Dkts. 57 at 17–18; 58 ¶¶ 27–32; 58-15; 58-16.]  When Plaintiffs inquired of Defendant whether he deleted emails from this account after April 3, 2020, he refused to answer and invoked the Fifth Amendment.  [Dkt. 175 at 5 (108:4–15).]

8.      The Court finds that emails in Defendant's forenzi@gmail.com account that were deleted when Defendant was on notice of the ligation would have been relevant to this litigation.  For example, these emails included communications with

5

iPage, a company affiliated with Domain.com, which registered and held Defendant's domain name tied to his brand, NitroIPTV.com.  Also included are emails with FDCServers, a company offering high volume, large scale web hosting services that would be used to provide IPTV services to subscribers.  FDCServers produced records reflecting that it provided a dedicated server to an account for "tekkhosting" using Defendant's forenzi@gmail.com email address during this time.  And further included are emails dated between April 2020 and June 2020 with WHMCS, whose services have been used for managing billing and other aspects of IPTV services like Nitro TV.  [Dkts. 58 ¶¶ 10, 27–36; 58-6 at 2; 58-15 at 2–18; 58-16 at 2–3; 59 ¶¶ 10, 14, 16–19; 164-1 ¶ 11; 164-15 at 2–7.]

9.     For example, screenshots and other evidence detailed throughout Plaintiffs' complaint [Dkt. 1] show the critical nature of Plaintiff's e-mails and the "tekkhosting" service related to NitroTV.  Generally, Plaintiff was communicating with these services, and through these services with subscribers, to offer specific copyrighted titles, bill customers (relevant to damages), and to manage other aspects of the NitroTV service.  While some of the information Plaintiffs need to demonstrate the extent of the harm they suffered has been made available by third parties, gaps in the data – and certainly e-mails between Galindo and others who assisted in creating and operating the NitroTV service – have been lost.

10.    When Plaintiffs deposed Defendant about his use and deletion of a number of relevant email accounts, he repeatedly refused to answer and asserted the Fifth Amendment.  [Dkts. 164-1 ¶ 12; 164-2; 175 at 5–10.  *See also* Dkt. 164-1 ¶ 12, Dkt. 164-2 at 142:14–17.]

11.    On May 29, 2020, Plaintiffs served their first set of interrogatories and requests for production of documents (RFPs), which requested that Defendant identify other individuals involved in Nitro TV and the individuals he believes are responsible for running Nitro TV, as well as certain communications, among other things.  [Dkt. 58 ¶ 18.]

12.     Less than a month later, on June 26, 2020, the Google email account rokutvjunkie@gmail.com, which was used by Defendant, was deleted.  [Dkts. 164-1 ¶ 10; 164-9 at 2; 164-10 at 2.]  That same day, the Google email account nitrovisionplus@gmail.com, which was created by Osvaldo Galindo, was deleted.  [Dkts. 164-1 ¶ 10; 164-11 at 2–3; 164-12 at 2.]  And then two days later, on June 28, 2020, the Google email account tekkhosting@gmail.com, which was created by Anna Galindo, was deleted.  [Dkt. 164-1 ¶ 10; 164-13 at 2; 164-14 at 2.]

13.     As described in Plaintiffs' motion for preliminary injunction filed with their initial complaint, Plaintiffs' pre-filing investigation revealed that Tekkhosting.com was one of the key domain names used in the operation of Nitro TV.  [Dkt. 14 ¶ 17.]

14.     On June 27, 2020, Defendant served verified responses to Plaintiffs' first set of RFPs and Plaintiffs' first set of interrogatories.  [Dkts. 58 ¶ 2; 58-1; 58-3.]  In the responses, Defendant failed to provide the real names or roles of any individuals involved in Nitro TV.  Instead, he provided the aliases of two individuals with whom he communicated through the Telegram application (++240 and AD2020).  [Dkts. 58 ¶ 2; 58-1 at 5–7, 9.]

15.     In his verified responses to Plaintiffs' first set of RFPs, Defendant claimed that "there are no responsive documents as anything involved with NitroIPTV.com (sic) was done through 'telegram' (sic) and that application has deleted per settings."  [Dkts. 58 ¶ 2; 58-3 at 7, 8, 10.]

16.     Defendant's assertion that he had and has no responsive documents, which was made under oath, is demonstrably untrue, as there are—or were prior to being destroyed during the pendency of this case—responsive documents from email accounts, accounts with streaming server providers, accounts with domain name providers, and records of Nitro TV transactions through PayPal, Stripe, and a number of bank accounts used in the operation of Nitro IPTV.  [Dkts. 58-6; 58-12; 58-15; 58-18; 164-7–164-21.]

7

17.     In addition to his email purge, Defendant appears to have hidden or destroyed his electronic devices used in the operation of Nitro TV because, when asked whether he had "dispose[d] of any devices that had Nitro TV records on them," he again refused to answer, pleading "the Fifth."  [Dkt. 164-2 at 13–25.] Defendant took these actions despite being told by his counsel not to destroy evidence.  [*See* Dkts. 68; 165-4 ¶ 4 (Vondran Declarations stating that Defendant had been advised to retain and not to destroy evidence).]  In fact, Defendant never denied that he destroyed relevant evidence and has never claimed that he was unaware of his obligation not to destroy evidence.

18.     Indeed, in his Opposition to Plaintiffs' Motion for Sanctions, Defendant cited his concern with criminal liability for destroying documents as a basis for asserting the Fifth Amendment in response to questions about his destruction of evidence.  [Dkt. 165 at 3.]

## II.    The Court Granted Plaintiffs' Discovery Motion and Warned Defendant About Escalating Sanctions.

19.     On August 19, 2020, Plaintiffs filed a discovery motion ("Discovery Motion") requesting an order: (1) requiring evidence preservation, imaging of devices, and a deposition of Defendant regarding document preservation and search issues; (2) compelling supplemental responses to Interrogatories 1 and 2 of Plaintiffs' first set of interrogatories and compelling production of documents responsive to Plaintiffs' first and second set of requests for production; (3) compelling consent to production of emails by Google; and (4) finding Plaintiffs should be awarded their reasonable attorneys' fees incurred in connection with the Discovery Motion.  [Dkt. 57.]

20.     Instead of substantively responding, Defendant opposed Plaintiffs' Discovery Motion by withdrawing his answer to the initial (non-operative)

8

complaint, thereby claiming he was in default and had somehow "mooted" the Discovery Motion.  [Dkts. 66; 68.]

21.     On October 14, 2020, the Court heard and largely granted Plaintiffs' Discovery Motion.  [Tr. [Dkt. 88] at 5:7–9:20, 24:7–27:8; *see also* Dkt. 139.] Specifically, the Court ordered that: (1) Defendant preserve all relevant information, documents, and evidence in his possession, custody, or control and disable all functions that may destroy or erase such evidence; (2) Plaintiffs be permitted to depose Defendant for up to five hours on the record to identify (i) repositories of relevant evidence, (ii) devices he has used (iii) his preservation of relevant evidence, and (iv) his destruction of relevant evidence, and to seek information responsive to Interrogatories Nos. 1 and 2 (without the deposition counting against the Plaintiffs' ability to substantively depose Defendant); (3) Defendant produce all non-privileged, responsive documents to RFP Nos. 2 through 5 and 7 through 80 in his possession, custody, or control; and (4) Plaintiffs be awarded attorneys' fees that would be separately briefed.  [Dkt. 139.]

22.     The Court ordered the relief detailed above at the hearing.  On October 19, 2020, at the Court's request, after consulting with Defendant's counsel, Plaintiffs submitted updated proposed orders reflecting the Court's orders during the hearing.  Due to an administrative error and other reasons beyond the parties' control, the revised orders requested by the Court were not docketed until April 29, 2021.  [*See* Dkt. Nos. 136–39.]  Nonetheless, Defendant's counsel was present at the October hearing in which the Court made clear the obligations imposed on his client and that the Court's discovery order was effective immediately.

23.     Given Defendant's responses to written discovery and other behavior by the time of the October 14, 2020 hearing, the Court determined that the most efficient way for Plaintiffs to obtain information necessary to move the case forward was for Plaintiffs to be allowed to depose Defendant on the topics that were the subject of the written discovery.  Defendant was also ordered to respond to

9

questions regarding relevant document repositories and Defendant's document preservation efforts, if any.  [Tr. [Dkt. 88] at 5:13–6:9; Dkt. 139 at 4–5.]

24.     The Court also stated that its "intent [was] to grant" Plaintiffs' imaging request once Plaintiffs deposed Defendant as to his document repositories and evidence preservation so as to allow the Court "to figure out the scope" of the devices to be imaged.  [Tr. [Dkt. 88] at 25:4–26:14.]

25.     The Court denied without prejudice Plaintiffs' request for an order compelling Defendant to consent to Google's production of his emails.  [Tr. [Dkt. 88] at 16:17–17:4, 24:17–25:3.]

26.     The discovery subject to the Court's order, *see* Dkts. 57 and 139, is directed to numerous core issues in the case: Defendant's direct sales of subscriptions to Nitro TV, his reseller network, the revenues he has earned from Nitro TV, his creation of channels and other content sources for Nitro TV, identification of individuals with whom he is working and their roles, his payment processors, his channels of communication regarding Nitro TV (e.g., email, instant messaging applications, social media), the willfulness of his copyright infringement and any violations of the preliminary injunction order (e.g., his repeat involvement with infringing services, his knowledge of prior litigation involving a now permanently enjoined IPTV service called SET TV, any continued involvement in IPTV services), and his affirmative defenses and disclaimers of responsibility and control.  [*See* Dkts. 164-1 ¶ 6; 58 ¶¶ 2–3; 58-1; 58-2; 58-3; 58-4.]

27.     At the hearing, the Court cautioned Defendant that although the "first step is monetary sanctions when there's behavior like this," further discovery misconduct could lead to "more onerous" sanctions, including further sanctions under Rule 37 and contempt.  [Tr. [Dkt. 88] at 6.]

### III. Defendant's Failure to Produce Documents and Belated Assertion of the Fifth Amendment as an Objection to Discovery.

28.     In violation of the Court's order on Plaintiffs' Discovery Motion, Defendant has not produced any documents.  [Dkts. 164-1 ¶ 3; 106-2 ¶ 3.]

29.     Defendant did not raise a Fifth Amendment objection in his only timely objections to Plaintiffs' first set of requests for production and first set of interrogatories.  Defendant did not provide any objections to Plaintiffs' second set of requests for production before the Discovery Motion was filed.  [Dkts. 164-1 ¶ 7; 58 ¶¶ 2–3; 58-1; 58-2; 58-3.]  Rather, on May 13, 2021, nearly seven months after the hearing on the Discovery Motion and the Court's order, and nine months after the discovery was served, Defendant served "responses" to all of the discovery to which the Court ordered him to respond.  The "responses" contained only objections based on the Fifth Amendment.  [Dkts. 164-1 ¶ 7; 164-4; 164-5.]

30.     Defendant also failed to serve objections to Plaintiffs' third set of RFPs and the second set of interrogatories until months after they were due.  [Dkt. 164-1 ¶ 20.]  After Plaintiffs contacted Defendant's counsel to request responses, Defendant served late objections in which he again asserted the Fifth Amendment and refused to respond and to provide the requested documents and interrogatory responses. [*Id.*; *see also* Dkts. 164-23–164-26.]

31.     Defendant had not asserted the Fifth Amendment when he responded to the discovery at issue in the Discovery Motion, in opposing the Discovery Motion, or at the hearing on the Discovery Motion.  [*See* Dkts. 164-1 ¶ 7; 58-1; 58-2; 58-3; 58-5; 68; Tr. [Dkt. 88]].  Instead, he asserted it for the first time at his Court-ordered deposition on November 30, 2020 and has consistently done so and failed to cooperate in any form of discovery since that time.

32.     Although Defendant withdrew his answer to the original complaint in an effort to invoke entry of default, Defendant later served an answer to the SAC. After receiving Defendant's answer, in which he asserted a number of affirmative defenses, Plaintiffs served a third set of interrogatories asking Defendant to state all

facts and identify all people and documents supporting his affirmative defenses. [Dkts. 164-1 ¶ 21; 164-27.]  Plaintiffs also asked for the contact information for Defendant Martha Galindo, as they were trying to serve her with the SAC.  [Dkts. 164-1 ¶ 21; 164-27.]

33.     Defendant failed to timely respond to this discovery.  [Dkt. 164-1 ¶ 21.] After Plaintiffs raised the issue with Defendant's counsel, Defendant belatedly responded.  *Id.* ¶ 22.  In those responses, Defendant refused to disclose how to contact Martha Galindo, once again asserting the Fifth Amendment, and largely declined to provide responses to the other interrogatories.  [Dkt. 164-28.]

**IV.    Defendant Has Refused to Permit Imaging of His Devices.**

34.     Despite being apprised of the fact that the Fifth Amendment is not a valid basis on which to avoid imaging of devices, Defendant refused to produce any devices in his possession, custody, or control for imaging on that basis.  [Dkt. 164-1 ¶ 5.]  The only exception was an empty offer to provide for imaging a single, new device that he described as never being used in connection with Nitro TV.  [*Id.*; Dkt. 164-3.]

**V.    Defendant's Alleged Basis for Assertion of the Fifth Amendment as an Objection.**

35.     The Court notes that Plaintiffs informed Defendant that they did not make a criminal referral [Dkt. 164-1 ¶ 8].  Additionally, the Court is unaware of any evidence that a criminal investigation or case is pending.  Nor has Defendant asserted that he is aware of any such investigation.  The Court therefore does not find that Defendant has any basis for assertion of the privilege against self-incrimination to avoid his discovery obligations.

36.     Without any of the usual bases for assertion of the privilege, Defendant only started asserting the Fifth Amendment after his counsel claimed to have discovered a "blog" containing a survey of copyright laws in multiple jurisdictions. The purported "blog" (actually an e-mail) included a section on criminal copyright.

[Dkts. 164-1 ¶ 8; 165 at 2; 165-4 ¶ 12.]  Although the U.S. copyright law component of this publication was prepared by partners at the law firm representing Plaintiffs, it was prepared before (and not in connection with) the present litigation.  [Dkt. 164-1 ¶ 8.]  Plaintiffs' counsel informed Defendant's counsel that the publication has nothing to do with this case.  [*Id.*; Dkt. 164-6.]

37.     Although Defendant's counsel claims to have discovered this "blog" on June 30, 2020 [Dkt. 165 at 2], Defendant failed to assert the Fifth Amendment in discovery responses that were served *after* that date [Dkts. 58 ¶ 3; 58-2; 58-5], in opposing Plaintiffs' Discovery Motion in September 2020 [Dkt. 68], or at the October 2020 hearing.  [(Tr. [Dkt. 88]).]

38.     Defendant also claimed that he invoked the Fifth Amendment in response to learning that Jan van Voorn, Executive Vice President and Chief of Global Content Protection Enforcement and Operations for the Motion Picture Association ("MPA"), was "involved in this lawsuit."  However, Defendant had been personally served with a declaration from Mr. van Voorn long before he made his objection.  Mr. van Voorn's declaration was filed when the initial complaint was filed and served.  [Dkt. 165 at 3; Dkt. 23.]

## VI.   Plaintiffs Have Demonstrated Their Independent Knowledge of the Existence of the Requested Documents.

39.     At the outset of the case, Plaintiffs filed declarations from Jan van Voorn and Kevin Plumb in support of their motion for preliminary injunction, which was granted.  [Dkts. 12; 13; 14; 34.]  These declarations, along with the attached exhibits, reflect Plaintiffs' knowledge of the existence of numerous documents showing Defendant's operation of Nitro TV, including Plaintiffs' knowledge of the existence of (1) domain name records, as Nitro TV operated through various domain names (e.g., NitroIPTV.com and tekkhosting.com) held by identified providers (Domain.com, Inc., NameCheap, Inc.); (2) emails and Facebook records, as Defendant utilized email (including admin@nitroiptv.com and

13

billing@tekkhosting.com) and Facebook to communicate with subscribers regarding numerous issues, including the addition of new channels on Nitro TV, television programs available on Nitro TV's "24/7" channels, and copyright infringement litigation against other IPTV providers; (3) reseller purchase records, as Defendant operated Nitro TV through a network of resellers who purchased reseller credits; (4) WHMCS subscriber management records, as Defendant utilized the WHMCS service to facilitate Nitro TV subscriber management and sales; and (5) marketing Facebook materials, as Defendant marketed Nitro TV and communicated with subscribers and resellers through Facebook.  [Dkts. 13; 13-1–13-9; 14; 14-1–14-25.]

40.    Further, as detailed in the declarations of Julie Shepard and Jan van Voorn filed in August 2020 in support of Plaintiffs' Discovery Motion, independent of Defendant, Plaintiffs knew and learned about other documents reflecting Defendant's operation of Nitro TV and the records created in the process through third-party subpoenas.  [*See* Dkts. 58; 59.]

41.    The documents produced by third parties confirmed Mr. van Voorn's testimony that, based on his experience and his investigation pertaining to Nitro TV, Defendant created and would have possessed or controlled billing records, subscriber registration records, subscriber payment collection records, domain name maintenance records, and website hosting records through Defendant's operation of Nitro TV.  Those are documents reflecting typical transactions and communications underlying the functions of most IPTV services like Nitro TV.  [Dkt. 59 ¶ 5.]

42.    In addition, Plaintiffs independently obtained additional evidence reflecting the existence of the requested records.  For example, Plaintiffs have independent knowledge of accounts at payment processors such as Stripe and PayPal, banks such as Capital One and Woodforest, and additional email accounts used in the operation of Nitro TV.  [*See* Dkts. 90-3–90-26.]

## VII. Prejudice Arising from Defendant's Discovery Misconduct.

43.    Defendant's destruction of evidence and refusal to provide documents and information has drawn out the discovery process and prevented or otherwise delayed Plaintiffs' discovery of relevant evidence. [*See* Dkt. 164-1 ¶ 13.] Plaintiffs have, in fact, demonstrated that they spent a year discovering Nitro TV's financial and operational dealings only through third-party subpoenas because of Defendant's failure to cooperate and to follow the orders of the Court. Despite these efforts, Plaintiffs and the Court have an incomplete picture of Nitro TV's actions and financial gains. This incomplete picture cannot be remedied with additional time or third-party discovery.

44.    This is especially true because the evidence destroyed includes the wholesale deletion of Defendant's flagship email account, NitroIPTV@gmail.com, as well as the massive and surgical purge of emails from Defendant's forenzi@gmail.com account, which was used to communicate with co-Defendant Richard Horsten and in setting up accounts with providers of services used by IPTV services like Nitro TV.

## GOVERNING STANDARDS

### A. Sanctions For Violation Of Discovery Orders And Failure To Cooperate In Discovery

Under Rule 37(b)(2)(A) of the Federal Rules of Civil Procedure and pursuant to their inherent power to control the cases before them, federal district courts are authorized to issue sanctions based upon noncompliance with a discovery order. *See Chambers v. Nasco, Inc.,* 501 U.S. 32, 49 n.14 (1991); *Societe Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers*, 357 U.S. 197 (1958); *see also Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006) (noting that the district court's "two sources of authority" are its "inherent power to levy sanctions in response to abusive litigation practices" and Rule 37).

Under Rule 37(b)(2)(A), this Court may make such sanctions orders as are "just" when a party has failed to comply with a discovery order. These include

1   orders precluding a disobeying party from introducing designated matters into

2   evidence, striking a pleading, and/or rendering a default judgment.  *See* Fed. R. Civ.

3   P. 37(b)(2)(A)(ii)&(v); *see also Roadway Express v. Piper*, 447 U.S. 752, 763

4   (1980).  The type of sanction ordered is within a district court's discretion.  *Von*

5   *Brimer v. Whirlpool Corp.*, 536 F.2d 838, 844 (9th Cir. 1976).

6        If the sanction ordered is less than and/or is not tantamount to dismissal, the

7   disobeying party's noncompliance need not be proven to be willful or in bad faith.

8   *See, e.g.*, *Wyle v. R.J. Reynolds Indus., Inc.*, 709 F.2d 585, 589 (9th Cir. 1983).  The

9   presence or absence of a disobeying party's willfulness or bad faith "is relevant to

10   the choice of sanctions rather than to the question whether a sanction should have

11   been imposed." *Marquis v. Chrysler Corp.*, 577 F.2d 624, 642 (9th Cir. 1978); *see*

12   *also Societe Internationale,* 357 U.S. at 208 (because Rule 37 requires only a failure

13   to obey an order and not a refusal, whether the disobeying party's conduct was

14   willful or not is "relevant only to the path which the District Court might follow in

15   dealing with" the failure to comply).  "In view of the range of sanctions available,

16   even negligent failures to allow reasonable discovery may be punished." *Marquis*,

17   577 F.2d at 642; *see also David v. Hooker*, 560 F.2d 412, 419-20 (9th Cir. 1977).

18        In contrast with less severe sanctions, terminating sanctions may be imposed

19   only if there has been "willfulness, bad faith, or fault" by the party who has

20   disobeyed a discovery order.  *See, e.g.*, *Connecticut Gen. Life Ins. Co. v. New*

21   *Images of Beverly Hills*, 482 F.3d 1091, 1096 (9th Cir. 2007).  This standard is met

22   by a showing of "disobedient conduct not shown to be outside the control of the

23   litigant." *Henry v. Gill Industries*, 983 F.2d 943, 948-49 (9th Cir. 1993) (internal

24   citation omitted); *see also In re Phenylpropanolamine (PPA) Products Liab. Litig.*,

25   460 F.3d 1217, 1233 (9th Cir. 2006).

26        In the Ninth Circuit, upon a finding of "willfulness, bad faith, or fault," a

27   court must assess the following five factors to decide if terminating sanctions should

28   be imposed: (1) the public's interest in the expeditious resolution of litigation; (2)

the court's need to manage its docket; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring the disposition of cases on their merits; and (5) the availability of less drastic sanctions. *See, e.g.*, *Valley Eng'rs Inc. v. Elec. Engineering Co.*, 158 F.3d 1051, 1057 (9th Cir. 1998); *Adriana Intern. Corp. v. Thoeren*, 913 F.2d 1406, 1412-13 (9th Cir. 1990) (noting that this five-factor test is a balancing test). When a court order has been violated, the first two factors support imposing terminating sanctions and the fourth factor "cuts against" them, and thus, the third and fifth factors are decisive. *Id.* at 1412; *see also Wanderer v. Johnson*, 910 F.2d 652, 656 (9th Cir. 1990) ("The first two of these factors favor the imposition of sanctions in most cases, while the fourth cuts against a default or dismissal sanction. Thus, the key factors are prejudice and availability of lesser sanctions.").

The third factor—prejudice—is satisfied if the disobeying party's actions impair the ability of the moving party "to go to trial" or "threaten to interfere with the rightful decision of the case." *Adriana*, 913 F.2d at 1412. Although mere delay alone does not establish prejudice, a failure to produce documents, as ordered, "is considered sufficient prejudice." *Id.*

Under the fifth factor, a district court must consider the impact of the terminating sanction sought and the adequacy of less drastic sanctions. *Id.* Whether or not the district court warned a disobeying party of the possibility of dismissal is relevant, but "an explicit warning is not always necessary" for a dismissal order to be proper. *Id.* at 1412-13. As the Ninth Circuit explained in *Valley Engineers*, *supra*, "the central factor in evaluating the district court order is justice, and everyone has notice from the text of Rule 37(b)(2) that dismissal is a possible sanction for failure to obey discovery orders." 158 F.3d at 1056-57. The five-part test is used "to determine whether a dismissal sanction is 'just,'" but notwithstanding the fifth factor, "it is not always necessary for the court to impose less serious sanctions first, or to give any explicit warning." *Id.* at 1057

17

(characterizing the five-part test as "a way for a district judge to think about what to do, not a series of conditions precedent before the judge can do anything").

### B. Fee Shifting Under Rule 37(a)

If a discovery motion is granted or disclosure or requested discovery is provided only after the filing of a motion, "the court ***must***, after giving an opportunity to be heard, require the party . . . whose conduct necessitated the motion, the party or attorney advising the conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees." Fed. R. Civ. P. 37(a)(5)(A) (emphasis added). The exceptions to this rule are if (1) the moving party did not first, in good faith, seek to obtain the discovery prior to filing the motion; (2) the "opposing party's nondisclosure, response, or objections was substantially justified"; or other circumstances make an award unjust. Fed. R. Civ. P. 37(a)(5)(A)(i)-(iii).

### <u>DISCUSSION</u>

There are several independent grounds warranting entry of the default judgment as requested by Plaintiffs: Defendant's violation of this Court's order; Defendant's destruction of evidence; and Defendant's wholesale refusal to engage in the discovery process. Each of these provides an independent ground for entry of default judgment, but when combined make the case for entry of default judgment even stronger. Defendant's attempt to sidestep this result by belatedly asserting the Fifth Amendment is unavailing.

## I. Defendant's Assertion of the Fifth Amendment Is Invalid.

As an initial matter, the Court must consider whether Defendant's invocation of the Fifth Amendment to avoid any of the discovery at issue is proper. For the following reasons, the Court holds it is not.

It is for the Court to determine if Defendant's repeated assertions of the Fifth Amendment are justified; Defendant's own "'say-so' does not of itself establish the hazard of incrimination." *Hoffman v. United States*, 341 U.S. 479, 486 (1951) ("The

18

1  witness is not exonerated from answering merely because he declares that in so
2  doing he would incriminate himself—his say-so does not of itself establish the
3  hazard of incrimination.  It is for the court to decide whether his silence is justified
4  ....”); *accord Davis v. Fendler*, 650 F.2d 1154, 1159-60 (9th Cir. 1981).

5      “A proper assertion of a Fifth Amendment privilege requires, at a minimum, a
6  good faith effort [by the party asserting the privilege] to provide the trial judge with
7  sufficient information from which [she] can make an intelligent evaluation of the
8  claim.”  *Davis*, 650 F.2d at 1160; *see also S.E.C. v. Kiselak Cap. Grp., LLC*, 2011
9  WL 4398443, at *5 (N.D. Tex. Sept. 20, 2011) (“[A] party must selectively invoke
10 the privilege against self-incrimination and ‘object with specificity to the
11 information sought from him.’”) (citation omitted).

12     A defendant must have “reasonable cause to apprehend [such] danger from a
13 direct answer” to questions posed to him.  *Hoffman*, 341 U.S. at 486; *see also*
14 *United States v. Neff*, 615 F.2d 1235, 1240 (9th Cir. 1980).  And as the party
15 resisting discovery, it was incumbent upon Defendant to establish that his assertions
16 of the Fifth Amendment were proper.  *Davis*, 650 F.2d at 1159-60 (finding the
17 District Court “did not err in finding that appellant failed to support his claim of
18 privilege” even where the appellant claimed a criminal case was pending); *see also*
19 *Baker v. Limber*, 647 F.2d 912, 916 (9th Cir. 1981) (“[T]he privilege normally is not
20 asserted properly by merely declaring that an answer will incriminate.”) (citation
21 omitted).

22     In this case, Defendant has not supported his broad assertion of the Fifth
23 Amendment, as he has not shown that he is faced with “substantial hazards of self-
24 incrimination,” *California v. Byers*, 402 U.S. 424, 429 (1971), that are “‘real and
25 appreciable,’ and not merely ‘imaginary and unsubstantial,’” *Marchetti v. United*
26 *States*, 390 U.S. 39, 48 (1968) (citing *Rogers v. United States*, 340 U.S. 367, 374
27 (1951)).  Plaintiffs’ document requests, interrogatories, and deposition questions
28 posed to Defendant have all arisen in civil litigation, and Defendant has presented

no evidence that there is any criminal investigation, let alone criminal action, pending.

Defendant points only to an email (or "blog," as Defendant refers to it) received by his counsel in June 30, 2020, which attached a survey of copyright law in the U.S. and various other territories, and included discussion of its longstanding criminal law components, as supporting his assertion of the Fifth Amendment in all instances.  [Dkts. 164-1 ¶ 8; 165 at 2; 165-4 ¶ 12.]  This does not establish that Defendant himself is faced with a real or substantial hazard of self-incrimination.  Further, Defendant cannot create a real threat of incrimination by demanding that Plaintiffs agree not to make a criminal referral and then claiming that Plaintiffs' refusal to do so provides a basis to invoke the Fifth Amendment.

Moreover, even if Defendant's assertion of the Fifth Amendment were valid, Defendant did not timely assert the Fifth Amendment as an objection to the discovery Plaintiffs served.  *See, e.g.*, *Davis*, 650 F.2d at 1160 ("Clearly, the Fifth Amendment is not a self [-]executing mechanism.  It can be affirmatively waived or lost by not asserting it in a timely fashion."); *Kiselak Cap. Grp., LLC*, 2011 WL 4398443, at *5, *8 (finding that defendant had "waived his right [under the Fifth Amendment] to object" to discovery requests where he "failed to present any valid excuse for the now untimely assertion of his objection to the discovery requests") (citing *Davis*, 650 F.2d at 1160); *In re Hammer*, 2007 WL 9775483, at *5 (W.D. Wash. Mar. 30, 2007) ("Because Appellant did not properly raise his Fifth Amendment objection . . . by asserting it in a timely manner, he waived it."); *Jaffe v. Grant*, 793 F.2d 1182, 1190 n.6 (11th Cir. 1986) (finding that it was not error for district court to find that defendant had waived objection based on Fifth Amendment by defendant's failure to timely assert it in response to discovery).

The Court is of the firm belief that, here, Defendant only belatedly raised a Fifth Amendment objection as a tactical maneuver to further hamper Plaintiffs' attempts to obtain key information through the discovery process.  Defendant was

1   never in real fear of criminal prosecution.  Notably, his counsel claims to have

2   discovered the "blog" in an email received in June 2020, yet Defendant did not

3   assert the Fifth Amendment until months later, notably *after* this Court informed the

4   parties in mid-October 2020 that Plaintiffs' Discovery Motion was largely granted.

5          Finally, the Fifth Amendment privilege against self-incrimination does not

6   protect against the production of records, even if production would be testimonial in

7   nature where, as here, the information conveyed by the act of production is "a

8   foregone conclusion."  *See Fisher v. United States*, 425 U.S. 391, 411 (1976).  As

9   the Ninth Circuit has explained, "where the existence and location of [documents]

10  are a foregone conclusion and the [defendant] adds little or nothing to the sum total

11  of [plaintiffs'] information by conceding that he in fact has the [documents,]"

12  enforcement of the Court's order compelling production "does not touch upon

13  constitutional rights."  *United States v. Sideman & Bancroft*, 704 F.3d 1197, 1202

14  (9th Cir. 2013) (citation and internal quotation marks omitted).  Even if the Fifth

15  Amendment applied here – which the Court does not find – the foregone conclusion

16  exception applies to the documents at issue.  Plaintiffs have established with

17  "reasonable particularity" that they have "independent knowledge" of the existence

18  of authentic documents that are (or were) in defendant's possession or control.

19  *United States v. Bright*, 596 F.3d 683, 692 (9th Cir. 2010).

20  **II.     Default Judgment Is Warranted For Defendant's Willful Misconduct**

21          Given the Court's finding that the Fifth Amendment does not shield

22  Defendant from his discovery obligations, default judgment is warranted here due to

23  (1) Defendant's willful non-compliance with this Court's October 2020 discovery

24  rulings, (2) willful destruction of evidence, and (3) willful disregard for his

25  discovery obligations following the October 2020 hearing.  *See, e.g.*, *Davis*, 650

26  F.2d at 1161 (finding the trial court did not abuse its discretion in entering default

27  where the defendant did not support his late claim of privilege under the Fifth

28  Amendment, given the defendant's "persistent unresponsiveness to both informal

21

1  discovery requests and formal court orders"); *Columbia Pictures, Inc. v. Bunnell*,

2  2007 WL 4877701, at *8 (C.D. Cal. Dec. 13, 2007) (entering default where

3  evidence reflected defendant destroyed evidence and refused to cooperate in

4  discovery).

5       **A.**    **Defendant's Actions Were Willful**

6       Defendant's violation of the Court's order to produce documents, and his

7  spoliation of evidence, was unquestionably willful.  As detailed above, Defendant's

8  spoliation included (1) a mass email purge within days of being served, (2) another

9  mass email purge in the days immediately surrounding when Defendant provided

10  verified discovery responses (falsely) claiming that he had no responsive documents

11  and could not name anyone else involved in Nitro TV, (3) continued use of the

12  messaging application Telegram—which was set to auto-delete messages—to

13  communicate regarding Nitro TV even after he was on notice of this action, and (4)

14  jettisoning of his electronic devices after being served with the complaint.

15       Moreover, Defendant has no excuse for his continued use of Telegram set to

16  automatically delete messages.  *See Hausman v. Holland Am. Line-U.S.A.*, 2016 WL

17  51273, at *9 (W.D. Wash. Jan. 5, 2016) ("[I]f Plaintiff did have a routine practice of

18  deleting his emails . . . he was obligated to stop such practice with the onset of this

19  litigation."); *Perez v. U.S. Postal Serv.*, 2014 WL 10726125, at *5 (W.D. Wash. July

20  30, 2014) (describing the "fail[ure] to  . . . suspend routine email deletions upon

21  receiving notice of potential litigation" as "gross negligence sufficient to support

22  sanctions").

23       **B.**    **The Factors the Court Must Consider Favor Default as a Sanction**

24       As set forth above, the Court must weigh: "(1) the public's interest in

25  expeditious resolution of litigation; (2) the court's need to manage its docket; (3) the

26  risk of prejudice to the [party seeking sanctions]; (4) the public policy favoring

27  disposition of cases on their merits; and (5) the availability of less drastic sanctions."

28  *Hester v. Vision Airlines, Inc.*, 687 F.3d 1162, 1169 (9th Cir. 2012) (citation

omitted).  Four of the five factors favor ordering default here, and any public policy favoring disposition on the merits is outweighed by the other factors.  *See Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1022 (9th Cir. 2002) (upholding default and noting that even though the "public policy favoring disposition of cases on the merits weighs against default judgment, that single factor is not enough to preclude imposition of this sanction when the other four factors weigh in its favor").

"Where a court order is violated, the first and second factors will favor sanctions."  *Comp. Task Grp., Inc. v. Brotby*, 364 F.3d 1112, 1115 (9th Cir. 2004).  Further, as discussed above, Defendant's destruction of evidence and refusal to provide documents and information, including after being ordered to do so, has drawn out the discovery process and prevented or otherwise delayed Plaintiffs' discovery of relevant evidence.  [Dkt. 164-1 ¶ 13]; *see Wood v. L.A. Cty. Sheriff's Dep't*, 2009 WL 5090932, at *4 (C.D. Cal. Dec. 10, 2009) (adopting report and recommendation imposing terminating sanctions where party's "refusal to comply with discovery rules" "undermined the process of bringing evidence to light"); *Microsoft Corp. v. Maturano*, 2009 WL 650589, at *5 (E.D. Cal. Mar. 12, 2009) (default ordered where defendant's discovery failures "unnecessarily continued the duration of th[e] case," increased plaintiff's costs of litigation, and "prevent[ed] [plaintiffs] from investigating its claims" against defendant).

The third factor favors default because the prejudice that Plaintiffs have already suffered will only continue if this Court does not order default.  Defendant has defied this Court's order by refusing to produce a single document, refusing to answer questions at his Court-ordered deposition, and destroying evidence.  *See* [Dkt. 106-2 ¶¶ 3–4.]  Indeed, Defendant's "fail[ure] to produce documents as ordered is considered significant prejudice."  *See In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 460 F.3d at 1227.  Moreover, Plaintiffs cannot eliminate this prejudice through third-party discovery.  Without the documents and information that Defendant has destroyed or is otherwise withholding, Plaintiffs cannot present

23

1   the trier of fact with a full picture of the scope and willful nature of Defendant's

2   infringement.

3       With respect to the fifth factor, Defendant's past conduct demonstrates that

4   nothing short of default is warranted here.  Under the fifth factor, the Court may

5   take into consideration: "whether the court explicitly discussed alternative sanctions,

6   whether it tried them, and whether it warned the recalcitrant party about the

7   possibility of dismissal."  *Valley Engineers Inc. v. Elec. Eng'g Co.*, 158 F.3d 1051,

8   1057 (9th Cir. 1998).  Importantly, however, "it is not always necessary for the court

9   to impose less serious sanctions first, or to give any explicit warning."  *Id.*

10      In October 2020, this Court granted Plaintiffs' Discovery Motion in large part

11  and ordered Defendant to pay Plaintiffs' attorneys' fees, pursuant to Rule 37, as

12  sanctions for his discovery misconduct.  [*See* Tr. [Dkt. 88] at 7-8.]  At that time, the

13  Court cautioned Defendant that although the "first step is monetary sanctions when

14  there's behavior like this," further discovery misconduct could lead to "more

15  onerous" sanctions, including further sanctions under Rule 37 and contempt.  *Id.* at

16  6.

17      Later, at the July 7, 2021, hearing on Plaintiff's Motion for Sanctions, the

18  Court specifically warned that Defendant should comply with the Court's earlier

19  October Order before the Court issued a written decision on the Sanctions Motion.

20  Defendant was given a chance to mitigate further prejudice to Plaintiffs.  Yet despite

21  these prior sanctions and warnings from the Court, Defendant continued to disregard

22  his discovery obligations.  He has failed to produce ***any*** documents, and, further, has

23  refused to answer court-ordered questions about his preservation of relevant

24  documents and the identities of others involved in Nitro TV.  *See* [Dkts. 164-1 ¶ 3;

25  106-2 ¶ 3.]

26      Defendant's unwillingness to comply with the Court's orders and his

27  discovery obligations even after being cautioned of the possibility of escalating

28  sanctions demonstrates that further sanctions short of default will be ineffective.

24

See, e.g., *Adriana Int'l Corp.*, 913 F.2d at 1413-14 (upholding entry of default where district court had already imposed "alternative sanctions before default," including monetary sanctions, and warned party about the possibility of greater sanctions, reasoning that party "had not complied with past sanctions, and the court had no reason to believe they would in the future"); *Garrison v. Ringgold*, 2020 WL 6537389, at *6 (S.D. Cal. Nov. 6, 2020) (granting motion for terminating sanctions and reasoning that "any other less drastic sanctions would not render Ringgold's compliance or deter any future noncompliance" where the court had already imposed sanctions and the defendant had not complied).

Finally, it is appropriate for default judgment here to encompass the well-pleaded allegations pertinent to statutory damages in a copyright case. *See C&SM Intl v. Closet Signature*, 2018 WL 4847052, at *2 (C.D. Cal. Feb. 12, 2018) ("Where . . . the plaintiff has 'pled that the defendants engaged in continuing willful infringement of its copyrights . . . the district court's default judgment includes an implied finding of willfulness.'") (quoting *Aries Music Entm't, Inc. v. Angelica's Record Distribs., Inc.*, 506 F. App'x 550, 552 (9th Cir. 2013)).

Accordingly, "[a]lthough termination of a case is a harsh sanction appropriate only in 'extraordinary circumstances,' the undersigned finds that the circumstances in this case warrant the entry of default judgment." *Consumer Fin. Prot. Bureau v. Morgan Drexen, Inc.*, 101 F. Supp. 3d 856, 875 (C.D. Cal. 2015) (quoting *Halaco Eng'g Co. v. Costle*, 843 F.2d 376, 380 (9th Cir. 1988)); *accord Bunnell*, 2007 WL 4877701, at *8.

**III. The Court Must Award Reasonable Attorneys' Fees Incurred by Plaintiffs For the Discovery and Sanctions Motions.**

Under Federal Rule of Civil Procedure 37(a)(5)(A), fee shifting is required if the Court finds that there is no substantial basis for the losing party's position in discovery motion practice.  In this case, Defendant Galindo's willful destruction of

25

1 evidence and complete failure to cooperate in discovery warrant fee shifting

2 pursuant to the rule for both the Discovery Motion and the Sanctions motion.

3     The Court has reviewed the requests for attorneys' fees submitted by

4 Plaintiffs for both the Discovery Motion and Sanctions Motion.  While the

5 Magistrate Judge granted the Discovery Motion last year, she did not enter an order

6 specifying the amount of fees to be awarded at that time.  The Court therefore

7 recommends an award of $88,080 in attorneys' fees and costs for motion practice

8 associated with the Discovery Motion.

9     The Court further recommends an award of $93,000 for the briefing and

10 argument and costs related to the Sanctions Motion.

11 ///

12 ///

13 ///

14                              **RECOMMENDATION**

15     For all of the foregoing reasons, **IT IS RECOMMENDED** that the District

16 Judge issue an Order:

17     (1) accepting this Report and Recommendation;

18     (2) awarding Plaintiff fees and costs in the amount of $88,080 in attorneys' fees

19         and costs for motion practice associated with Discovery Motion;

20     (3) awarding Plaintiff $93,000 for fees and costs associated with litigating the

21         Sanctions Motion;

22     (4) requiring payment of all monetary sanctions ordered by the District Court

23         pursuant to this recommendation within 60 days of the District Court's Order;

24     (5) granting Plaintiff's Motion for Terminating Sanctions and ordering judgment

25         entered finding Defendant Alejandro Galindo liable in this action;

26     (6) holding that the judgment entered include an explicit finding that Defendant's

27         copyright infringement was willful, therefore encompassing the Second

28

Amended Complaint's well-pleaded allegations related to statutory damages under Federal copyright law.

DATED:  June 14, 2022

_____
GAIL J. STANDISH
UNITED STATES MAGISTRATE JUDGE

## NOTICE

Reports and Recommendations are not appealable to the United States Court of Appeals for the Ninth Circuit, but may be subject to the right of any party to file objections as provided in the Local Civil Rules for the United States District Court for the Central District of California and review by the United States District Judge whose initials appear in the docket number.  No notice of appeal pursuant to the Federal Rules of Appellate Procedure should be filed until the District Court enters judgment.

27