LINK 226 & 227

1

2                                                                                      JS-6, O

3

4

5                        UNITED STATES DISTRICT COURT

6                       CENTRAL DISTRICT OF CALIFORNIA

7

8   COLUMBIA PICTURES INDUSTRIES, INC.,      Case No.:  2:20-cv-03129-MEMF (GJSx)
    et al.,
9                                            ORDER GRANTING PLAINTIFFS'
                        Plaintiffs,          MOTION FOR DEFAULT JUDGMENT
10                                           AGAINST DEFENDANTS RICHARD
          v.                                 HORSTEN, ANNA GALINDO, MARTHA
11                                           GALINDO, OSVALDO GALINDO, RAUL
                                             ORELLANA, AND FIRESTREAM LLC [ECF
12  ALEJANDRO GALINDO, et al.,               NO. 227] AND GRANTING PLAINTIFFS'
                                             REQUESTS FOR RELIEF PURSUANT TO
13                      Defendants.          PLAINTIFFS' SUPPLEMENTAL BRIEF IN
                                             SUPPORT OF MOTION FOR
14                                           TERMINATING SANCTIONS AND ENTRY
                                             OF JUDGMENT AGAINST DEFENDANT
15                                           ALEJANDRO GALINDO [ECF NO. 226]

16

17

18

19

20          Before the Court is the Motion for Default Judgment filed by Plaintiffs Columbia Pictures,

21   Industries, Inc.; Amazon Content Services, LLC; Disney Enterprises, Inc.; Paramount Pictures

22   Corporation; Warner Bros. Entertainment Inc.; Universal City Studios Productions LLLP; Universal

23   Television LLC; and Universal Content Productions LLC. ECF No. 227. Also before the Court is

24   Plaintiffs' Supplemental Brief in Support of their Motion for Terminating Sanctions and Entry of

25   Judgment against Defendant Alejandro Galindo. ECF No. 226. For the reasons stated herein, the

26   Court hereby GRANTS the Motion for Default Judgment and GRANTS Plaintiffs' Request for

27   judgment against Alejandro Galindo.

28

1    **I.    Factual Background[1]**

2          This case involves large-scale copyright infringement through an unlicensed internet

3    streaming[2] service. Plaintiffs Columbia Pictures Industries, Inc. ("Columbia"); Amazon Content

4    Services, LLC ("Amazon"); Disney Enterprises, Inc. ("Disney"); Paramount Pictures Corporation

5    ("Paramount"); Warner Bros. Entertainment, Inc. ("Warner Bros."); Universal City Studios

6    Productions LLLP ("Universal City"); and Universal Content Productions LLC ("Universal

7    Content") (collectively, "Plaintiffs"), either directly or through affiliates, "produce and distribute a

8    significant portion of the world's most popular television programs and motion pictures." SAC ¶ 31.

9    Plaintiffs own or hold "the exclusive U.S. rights . . . to reproduce, distribute, and publicly perform

10   countless works, including by means of streaming those works over the Internet to the public." *Id.* ¶

11   32.

12         Defendants Richard Horsten (a/k/a "Rik de Groot") ("Horsten"), Alejandro ("Alex")

13   Galindo, Anna Galindo, Martha Galindo, Osvaldo Galindo, Raul Orellana (a/k/a "Touchstone")

14   ("Orellana"), and Firestream LLC ("Firestream") (collectively, the "Nitro Defendants") owned and

15   operated Nitro TV, an unlicensed Internet Protocol television service ("IPTV"). *Id.* ¶¶ 1, 34.

16         **A.  Nitro TV Platforms**

17         Nitro TV is a collection of web-based and application-based streaming platforms for use on

18   mobile phones and smart TVs (collectively, the "Nitro TV Platforms"). *Id.* ¶ 2. For $20 per month,

19   the Nitro Defendants offered Nitro TV subscription packages consisting of thousands of live and

20   title-curated television channels available twenty-four hours a day, seven days a week, in the United

21   States and abroad. *Id.* ¶¶ 1–3, 42. Beginning in or around May 2017, Nitro Defendants marketed,

22   promoted, and sold Nitro TV subscriptions through NitroIPTV.com. *Id.* ¶ 41. Alex Galindo

23   registered the domain name NitroIPTV.com with Domain.com LLC in December 2016. *Id.* In April

24   2017, Horsten, under the alias Rik de Groot, registered the domain names for TekkHosting.com,

25   _____

26   [1] Unless otherwise stated, the following factual background is derived from the Second Amended Complaint.

27   ECF No. 113 ("SAC").
     [2] A "stream" is "digital data (such as audio or video material) that is continuously delivered one packet at a

28   time and is usually intended for immediate processing or playback." *Stream*, Webster's Dictionary, https://www.merriam-webster.com/dictionary/stream (last visited Nov. 8, 2022).

1   Lalaluhosting.com, and Nitro.ltd with Namecheap, Inc. *Id.* All three sites are connected to the Nitro

2   TV Platforms.

3       Subscribers can obtain access to Nitro TV in two ways: (1) by purchasing a subscription

4   through the Nitro TV website or another website maintained by the Nitro Defendants or (2)

5   purchasing a subscription through a Nitro TV reseller. *Id.* ¶ 41. Many of the channels include

6   popular television programs and movies such as *The Office*, *Spider-Man: Homecoming*, *Toy Story 3*,

7   *Star Trek Beyond*, and *Joker*, and include works whose copyrights Plaintiffs own or exclusively

8   control ("Copyrighted Works" or the "Works"). *Id.* ¶ 1. The channels also include live, California-

9   based television networks such as Los Angeles ABC, CBS, CW, NBC, and FOX affiliates. *Id.* ¶ 50.

10  Nitro TV also includes a "Catch Up" feature[3] which allows a subscriber to access "television

11  programming from the prior two days," *id.* ¶ 51, and "24/7, title-curated channels," which "are

12  devoted to a single television series, motion picture, or franchise." *Id.* ¶ 52.

13      During the many years the Nitro Defendants operated Nitro TV, they infringed upon, at a

14  minimum, 1,897 Copyrighted Works. *See* SAC, Ex. A. The Nitro Defendants' infringement was

15  willful—they actively selected the programming they sold and streamed illegally on Nitro TV,

16  notified Nitro TV subscribers when channels containing the Copyrighted Works became available,

17  solicited feedback from subscribers regarding preferred television programs, and added television

18  shows in response to such feedback. *Id.* ¶ 3. The Nitro Defendants also took steps to actively

19  advertise Nitro TV, such as on YouTube channels and through Facebook. *See id.* ¶¶ 28, 35–37.

20  However, at no point did the Nitro Defendants seek to register a Digital Millennium Copyright Act

21  ("DMCA") agent for any Nitro TV website they operated. *Id.* ¶ 4. Instead, the Nitro Defendants took

22  steps to operate anonymously and "hide their tracks," such as concealing registrant information on

23

24

25

26  _____

27  [3] The SAC describes the "Catch Up" features as follows: "For example, a Nitro TV subscriber using this feature on a Monday would be shown a guide of what aired on Sunday and Saturday, and may select and

28  watch a program that was telecast at a specific time on a specific channel . . . during the prior two days." *Id.* ¶ 51.

the primary Nitro TV website from public access and advising subscribers to use a Virtual Private Network ("VPN").[4] *Id.* ¶¶ 4, 39, 41.

**B. Nitro TV Reseller Network**

In addition to selling subscription packages directly to users, the Nitro Defendants also developed a robust "reseller network" by which resellers market and sell the Nitro TV Platforms to subscribers all over the world. *Id.* ¶¶ 5, 54. Nitro TV resellers purchase reseller credits hosted on nitroiptv.com or other websites hosted by the Nitro Defendants. *Id.* ¶ 41. Profits and payments generated from the reseller network are managed by Anna Galindo, Martha Galindo, and Osvaldo Galindo who "hold and operate critical payment processor and bank accounts through which millions of dollars' worth of Nitro TV reseller credits and subscriptions have been sold." *Id.* ¶¶ 6, 40. Anna Galindo, Martha Galindo, and Osvaldo Galindo also used these accounts to pay Horsten, Orellana, and Firestream for their work in connection with the "promotion, sales, and operation of Nitro TV." *Id.* ¶ 40

**II.    Procedural Background**

On April 3, 2020, Plaintiffs filed their initial complaint against Alex Galindo and Does 1–20 for direct and secondary copyright infringement associated with Nitro TV. ECF No. 1. Soon after, Plaintiffs sought—and were awarded— a preliminary injunction to enjoin Alex Galindo's copyright infringement, including his ongoing operation of Nitro TV. ECF Nos. 12 ("Motion for Preliminary Injunction"); 34 ("Order Granting Preliminary Injunction").

On May 4, 2020, Plaintiffs filed an application for entry of default against Alex Galindo. ECF No. 31. The Clerk of Court entered default on May 5, 2020. ECF No. 32. However, on May 19,

---

[4] A VPN is a "a private computer network that functions over a public network." VPN, Merriam-Webster, https://www.merriam-webster.com/dictionary/VPN (last accessed Nov. 10, 2022); *see also United States v. Fisher*, No. 217CR00073APGGWF, 2019 WL 3310508, at *3 (D. Nev. Mar. 28, 2019), *report and recommendation adopted as modified*, No. 217CR00073APGGWF, 2019 WL 2419456 (D. Nev. June 10, 2019) ("A person using a VPN to communicate on the internet can obscure his or her true IP address and identity because the communication appears to originate from the VPN's IP address, rather than the user's actual IP address.").

2020, pursuant the parties' stipulation, ECF No. 36, the Court set aside the entry of default. ECF No. 37. Discovery commenced soon after. *See* Civil Trial Order, ECF No. 43.

However, Alex Galindo refused to cooperate in discovery and did not produce any documents. *See* ECF Nos. 53, 57. On August 19, 2020, Plaintiffs, suspecting that Alex Galindo had engaged in spoliation of evidence, filed a discovery motion requesting an order requiring, among other things, the preservation and production of relevant evidence and responses to interrogatories. ECF No. 57. Magistrate Judge Gail Standish granted the motion and ordered Alex Galindo to propound the requested discovery. *See* Report & Recommendation on Plaintiffs' Motion for Sanctions Against Alejandro Galindo, ECF No. 209 ("R&R") at 9–10, *report and recommendation adopted* ECF No. 222. Again, Alex Galindo failed to produce the ordered discovery.[5] R&R at 11–12. As a result, Plaintiffs filed a Motion for Terminating Sanctions against Alex Galindo. ECF No. 112. Judge Standish issued a Report and Recommendation granting the Motion for Terminating Sanctions and granting Entry of Judgment on June 30, 2022. *See* R&R. On August 15, 2022, this Court adopted the R&R and ordered Plaintiffs to submit supplemental briefing on the issue of statutory damages and the amount of damages sought by Plaintiffs.[6] ECF No. 222. Plaintiffs filed the requested brief on October 3, 2022. ECF No. 226 ("Supplemental Brief").

On August 27, 2020, Plaintiffs filed a First Amended Complaint adding Horsten as a defendant. ECF No. 63. On March 23, 2021, Plaintiffs filed the operative SAC adding Defendants Anna Galindo, Osvaldo Galindo, Raul Orellana, Firestream, and Martha Galindo.[7] ECF No. 112. Plaintiffs allege three causes of action pursuant to the Copyright Act, 17 U.S.C. § 101, *et seq.*: (1) direct copyright infringement against Defendants Alex Galindo, Anna Galindo, Martha Galindo, Osvaldo Galindo, and Horsten; (2) secondary copyright infringement against all Nitro Defendants; and (3) intentional inducement of infringement against all Nitro Defendants. *See* SAC ¶¶ 64–91. Alex Galindo filed an answer on April 13, 2021. ECF No. 126. Despite properly effecting service on

---

[5] A detailed summary of Alex Galindo's discovery violations may be found in the R&R.
[6] The Court addresses Plaintiffs' statutory damage supplemental briefing in a separate order.
[7] Because Alex, Anna, Martha, and Osvaldo share the same last name, the Court refers to all four defendants by their first and last names.

each remaining defendant, *see* ECF Nos. 130, 131, 132, 133, 134, 190, the remaining defendants
(collectively, the "Defaulted Defendants") failed to appear in this action.[8] Plaintiffs filed Requests
for the Clerk to enter default judgment on each remaining defendant. ECF Nos. 140, 141, 142, 143,
148, 191. Each request was granted pursuant to Federal Rule of Civil Procedure 55(a). ECF Nos.
144, 145, 146, 147, 149, 192. Plaintiffs filed the instant Motion for Default Judgment on October 3,
2022. ECF No. 227 ("Motion" or "Mot."). Plaintiffs served the Motion and notice of the Motion
hearing on all Nitro Defendants and filed proof of service with the Court. *See* ECF Nos. 229, 235.
The Court heard oral argument on November 17, 2022. None of the Nitro Defendants appeared at
the hearing.

## MOTION FOR DEFAULT JUDGMENT

By their Motion for Default Judgment, Plaintiffs seek default judgment against the Defaulted
Defendants and statutory damages in the same amount as sought against Alex Galindo.

**III.   Applicable Law**

**A. Motion for Default Judgment**

Federal Rule of Civil Procedure 55(b) authorizes a district court to grant default judgment
after the Clerk of the Court enters default under Rule 55(a). FED. R. CIV. P. 55(b). Local Rule 55-1
requires the party seeking default judgment to file a declaration establishing: (1) when and against
what party the default was entered; (2) the pleading on which default was entered; (3) whether the
defaulting party is an infant or incompetent person, and if so, whether that person is represented by a
general guardian, committee, conservator, or other like fiduciary who has appeared; (4) that the
Servicemembers Civil Relief Act does not apply; and (5) that the defaulting party was properly
served with notice. C.D. Cal. L.R. 55-1.

Once default has been entered, the well-pled factual allegations in the complaint, except
those concerning damages, are deemed admitted by the non-responding party. *See* FED. R. CIV. P.

---

[8] It should be noted that Anna Galindo, prior to being named as a defendant in this case, filed a non-party
motion to quash a subpoena for Woodforest National Bank. ECF No. 85. Anna Galindo did not appear in this
action upon receipt of the SAC and related summons.

8(b)(6); *TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917–18 (9th Cir. 1987). However, default judgment is not automatic upon the Clerk's entry of default; rather, it is left to the sound discretion of the court. *Aldabe v. Aldabe*, 616 F.2d 1089, 1092–93 (9th Cir. 1980). When deciding whether to enter default judgment, courts consider seven factors, commonly known as the *Eitel* factors:

> (1) the possibility of prejudice to the plaintiff; (2) the merits of plaintiff's substantive claim; (3) the sufficiency of the complaint; (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect; and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits.

*Eitel v. McCool*, 782 F.2d 1470, 1471–72 (9th Cir. 1986).

"Well-pleaded allegations" require "sufficient factual matter . . . to 'state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). It requires "more than a sheer possibility that a defendant has acted unlawfully" but does not require "detailed factual allegations." *Id.* Instead, the plaintiff need only show more than "threadbare recitals of the elements of a cause of action." *Id.* "Determining whether a complaint states a plausible claim for relief is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Ebner v. Fresh, Inc.*, 838 F.3d 958, 963 (9th Cir. 2016) (quoting *Iqbal*, 556 U.S. at 679).

## B. Personal Jurisdiction

When granting a motion for default judgment pursuant to Federal Rule for Civil Procedure 55, the Ninth Circuit requires that the district court "determine whether it has the power, i.e., the jurisdiction, to enter the judgment in the first place." *In re Tuli*, 172 F.3d 707, 712 (9th Cir. 1999). The purpose of this requirement is to prevent the district court from "entering a default judgment that can later be successfully attacked as void." *Id.* As such, the district court must consider whether the defendant is subject to personal jurisdiction in this forum. *See Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 801 (9th Cir. 2004). And though the district court has an obligation to determine whether jurisdiction is proper, *see id.*, it is the *plaintiff's* obligation to establish that the Court has personal jurisdiction over a defendant. *See Mattel, Inc. v. Greiner & Hausser GmbH*, 354 F.3d 857, 862 (9th Cir. 2003) (holding that the plaintiff "bears the burden of establishing the district court's

1    personal jurisdiction over the Defendants"); FED. R. CIV. P. 8(a)(1) ("A pleading that states a claim

2    for relief must contain [. . .] a short and plain statement of the grounds for the court's

3    jurisdiction . . . .").

4    **IV.    <u>Discussion</u>**

5    **A.  The Court has personal jurisdiction over the Nitro Defendants.**

6    "For a court to exercise personal jurisdiction over a nonresident defendant, that defendant

7    must have at least minimum contacts with the relevant forum such that the exercise of jurisdiction

8    does not offend traditional notions of fair play and substantial justice." *Schwarzenegger*, 374 F.3d at

9    801 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation marks

10   omitted)). Under the minimum contacts test, jurisdiction can be either general or specific. *Id.*

11   Courts view copyright infringement as a tort claim and thus apply the "purposeful direction"

12   minimum contacts test. *See Mavrix Photo, Inc. v. Brand Technologies, Inc.*, 647 F.3d 1218, 1228

13   (9th Cir. 2011) (applying the "purposeful direction" analysis to a copyright infringement claim).

14   Purposeful direction is analyzed under the *Calder* "effects" test, which requires the defendant to

15   have "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that

16   the defendant knows is likely to be suffered in the forum state." *Id.* (citing *Calder v. Jones*, 465 U.S.

17   783, 789–90 (1984)). The test is composed of three elements: "the defendant allegedly must have (1)

18   committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the

19   defendant knows is likely to be suffered in the forum state." *Mavrix Photo*, 647 F.3d at 1228 (citing

20   *Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124, 1128 (9th Cir. 2010), *abrogation*

21   *recognized by Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064 (9th Cir. 2017)).

22   The Court finds that Plaintiffs have satisfied each element of the *Calder* effects test. The first

23   factor—intentional act—is satisfied as copyright infringement is generally considered to be an

24   intentional act. *See, e.g.*, *Mavrix Photo*, 647 F.3d at 1229 (finding that defendant had "committed an

25   intentional act" by "allegedly infringing" on plaintiff's copyright-protected materials.).

26   Next, the second factor—whether the Nitro Defendants' conduct was "expressly aimed" at

27   California—is satisfied, as Plaintiffs have alleged that the Nitro Defendants marketed Nitro TV

28   subscriptions in California and hosted California-specific programming on the Platform.

Specifically, the SAC alleges that the Nitro Defendants "have marketed and sold Nitro TV subscriptions to end users in California as well as TekkHosting Nitro Reseller Credits (which are exchanged for Nitro TV subscriber credentials) to resellers in California [and] do business with California-based companies," and that the alleged copyright infringement "caused harm to Plaintiffs in California." SAC ¶¶ 9–12. The SAC also alleges that the Nitro TV Platforms contain "a collection of [California-specific] broadcast television networks" such as "Los Angeles ABC, CBS, CW, NBC and FOX" affiliates. *Id.* ¶ 50; *see also Mavrix Photo*, 647 F.3d 1230 (finding that defendant expressly aimed its business activity to the forum state because the defendant's website contained advertisements targeting California residents, indicating "that [defendant] kn[ew]—either actively or constructively—about its California user base, and that it exploit[ed] that base for commercial gain").

The third and final element—foreseeability of harm—is also satisfied. The Ninth Circuit has held that "a corporation can suffer [jurisdictionally sufficient] economic harm both where the bad acts occurred and where the corporation has its principal place of business." *Dole Food Co., Inc. v. Watts*, 303 F.3d 1104, 1113 (9th Cir. 2002). Plaintiffs argue that "Defendants reasonably expected or should have reasonably expected their acts to cause harm in California because Plaintiffs either maintain headquarters or offices in California, and it is the location of a significant portion of Plaintiffs' production and distribution operations." SAC ¶ 12; *see also id.* ¶¶ 14–21 (listing Plaintiffs' headquarters and principal places of business). As seven of the eight plaintiffs are headquartered and have their principal place of business in California, the Court finds that it was foreseeable that Plaintiffs would have suffered harm in the forum state. *Dole Food Co.*, 303 F.3d at 1114 ("[W]hen a forum in which a plaintiff corporation has its principal place of business is in the same forum toward which defendants expressly aim their acts, the 'effects' test permits that forum to exercise personal jurisdiction.").

The remaining plaintiff, Amazon, is described as "incorporated under the laws of the State of Delaware with its principal place of business in Seattle, Washington." SAC ¶ 15. This, however, does not negatively impact a finding of foreseeability of harm. Indeed, in *Mavrix Photo, Inc. v. Brand Technologies, Inc.*, the Ninth Circuit held that "jurisdictionally significant harm" extends to a

defendant's actions that "destroy[] . . . California-based value." 647 F.3d at 1231–32. The plaintiff in *Mavrix Photo* was a Florida corporation with its principal place of business in Miami. *Id.* at 1221. Regardless, the Ninth Circuit found that as the defendant republished photos under plaintiff's exclusive ownership, "it was foreseeable that . . . economic loss would be inflicted not only in Florida . . . but also in California [as a] substantial part of the photos' value was based on the fact that a significant number of Californians would have bought publications . . . in order to see the photos." *Id.* at 1231–32. Similar reasoning applies here. Plaintiffs contend that Amazon "owns or controls the copyrights or exclusive rights in the content that it or its affiliates produce or distribute." SAC ¶ 15. As was found in *Mavrix Photo*, the Court finds that it was foreseeable that Amazon would suffer economic loss in California as "a significant number of Californians would have bought" Amazon's content but-for the Nitro Defendants' conduct.

Accordingly, the Court finds that it has personal jurisdiction over the Nitro Defendants.

**B.  Plaintiffs have satisfied the procedural requirements of Local Rule 55-1.**

The Clerk of the Court entered default against the Defaulted Defendants on May 6, 2021, May 14, 2021, and November 15, 2021. ECF Nos. 144 (Entry of Default Against Raul Orellana); 145 (Entry of Default Against Firestream LLC); 146 (Entry of Default Against Anna Galindo); 147 (Entry of Default Against Osvaldo Galindo); 149 (Entry of Default Against Richard Horsten); 192 (Entry of Default Against Martha Galindo). The Defaulted Defendants have not responded to the Complaint or otherwise defended the action. Pursuant to Local Rule 55-1, the Motion states that the Defaulted Defendants are not minors, infants, or otherwise incompetent persons, nor subject to the Servicemembers Civil Relief Act. Mot. at 6. Finally, Plaintiffs served the Defaulted Defendants with a copy of this Motion. Proof of Service, ECF No. 229; Declaration of Julie A. Shepard, ECF No. 227-1 ("Shepard Decl.") ¶ 2. As such, the Court finds Waters has complied with the procedural requirements of Local Rule 55-1.

**C.  The *Eitel* factors weigh in favor of granting default judgment.**

i.  <u>Plaintiffs would suffer prejudice without a default judgment.</u>

The first *Eitel* factor requires the Court to consider the harm to a plaintiff in the absence of default judgment. *See Eitel*, 782 F.2d at 1471. Plaintiffs argue that by failing to appear in this action,

1   the Defaulted Defendants have likely "left [Plaintiffs] . . . without any recourse or any ability to

2   recoup damages absent entry of a default judgment." Mot. at 7. Moreover, given the nature and

3   extent of the evasive conduct previously employed by the Nitro Defendants, *see infra* Section

4   IV.C.ii.2.ii.1, it is likely that without further Court action, the Nitro Defendants may continue the

5   infringing conduct. And while Plaintiffs acknowledge that Alex Galindo has appeared in this action

6   and that they have obtained terminating sanctions against him, *see* ECF No. 222, it appears that

7   Plaintiffs believe that these sanctions will be insufficient to provide Plaintiffs with adequate relief.

8   *See id.* 7–8. The Defaulted Defendants failed to appear to contest this allegation.

9       Taking the well-pled factual allegations as true—as this Court must, given that the Clerk has

10  entered default—Plaintiffs will be prejudiced if the Court does not grant default judgment.

11  Accordingly, the Court finds that this factor weighs in favor of granting default judgment.

12          ii.   The Court finds Plaintiffs' SAC sufficient and the claims alleged therein
                  meritorious.[9]
13

14      The second and third *Eitel* factors consider the substantive merits and sufficiency of the

15  complaint. *See Eitel*, 782 F.2d at 1471. Notwithstanding the entry of default, the Court must still

16  determine whether the facts alleged give rise to a legitimate cause of action because "claims [that]

17  are legally insufficient . . . are not established by default." *Cripps v. Life Ins. Co. of N. Am.*, 980 F.2d

18  1261, 1267 (9th Cir. 1992). Plaintiffs maintain that they have sufficiently pleaded the Copyright Act

19  claims set forth in the SAC. Mot. at 8.

20      To establish a claim for direct copyright infringement, Plaintiffs must establish (1) ownership

21  of a valid copyright of the allegedly infringed materials, and (2) "demonstrate that the alleged

22  infringers violate at least one exclusive right granted to copyright holders 17 U.S.C. § 106." *A&M*

23  *Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001). Upon review of the Motion and

24  the SAC, the Court finds that Plaintiffs have satisfied both requirements.

25

26  ───────────────

27  [9] Plaintiffs cite to a number of district court cases to support their arguments. However, the Court reminds
    Plaintiffs that trial court decisions are not binding on this Court. *See Hart v. Massanari*, 266 F.3d 1155, 1174
    (9th Cir. 2001) ("[T]he binding authority principle applies only to appellate decisions, and not to trial court
28  decisions . . . .").

*1.   Plaintiffs have sufficiently pleaded evidence of ownership of a valid copyright.*

First, Plaintiffs have presented detailed evidence indicating that they own and control all 1,897 Copyrighted Works. To bring a copyright suit, a plaintiff must show that she has registered the works at issue with the U.S. Copyright Office. *See* 17 U.S.C. § 411(a); *Fourth Est. Pub. Benefit Corp. v. WallStreet.com, LLC*, 139 S. Ct. 881, 886 (2019) (citing 17 U.S.C. § 411(a)). "A copyright registration is 'prima facie evidence of the validity of the copyright and the facts stated in the certificate.'" *United Fabrics Int'l, Inc. v. C&J Wear, Inc.*, 630 F.3d 1255, 1257 (9th Cir. 2011) (quoting 17 U.S.C. § 410(c)).

Plaintiffs have provided a "representative list of titles, along with their [federal] registration numbers, as to which [the Nitro] Defendants have directly and secondarily infringed." SAC ¶ 22; *id.*, Ex. A. Therefore, Plaintiffs are the presumed owners of the Copyrighted Works, and this first element is met.

*2.   Plaintiffs have sufficiently demonstrated that the Defaulted Defendants violated at least one exclusive right granted to copyright holders.*

Plaintiffs proceed under two theories in support of the second element—whether the Defaulted Defendants violated at least one exclusive right granted to copyright holders. *A&M Records, Inc.*, 239 F.3d at 1013. First, that Horsten, in collaboration with Alex Galindo, directly infringed on "Plaintiffs' exclusive rights to publicly perform their works and reproduce their works." Mot. at 9. Second, that all Nitro Defendants are liable under both theories of secondary liability—contributory infringement and inducement. *Id.* at 12. The Court evaluates both theories in turn.

i.   <u>Plaintiffs have established that Horsten and Galindo directly infringed on Plaintiffs' exclusive rights to publicly perform and reproduce the Works.</u>[10]

Section 106 of the Copyright Act enumerates the specific rights exclusive to copyright owners. Among these rights is the right "to perform the copyrighted work publicly." 17 U.S.C. §

---

[10] Although at various points in discussing direct infringement Plaintiffs refer to "the Defendants," the Court understands that Plaintiffs are contending that only Defendants Horsten and Galindo are liable for direct infringement, and the other Nitro Defendants are only secondarily liable—for contributory infringement and inducement.

106(4). ("[I]n the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly."). While the law indicates that there are two ways to "perform a work publicly,"[11] Plaintiffs proceed under the second definition, that is, "to transmit or otherwise communicate a performance or display of the work . . . to the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in the separate places and at the same time or at different times." 17 U.S.C. § 101. Streaming a copyrighted work over the Internet qualifies as public performance. *See, e.g.*, William F. Patry, Patry on Copyright § 14:2 (Sept. 2022) ("Transmission of a copy of a work stored on a computer server to members of the public is a public display, even if to only one person, because people in different locations can also receive it."); *Am. Broad. Cos., Inc. v. Aereo, Inc.*, 573 U.S. 431, 445–48 (2014) (finding that a provider that "streams . . . programs over the Internet to . . . subscribers" qualifies as a public performance under the meaning of the statute).

Plaintiffs allege that Horsten and Galindo "continuously transmitted [without Plaintiffs' authorization] Plaintiffs' Copyrighted Works [by] provid[ing] subscribers with access to thousands of live and title-curated television channels—containing countless Copyrighted Works—that were streamed twenty-four hours a day, seven days a week." Mot. at 10; *see also* SAC ¶¶ 2–5, 34. As the law indicates that streaming falls under the purview of public performance, the Court finds that Plaintiffs have sufficiently established that Horsten and Galindo publicly performed the Copyrighted Works without authorization.

Plaintiffs further contend that Horsten and Galindo violated Plaintiffs' "exclusive right to reproduce their Works." Mot. at 10. The Copyright Act reserves the right to "reproduce the copyrighted work in copies" to the holder of the copyright. *See* 17 U.S.C. § 106; *see also* 2 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 8.02 (2022) ("Nimmer") ("The reproduction right consists of the exclusive right to reproduce the copyrighted work in copies or

---

[11] The statute also defines public performance of a work as "to perform or display it at a place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered." 17 U.S.C. § 101.

phonorecords." (quotation marks omitted)). Under the DMCA, a copy is defined as a "material object[] . . . in which a work is fixed by any method now known or later developed, and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." 17 U.S.C. § 101. To qualify as a copy under the Copyright Act, the "allegedly infringing work must be fixed in some tangible form, from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." *Sega Enterprises Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1519 (9th Cir. 1992) (quotation marks omitted) (citing 17 U.S.C. § 101). Plaintiffs highlight two instances of unauthorized reproduction of their Works: (1) Nitro TV's "Catch-Up" feature, which "allowed subscribers to watch television programs from the prior two days," Mot. at 10; SAC ¶ 51, and (2) Nitro TV's "24/7 channels" which "continuously streamed episodes of a single television series, single movie, or collection of movies at all times of the day and night, seven days a week." *Id.* at 11; SAC ¶¶ 52–53. Both features, Plaintiffs argue, require making copies of or otherwise reproducing the relevant television programs and movies. *See* Mot. at 10–11; SAC ¶¶ 51–53. As previously stated, at no point did Plaintiffs give Horsten or Galindo authorization to reproduce their Copyrighted Works. *See* Section III.C.ii.2.i. Thus, the Court—taking all allegations as true—finds that Plaintiffs have sufficiently pleaded a direct infringement copyright claim against Horsten and Galindo.

> ii.  Plaintiffs have sufficiently alleged that the Defaulted Defendants secondarily infringed Plaintiffs' Copyrighted Works.

Plaintiffs next argue that the Defaulted Defendants are liable under two theories of secondary liability: contributory infringement and inducement. Mot at 12. Plaintiffs allege that the Nitro Defendants, through Nitro TV, "provided subscribers with access to thousands of live and title-curated television channels—containing countless Copyrighted Works . . . ." *Id.* at 10.

> 1.  *Plaintiffs have sufficiently alleged contributory infringement.*

"[I]n general, contributory liability is based on the defendant's failure to stop its own actions which facilitate third-party infringement . . . ." *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1175 (9th Cir. 2007). A defendant is a contributory infringer if "it has knowledge of a third party's

infringing activity, and (2) induces, causes, or materially contributes to the infringing conduct." *Perfect 10, Inc. v. Visa Intern. Serv. Ass'n*, 494 F.3d 788, 795 (9th Cir. 2007) (citing *Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004)). "Liability for contributory copyright infringement attaches if the [defendants] (1) knew of the direct infringement; and (2) they either induced, caused, or materially contributed to the infringing conduct." *Luvdarts, LLC v. AT&T Mobility, LLC*, 710 F.3d 1068, 1072 (9th Cir. 2013) (citing *A&M Records*, 239 F.3d at 1019). In the context of the Internet, contributory liability occurs "when the defendant engages in personal conduct that encourages or assists the infringement." *Visa Intern. Serv. Ass'n*, 494 F.3d at 795.

The Court begins with the first element of "knowledge." Plaintiffs allege that "Defendants knew that Nitro TV was used to infringe Plaintiffs' Copyrighted Works [as] Defendants specifically curated the programming and channels available on Nitro TV, even asking subscribers for feedback on additional shows to include." Mot. at 12 (citing SAC ¶¶ 37–38). The SAC also alleges that the Nitro Defendants "used the Nitro TV Facebook Group as a vehicle to advise . . . subscribers how to hide infringing activity," including providing instructions on how to use a VPN. SAC ¶ 39. Plaintiffs further contend that the Nitro Defendants' decision to "anonymize the operation of Nitro TV" after learning of a similar lawsuit against a "similarly-infringing" streaming service implies that the Nitro TV Defendants had knowledge of the infringing activity. Mot. at 12 (citing SAC ¶ 3).

While the Ninth Circuit requires "more than a generalized knowledge . . . of the possibility of infringement," there is an inconsistency in this circuit's case law regarding the requisite "knowledge" standard in the context of contributory infringement. *See Erickson Prods., Inc. v. Kast*, 921 F.3d 822, 832 (9th Cir. 2019) (summarizing the inconsistency). In *Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*, the Ninth Circuit held that "know or have reason to know" is the appropriate "knowledge" standard. 658 F.3d 936, 943 (9th Cir. 2011). Two years later, however, in *Luvdarts, LLC v. AT&T Mobility, LLC*, the Ninth Circuit held that "knowledge" is defined only as "actual knowledge of specific acts of infringement" and "[w]illful blindness of specific facts." 710 F.3d at 1072–73.

Even with this inconsistency in mind, the Court finds that Plaintiffs have satisfied the standard. The instant case is akin to *Columbia Pictures Industries, Inc. v. Fung*, where the Ninth

1   Circuit found that a detailed accounting of the defendant "actively encouraging infringement, by

2   urging his users to both upload and download particular copyrighted works, providing assistance to

3   those seeking to watch copyrighted films, and helping his users burn copyrighted material on to

4   DVDs" was sufficient to meet the first prong of the contributory infringement analysis. 710 F.3d

5   1020, 1043 (9th Cir. 2013). Here, the SAC provides a detailed summary of the Nitro Defendants

6   "actively encouraging infringement" by soliciting download suggestions and providing subscribers

7   with guidance on how to best subvert detection while viewing the Works. These facts—taken as

8   true—imply that the Nitro Defendants were aware that Nitro TV contained unlicensed works and

9   took steps to both encourage third-party infringement of the material and aid in the concealment of

10  the infringement itself. Thus, the Court finds that Plaintiffs have satisfied the first element of

11  contributory infringement.

12          The Court next considers the second element—whether the Nitro Defendants "either induced,

13  caused, or materially contributed to the infringing conduct." *Luvdarts, LLC*, 710 F.3d at 1072. As

14  stated by Plaintiffs, a "material contribution" may be established where the defendant "substantially

15  assists . . . a worldwide audience of users to access infringing materials." *Perfect 10, Inc.*, 508 F.3d

16  at 1172; Mot. at 13. Plaintiffs lodge two allegations in support of this factor. First, Plaintiffs allege

17  that the Nitro Defendants "have done precisely this by architecting and operating . . . Nitro TV [and]

18  by designing and managing the distribution channels that provide access to Nitro TV, all with the

19  goal of growing [Nitro TV's] subscriber base . . . to be as large as possible." Mot. at 13; SAC ¶¶ 55–

20  57. Second, Plaintiffs allege that Anna Galindo, Martha Galindo, and Osvaldo Galindo operated and

21  facilitated the payment processor and bank accounts used to sell and process Nitro TV subscriptions

22  and reseller credits and pay Horsten and Orellana for their work operating, promoting, and marketing

23  the Nitro TV Platform. *See* Mot. at 13; SAC ¶¶ 2, 5, 6, 40, 54–58. Evaluating the allegations in the

24  SAC, the Court finds that Plaintiffs have sufficiently shown that the Defaulted Defendants facilitated

25  and were otherwise actively involved in the infringing conduct. Indeed, the SAC indicates that but

26  for the Defaulted Defendants' conduct, subscribers would not have been able to access the Works.

27  *See Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 264 (9th Cir. 1996) (finding that defendant

28  had materially contributed because "it would be difficult for the infringing activity to take place in

the massive quantities alleged without the . . . services provided by the [defendant]. These services include, *inter alia,* the provision of space, utilities, parking, advertising, plumbing, and customers.").

Upon full review of the SAC's allegations, the Court finds that the Defaulted Defendants can be held contributorily liable for the subscribers' direct infringement of the Works. Indeed, the allegations in the SAC imply that the Defaulted Defendants "could be held contributorily liable if [they] had knowledge that [the infringing Works] were available using the [Platform], could take simple measures to prevent further damage to [the Plaintiff's copyrighted works, and failed to take such steps." *Perfect 10, Inc.*, 508 F.3d at 1172. In sum, the Court finds Plaintiffs' contributory infringement claim sufficiently pleaded for the purposes of this Motion.

### 2. *Plaintiffs have sufficiently pleaded inducement.*

Plaintiffs also allege secondary liability under the theory of inducement. Mot. at 13; SAC ¶¶ 83–88. A plaintiff proceeding under the theory of inducement must establish four elements: "(1) the distribution of a device or product, (2) acts of infringement, (3) an object of promoting its use to infringe copyright, and (4) causation." *Fung*, 710 F.3d at 1032 (citing *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 936–37 (2005)). The Court finds that Plaintiffs have satisfied all four elements.

As to the first two elements—"the distribution of a device or product" and "acts of infringement"—as previously established, the Defaulted Defendants directly infringed on the Copyrighted Works by and through streaming the Copyrighted Works through the Platform and by granting subscribers and the reseller network access to the Platform. *See* Mot. at 14. This satisfies the first two elements.

The third element—whether the Defaulted Defendants acted with "an object of promoting its use to infringe copyright"—is also satisfied. This element is premised on a "clear expression or other affirmative steps taken to foster infringement." *Grokster*, 545 U.S. at 937. This element requires a "high degree of proof of the improper object," and the improper object being "plain and . . . affirmatively communicated through words or actions." *Fung*, 710 F.3d at 1034 (citing *Grokster*, 545 U.S. at 937). While "[t]he classic instance of inducement is by advertisement or solicitation that

1  broadcasts a message designed to stimulate others to commit violations," the Supreme Court has also

2  found sufficient proof of inducement where defendants engaged in communications that, while not

3  directly promoting infringing uses, "provided information affirmatively supporting such uses."

4  *Grokster*, 545 U.S. at 937.

5    Here, Plaintiffs provide evidence of advertisements and communications "affirmatively

6  supporting" infringement. The SAC alleges that the Defaulted Defendants, along with Alex Galindo,

7  advertised the Platform through the use of the Hosting Sites, YouTube advertisements, and through

8  the use of resellers. *See* SAC ¶¶ 35, 36, 41, 56, 58, 62. The Defaulted Defendants also "utilized

9  social media, including the Nitro TV Facebook group, to advise subscribers on how to hide their true

10  locations from detection while using Nitro TV," *id.* ¶ 39, and likely "designed to stimulate others to

11  commit [copyright] violations." *Fung*, 710 F.3d at 1036 (citing *Grokster*, 545 U.S. at 937)

12  (alterations in original). This evidence is more than sufficient to satisfy the third element. *See id.*

13    Finally, the Court finds that the fourth element of causation is clearly met. Causation is

14  established "if [a defendant] provides a service that could be used to infringe copyrights, with the

15  manifested intent that the service actually be used in that manner." *Id.* at 1037. Here, Plaintiffs argue

16  that "Defendants have made clear their unlawful intent that the Nitro TV enterprise be used to

17  facilitate infringement" because the Nitro Defendants took steps to actively "curat[e]" and promote

18  the infringing Works on the Platform and "developed an extensive web of resellers to market Nitro

19  TV and expand its subscriber base." Mot. at 14 (citing SAC ¶¶ 28–29, 35–39, 54). Further, because

20  the Nitro Defendants provided subscribers with tips on how to use a VPN to best view the infringing

21  works on the Platform, *see* SAC ¶ 39, the SAC's allegations indicate that the Nitro Defendants

22  intended for subscribers to use the Platform with the express purpose of viewing the infringing

23  content. Accordingly, the Court finds that the causation element is met.

24    As the allegations in the SAC satisfy all four elements of inducement, the Court finds that

25  Plaintiffs have sufficiently pleaded this claim.

26

27  / / /

28  / / /

18

Plaintiffs' claims for both direct and secondary copyright infringement are sufficiently pleaded. As such, the Court finds that these two *Eitel* factors—merits of the claim and sufficiency of the complaint— point towards granting default judgment.

### iii.   The sum of money at stake is reasonable.

In evaluating this factor, the Court must balance the amount of money at stake in relation to the seriousness of Defendants' conduct. *See Eitel*, 782 F.2d at 1471–72.

> *1.   Plaintiffs are entitled to the maximum statutory award for willful infringement for a reasonable subset of the infringed Works.*

Pursuant to 17 U.S.C. § 504, Plaintiffs seek statutory damages in the amount of $51.6 million. *See* Mot. at 16; SAC ¶¶ 70, 80, 89.

Plaintiffs argue that they are entitled to an award of $150,000 on each infringed Work because the Nitro Defendants engaged in willful and egregious conduct, but are seeking this award only on a subset of Works. Supplemental Brief at 18. The Copyright Act provides for an award of enhanced statutory damages upon a finding of willful infringement. Specifically, it provides that "[i]n a case where the copyright owner sustains the burden of proving, and the court finds, that infringement was committed willfully, the court in its discretion may increase the award of statutory damages to a sum of not more than $150,000." 17 U.S.C. § 504(c)(2). Moreover, "[a] plaintiff may elect statutory damages regardless of the adequacy of the evidence offered as to his actual damages or the amount of the defendant's profits." *Columbia Pictures Television v. Krypton Broad. of Birmingham, Inc.*, 259 F.3d 1186, 1195 (9th Cir. 2001) (internal quotation marks omitted) (quoting Nimmer § 14.04[A]). "The court has wide discretion in determining the amount of statutory damages to be awarded, constrained only by the specified maxima and minima." *Harris v. Emus Records Corp.*, 734 F.2d 1329, 1335 (9th Cir. 1984). "In measuring the damages, the court is . . . guided by what is just in the particular case, considering the nature of the copyright, the circumstances of the infringement and the like . . . ." *Peer Int'l Corp. v. Pausa Records, Inc.*, 909 F.2d 1332, 1336 (9th Cir. 1990) (quoting *F.W. Woolworth Co. v. Contemporary Arts*, 344 U.S. 228, 232 (1952)).

The Court, exercising its discretion—finds that Plaintiffs are entitled to the full statutory award amount on each Work in the subset of infringed Works. Specifically, the nature and scope of

Alex Galindo and the Defaulted Defendants' conduct indicate that the Nitro Defendants willfully engaged in egregious Copyright infringement. *See* Mot. at 15–17; Supplemental Brief at 20–22. The Nitro Defendants' conduct and the conduct's impact are wide-ranging. Nitro TV's very existence "creates the impression that [the Nitro Defendants and reseller network] are providing a legitimate, licensed service" which "undermine[s] [and stunts the growth of] the market" for Plaintiffs' "legitimate offerings." Declaration of Sean Jaquez, ECF No. 15 ("Jaquez Decl.") ¶¶ 31–32. Indeed, Plaintiffs' business model, as well as the entertainment industry itself, hinges on copyright owners' ability to control the distribution and use of their copyrighted works. *See id.* ¶¶ 4–11. The Nitro Defendants' infringement compromises this business model by depriving Plaintiffs of their ability to "control the distribution and use of [their] Works"; "threatens [Plaintiffs'] relationships with [their] legitimate licenses and . . . digital distribution business"; "encourage[s] the growth of the illicit market for infringing content"; and exposes Plaintiffs to continued risk of piracy. *Id.* ¶¶ 12–38. Moreover, Alex Galindo engaged in spoliation and blocked Plaintiffs from conducting meaningful discovery to determine the full scope of the Nitro Defendants' infringement and Nitro TV-related profits or determine the extent of Plaintiffs' financial loss. *See* R&R at 4–8. The Nitro Defendants should not be rewarded for or given the benefit of the doubt due to their wrongful conduct. Given the extent of the Nitro Defendants' willful conduct, the Court finds an award of the maximum $150,000 per Work reasonable.

### 2. *Plaintiffs' requested award of $51.6 million is reasonable.*

Plaintiffs indicate that the Nitro Defendants infringed upon at least 1,872 Works. *See* SAC, Ex. A; *see also* Declaration of Julie A. Shepard, ECF No. 226-1, Exs. A–G (listing 689 separate Copyrighted Works); Declaration of Kevin Shuai, ECF No. 226-2, Ex. 1 (providing hundreds of copyright registration certificates for Copyrighted Works owned by Paramount Pictures); Declaration of Gary Lim, ECF No. 226-3, Exs. 1–2 (providing hundreds of copyright registrations for Copyrighted Works owned by the Walt Disney Company). An award of $150,000 on each of the 1,872 Works would amount to statutory damages in excess of $280 million. However, rather than request $150,000 per *each* Work, Plaintiffs request that all Nitro Defendants be held jointly and severally liable for statutory damages in the amount of $51.6 million—an amount derived from

awarding the statutory maximum on a selection of just 344 Works.[12] Supplemental Brief at 20; *see* Mot. at 16–25. This requested amount is consistent with statutory awards granted by courts in this district.[13] Thus, given the circumstances of the alleged infringement, the Court finds this request reasonable and awards $51.6 million or $150,000 per work on 344 Works.[14]

### 3. Plaintiffs are entitled to post-judgment interest.

"[P]ost-judgment interest is determined by federal law." *Northrop Corp. v. Triad Int'l Mktg., S.A.*, 842 F.2d 1154, 1155 (9th Cir. 1988). 28 U.S.C. § 1961 provides that "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court." 28 U.S.C. § 1961(a). Post-judgment interest is calculated "from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment." *Id.*

Here, Plaintiffs seek post-judgment interest as provided under 28 U.S.C. § 1961. Mot. at 23. The record provides no countervailing evidence setting post judgment interest at a different amount.

Accordingly, the Court finds that Plaintiffs are entitled to the amount permitted by Section 1961(c).

/ / /

/ / /

---

[12] Plaintiffs base the $51.6 million award amount on applying the maximum statutory award amount on 344 Works. *See* Supplemental Brief at 20; Mot. at 16. It should be noted that the Motion lists 342 Works rather than 344. *See* Mot. at 16. During oral argument, however, Plaintiffs' counsel clarified that 342 is a typographical error.

[13] Courts have reduced the requested award amount where defendants have similarly displayed "egregious" behavior when "the number of copyrighted works at issue would amount to an excessively large award." *Warner Bros. Ent't, Inc. v. Tusa*, No. 2:21-cv-05456-VAP-ASx, 2021 WL 6104399, at *7 (C.D. Cal. Oct. 25, 2021). *See also China Cent. Television v. Create New Tech. (HK) Ltd.*, No. 15-01869, 2015 WL 12732432, at *17–18 (C.D. Cal. Dec. 7, 2015) (reducing plaintiffs' requested award amount from $300,900,000 to $30,000,000 where 2,006 infringed works were at issue). *C.f. Peer Int'l Corp.*, 909 F.2d at 1337 (awarding the then-maximum award amount of $50,000 per work on only eighty violations); *Warner Bros Ent't Inc. v. Caridi*, 346 F. Supp. 2d 1068, 1074 (C.D. Cal. 2004) (awarding the maximum amount of $150,000 per work where only two infringed works were at issue).

[14] The $51.6 million award amount may also be arrived at by awarding damages in the amount of $27,200 per work on each of the indicated 1,872 Copyrighted Works, which the Court finds to be reasonable in light of the relevant minimums and maximums and all of the facts of the case.

i.   There is little possibility of dispute.

The fifth *Eitel* factor requires the Court to consider the possibility of dispute about material facts in the case. *See Eitel*, 782 F.2d at 1471–72. This *Eitel* factor generally weighs in favor of default judgment where a complaint is well-pleaded and the defendants make no effort to respond.

The Defaulted Defendants have not responded to this action. And though Alex Galindo did appear in this case, there is no indication from the SAC nor the Motion that there are any facts in dispute. Upon entry of default, all well-pleaded facts in the complaint are taken as true, except those relating to damages. *TeleVideo Sys., Inc.*, 826 F.2d at 917–18. Considering the low likelihood of disputed facts, the Court finds this factor to weigh in favor of default judgment.

ii.   The Court is unable to conclude whether there is excusable neglect.

The sixth *Eitel* factor considers the possibility that the default resulted from excusable neglect. *See Eitel*, 782 F.2d at 1472.

Here, Plaintiffs allege that they have properly served the Defaulted Defendants with the Complaint, summons, and this motion for default judgment. *See supra* Section II.B, Mot. at 18. Absent any further information, the Court is unable to conclude whether the Defaulted Defendants' failure to respond is due to excusable neglect.

iii.   Policy favoring resolution on the merits weighs against granting default judgment.

The Ninth Circuit's "starting point is the general rule that default judgments are ordinarily disfavored. Cases should be decided upon their merits whenever reasonably possible." *Eitel*, 782 F.2d at 1472. Therefore, the policy favoring resolution on the merits weighs against granting default judgment.

Taken as a whole, the Court finds that the *Eitel* factors weigh towards granting default judgment against the Defaulted Defendants.

/ / /

/ / /

V.  **Remedies**

A.  **The Court grants the request for permanent injunction.**

Having found in favor of granting default judgment, the Court next considers whether it should award Plaintiffs a permanent injunction against the Defaulted Defendants. The Copyright Act allows courts to grant permanent injunctions "to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a). Plaintiffs seek a permanent injunction

> enjoining Defendants and their officers, agents, servants, employees, attorneys, and all persons acting in active concert or participation with them, from publicly performing, reproducing, distributing or otherwise infringing in any manner (including without limitation by materially contributing to or intentionally inducing the infringement of) any right under copyright in any of the Copyrighted Works, including without limitation by publicly performing or reproducing those Works, or by distributing any software of proving any service or device that does or facilitates any of the foregoing acts.

SAC at Prayer ¶ 1.

Plaintiffs also seek to "impound[] hardware in Defendants' possession, custody, or control, and any and all documents or other records in Defendants' possession, custody, or control relating to Defendants' direct and secondary infringement of the Copyrighted Works." *Id.*

A party seeking a permanent injunction must show: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of the hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.*, 762 F.3d 867, 879 (9th Cir. 2014) (citations omitted). The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

The Court finds that Plaintiffs have satisfied all four required elements. First, as previously discussed, Plaintiffs have shown that they are entitled to judgment on their Copyright claims. Indeed, the allegations set forth in the SAC imply that any continuing infringement of Plaintiffs' exclusive rights over their Copyrighted Works will likely cause harm to Plaintiffs' business model, reputation and standing in the marketplace and undermine the value of the Works. *See* Mot. at 23–24. Second,

monetary damages will fail to provide Plaintiffs with full compensation for the Nitro Defendants' infringement. Indeed, as Plaintiffs point out, the Nitro Defendants have either failed to appear in this action or have engaged in spoliation of evidence, making it nearly impossible for Plaintiffs to grasp the full scope of the Nitro Defendants' infringement. *See id.* at 24. It is thus nearly impossible for Plaintiffs to request monetary damages that will provide full compensation for the harm caused. Third, the balance of hardships tips in Plaintiffs' favor. Again, the Court has found Plaintiffs' claims meritorious. There is no evidence that any defendant will suffer any hardship upon entry of a permanent injunction. Instead, the evidence in the SAC and record indicates that the Nitro Defendants will likely attempt to continue their infringing acts or further stonewall Plaintiffs'—or any other harmed party's—attempts to receive adequate relief. *See* Supplemental Brief at 24–25; *see generally* R&R. Finally, as to public interest, the Supreme Court has held that copyright protections give creators the incentive to share their creations with the public. *See Sony Corp. of Am. v. Universal City Studios, Inc.*, 3464 U.S. 417, 429 (1984) (holding, on a motion for an injunction, that the goal of granting copyright protection to an author or artist is to "motivate the creative activity of authors and inventors by the provision of a special reward, and to allow the public access to the products of their genius after the limited period of exclusive control has expired.").

Accordingly, the Court concludes that Plaintiffs are entitled to a permanent injunction.

### PLAINTIFFS' MOTION FOR TERMINATING SANCTIONS AND ENTRY OF JUDGMENT

By their Motion for Terminating Sanctions and Entry of Judgment, Plaintiffs seek terminating sanctions against Alex Galindo and statutory damages against Alex Galindo in the same amount as sought against the Defaulted Defendants.

Plaintiffs, in support of their Motion for Terminating Sanctions and Entry of Judgment against Alex Galindo, have provided supplemental briefing in support of their requests for entry of the following relief: (1) "imposition of the maximum statutory damages per each Copyrighted Work infringed"; (2) "an award of $51.6 million in statutory damages"; and (3) requests for entry of a permanent injunction and post-judgment interest. *See* Supplemental Brief at 9–25.

Finally, Plaintiffs also request that the Court award $51.6 million in statutory damages, permanent injunction and post-judgment interest. Supplemental Brief at 18–25. Plaintiffs' arguments as to these requests are similar—if not identical—to their requests for the same relief as to the Defaulted Defendants. Accordingly, the Court grants the requested awards on the same bases as those previously discussed. *See supra* Motion for Default Judgment, Section IV.C.iii.1–2; *id.* V.A.

## **CONCLUSION**

For the reasons stated herein, the Court hereby GRANTS Plaintiffs' Motion for Default Judgment as to the Defaulted Defendants and GRANTS Plaintiffs' requested entry of judgment as to Alex Galindo. The Court ORDERS as follows:

1) Plaintiffs are entitled to statutory damages in the amount of $51.6 million for which all Nitro Defendants shall be held jointly and severally liable;

2) Plaintiffs are entitled to a permanent injunction;

3) Plaintiffs are entitled to post-judgment interest.

A Judgment order will follow.

IT IS SO ORDERED.

Dated: November 18, 2022          _____

MAAME EWUSI-MENSAH FRIMPONG

United States District Judge